# In the United States Court of Federal Claims

No. 06-465C
(Filed August 11, 2009)

| | |
|---|---|
| * * * * * * * * * * * * * * * * * * * * *  * | |
| | * |
| **THE LIQUIDATING TRUSTEE** * | Contracts, summary judgment; |
| **ESTER DUVAL OF KI** * | RCFC 56(c); counterclaim for |
| **LIQUIDATION, INC., f/k/a KULLMAN** * | fraud; False Claims Act, 31 |
| **INDUSTRIES, INC.,** * | U.S.C. §§ 3729(a)(1), (b)(1) |
| * | (2006); 28 U.S.C. § 2514 |
| Plaintiff, * | (2006); burden of proof on fraud |
| * | claims. |
| v. * | |
| * | |
| **THE UNITED STATES,** * | |
| * | |
| Defendant. * | |
| * | |
| * * * * * * * * * * * * * * * * * * * * *  * | |

L. James D'Agostino, Greenberg Traurig, LLP, McLean, VA, for plaintiff.

Devin A. Wolak, Washington, DC, with whom was Assistant Attorney General Tony West, for defendant. John C. Sawyer and Thomas D. Dinackus, U.S. Department of State, of counsel.

### MEMORANDUM OPINION AND ORDER

**MILLER**, Judge.

Before the court after argument are defendant's motion for partial summary judgment and the parties' cross-motions and motion for summary judgment. Defendant moves to dismiss the complaint based on the affirmative defense that plaintiff's claim is barred by fraud for submitting false claims and statements. Defendant asserts two counterclaims for penalties and forfeiture due to the alleged fraud. Plaintiff cross-moves for judgment in its favor on the counterclaims due to the Government's total failure of proof. As the Government's counterclaim was the subject of a voluntary bankruptcy petition filed under Chapter 11 on October 17, 2005, plaintiff also contends that the Government's fraud

counterclaims are not applicable to the beneficiaries of a liquidation trust created pursuant to the findings of the bankruptcy court.

## FACTS

The following facts are undisputed, unless otherwise noted.  The Department of State (the "DOS"), Overseas Building Operations (the "OBO"), on July 12, 2002, awarded Contract No. SALMEC-02-C-0025 (the "Contract") to Kullman Industries, Inc. ("Kullman").  1/  The Contract was for the design and construction of a new U.S. Embassy in Dushanbe, Tajikistan (the "Embassy").  The total contract price was anticipated to total $63,740,520, as of the award date.

This project differed from a traditional construction project in that a substantial portion of the work was performed off-site in the United States.  Kullman manufactured modules for the Embassy at its factory in New Jersey and then installed the modules on-site in Dushanbe.  The payment procedures under the Contract required the contractor to submit monthly applications for progress payments subsequent to the completion of work.  Part 1.3(B)(1) under Section 01200 (Payment Procedures) of the Contract stated, in part:

> The **Schedule of Values** is a tabulation of cost-loaded work elements or activities as defined in the Contractor's project execution schedule to include all design, construction, and all other cost elements of the project. The **Schedule of Values** shall segregate major project elements to reflect design and construction costs for each major building and area of the project.

The parties dispute, and defendant characterizes as irrelevant to this motion, whether the Contract included geotechnical work related to the design and construction of the Embassy.  Def.'s Resp. to Pl.'s Corr. Prop. Findings of Uncontr. Fact No. 8, filed June 19, 2009.  As evidenced by an e-mail dated June 18, 2003, from Catherine Wilkins, Project Manager for the DOS, to Contracting Officer Ralph Sutherland, Kullman did not interpret the Contract as including geotechnical work and was "preparing a pricing proposal to be negotiated"; however, the DOS disagreed and expected Kullman to proceed without delay.  Pl.'s App. Tab 8 at 2.  Plaintiff contends that it reallocated funds from transportation in the schedule of values to perform the geotechnical work and continue performance on the Contract.

---

1/ Plaintiff is the liquidation trustee for Kullman Industries, Inc.  The contractor was Kullman.

Sometime in or around 2003, Kullman began to develop serious cash flow problems due to delays caused by the DOS and non-payment of work relating to "certification, transportation, and geotechnical work." Pl.'s Corr. Prop. Findings of Uncontr. Fact No. 11, filed May 5, 2009.  Plaintiff asserts that Kullman communicated to the DOS that it was experiencing cash flow problems, which were affecting Kullman's ability to pay its subcontractors, but that the DOS did not address the issue. Id. No. 12 (citing Tab 16 at 5 (e-mail dated May 7, 2004, from John J. Lefkus III, Vice President and Chief Operations Officer ("COO"), to Walter Cate stating that Mr. Lefkus called DOS multiple times and did not receive response), Tab 16 at 6 (May 28, 2004 e-mail from Mr. Lefkus to Mr. Cate noting that lack of communication is complicating further the situation between DOS and Kullman)).  Defendant deems plaintiff's assertion irrelevant, and defendant also directly controverts plaintiff's proposed fact by citing to several communications between the parties regarding the issues that Kullman allegedly faced with delays and non-payment of work. Def.'s Resp. to Pl.'s Corr. Prop. Findings of Uncontr. Fact No. 12  (citing Pl.'s App. Tab 13 at 1 (letter dated Nov. 12, 2003, denying Kullman's request for equitable adjustment claim), Tab 14 (Dec. 3, 2003 e-mail from Alan Rand, Vice President, to Contracting Officer Sutherland discussing meeting held between parties regarding disputed contract issues)). 2/

Section G, Clause G.5 of the Contract stipulates:

> The Contractor shall submit with the request for payment a certification that the Contractor has (a) made full payment from the proceeds of prior payments, and (b) that he will make timely payment from the proceeds of the progress or final payment for which request is being made, to his subcontractors and suppliers in accordance with the Contractor's contractual arrangements with them.

Pl.'s App. Tab 17 at 1.  The General Administrative Procedures for the Contract specified that progress payments should be submitted after completing the work; should be substantiated by "progress report submittals," accurately coordinated with the schedules of values; and should be consistent with previous payment applications. Id. Tab 3 at DA14. Clause G.7.3 obligates the contractor to timely pay its subcontractors and suppliers from the

---

2/ Defendant attributes plaintiff's financial woes to "all of its contracts, decisions by management, and other financial endeavors."  Def.'s Resp. to Pl.'s Corr. Prop. Findings of Uncontr. Fact No. 12.  Moreover, defendant reminds that plaintiff must establish that its business was sound before it can allocate blame to the DOS for Kullman's inability to pay its subcontractors. Id. (citing Servidone Constr. Corp. v. United States, 931 F.2d 860, 861 (Fed. Cir. 1991) (discussing total-cost method in computing contractor's damages)).

"proceeds of the progress or final payment for which request is being made . . . ." Id. Tab 17 at 2.

It was the parties' practice in administering the Contract that Kullman submitted progress payment requests or "invoices" to the DOS for work performed during a calendar month.  An invoice submitted by Kullman to the DOS contained line items that corresponded with a named task, and, post-Invoice No. 12998 (billed for the month of January 2004), Kullman provided alphanumeric codes that represented tasks performed pursuant to the Contract.  Plaintiff asserts that the DOS did not pay many of the progress payments submitted for work performed.  Defendant directly contradicts this assertion, stating that the DOS "made the appropriate progress payments, for the work [Kullman] accomplished each month, as required by the contract."  Def.'s Resp. to Pl.'s Corr. Prop. Findings of Uncontr. Fact No. 19 (citing Declaration of Alvin Brown, Chief of the Domestic Liaison Center, Global Financial Services, Financial Operations for the DOS, Nov. 5, 2008, at 1-3) (This declaration merely evidences that some payments were disbursed to Kullman, but not that the DOS satisfied all payment obligations under the Contract.)).

Section G, Clause G.7 of the Contract, incorporates by reference 48 C.F.R. (FAR) § 52.232-5 (2002), which addresses payments made under fixed-priced construction contracts.  The relevant provisions of FAR 52.232-5 read, as follows:

> (b) Progress payments. The Government shall make progress payments monthly as the work proceeds, or at more frequent intervals as determined by the Contracting Officer, on estimates of work accomplished which meets the standards of quality established under the contract, as approved by the Contracting Officer.
>
> . . . .
>
> (c) Contractor certification. Along with each request for progress payments, the Contractor shall furnish the following certification, or payment shall not be made: (However, if the Contractor elects to delete paragraph (c)(4) from the certification, the certification is still acceptable.)
>
> I hereby certify, to the best of my knowledge and belief, that--
>
> (1) The amounts requested are only for performance in accordance with the specifications, terms, and conditions of the contract;

(2) All payments due to subcontractors and suppliers from previous payments received under the contract have been made, and timely payments will be made from the proceeds of the payment covered by this certification, in accordance with subcontract agreements and the requirements of chapter 39 of Title 31, United States Code;

(3) This request for progress payments does not include any amounts which the prime contractor intends to withhold or retain from a subcontractor or supplier in accordance with the terms and conditions of the subcontract; and

(4) This certification is not to be construed as final acceptance of a subcontractor's performance.

Section (d) also provides that, if the contractor realizes after submitting a certified request that the request does not comply fully with the contract, the contractor must notify the contracting officer and is obligated to pay interest on any unearned payments received and held for more than eight days.  Lastly, under FAR 52.232-5(e), the contracting officer is authorized to withhold up to 10% of the payment amount if she determines that the contractor has not performed the work satisfactorily.

Clause G.7.4 "Evaluation by the Contracting Officer" anticipates that, after the contractor submits a payment request, the contracting officer should determine the amount due, based on "his/her opinion."  See Def.'s App. at 10.  If the full amount is not paid to the contractor, the contracting officer must provide an explanation.  In addition to the amount of money that the DOS withholds by right from the contractor, the DOS can withhold payment if necessary to cover amounts due to the contractor's employees, subcontractors, and suppliers.  The Contract explicitly incorporates multiple FAR provisions to the Contract, Def.'s App. at 11, including FAR 52.232-27, which addresses "Prompt payment for construction contracts," id. at 13.

Plaintiff states that the amount that Kullman would pay subcontractors and suppliers was based on the invoices that the subcontractors submitted to Kullman.  Plaintiff explains that the subcontractors billed Kullman for direct and indirect costs.  Defendant counters that, although Kullman primarily paid its suppliers based on items invoiced, Kulllman paid its subcontractors through progress payments using a schedule of values similar to the payment vehicle employed by the Contract.  Def.'s Resp. to Pl.'s Corr. Prop. Findings of Uncontr. Fact No. 17 (citing Deposition of Robert Kullman, June 13, 2008, at 220, 229-30; Def.'s Suppl. App. at 142-44).

Prior to receiving payment for work performed under the Contract, the contractor was required to certify that the amount requested represents work performed pursuant to the terms of the Contract and that "payments to subcontractors and suppliers have been made from previous payments received under the contract, and timely payments will be made from the proceeds of the payment covered by the certification . . . ." 31 U.S.C. § 3903(b)(1)(B)(ii) (2006).  The contractor was enjoined not to include in its payment application any portions of payments that it intends on retaining from the subcontractor or supplier.  Id. § (b)(1)(B)(iii).

The DOS paid twelve of the first thirteen invoices that Kullman submitted for payment.  Kullman Dep. at 20; see also Def.'s Supp. App. at 113-14 (rejected eleventh invoice, Invoice No. 12797, which was resubmitted as twelfth and paid).  By facsimile transmission dated November 14, 2003, Eduardo R. Gaarder, Chief, European and Eurasian Branch, Construction and Commissioning Division for the DOS, sent Mr. Rand and Michael S. Ross two sample templates containing language for the certifications that Kullman should have included on its previous payment requests.  Mr. Gaarder followed up with an e-mail of the same date stating that the parties can work out the exact language of the certification before Kullman submits its next pay request.  Plaintiff relegates this e-mail to evidence of the DOS's "lack of concern or consistency when addressing the inclusion of certification language."  Pl.'s Resp. to Def.'s Prop. Findings of Uncontr. Fact No. 18.

The certification language eventually employed by Kullman, beginning with Invoice No. 12854, dated November 30, 2003, read:

> The undersigned Contractor certifies that to the best of the Contractor's knowledge, information and belief the Work covered by this Application for payment has been completed in accordance with the Contract Documents, that all amounts have been paid by the Contractor for Work for which previous Certificates for Payment were issued and payments received from the Owner, and that current payment shown herein is now due.

See Def.'s App. at 64.  Kullman included this certification language in Invoice Nos. 12854, 12887, 12997 (original version), 3/ 12998, 13023, and 13032 (original and revised forms), which covered work performed between November 2003 through February 2004.  Id. at 64

---

3/  After the DOS rejected Invoice No. 12997, Kullman resubmitted the revised invoice without the certification language.  Plaintiff explains that Kullman did not include the certification on revised Invoice No. 12997 because the language was included in the original.  Pl.'s Resp. to Def.'s Prop. Findings of Uncontr. Fact No. 19.

(Nov. 30, 2003), 67 (Dec. 31, 2003), 69 (Feb. 16, 2004), 71 (Jan. 31, 2004), 25 (Feb. 29, 2004), 28 (Feb. 29, 2004), 76 (Feb. 29, 2004).

For Invoice Nos. 13057, 13056, 13093, and 13127, billed for the periods covering March through May 2004, the font type and size of the certifications were inconsistent and distorted. By letter dated April 24, 2004, Ms. Wilkins contacted Mr. Rand, Kullman's official who primarily executed the invoices, stating that Invoice No. 13057 had a few "minor" issues. One was that the "certification of payments to sub-contractors appear[ed] to be formatted using different sizes of type fonts," causing several words to be "obliterat[ed]" when the document was printed. Id. at 24. She advised that this error was not significant enough to deny the invoice, but encouraged Kullman to correct the problem on its future invoices. This issue concerning the certifications did not occur again in any of the subsequent invoices, and Kullman then changed the certification to the following:

> I hereby certify that, to the best of my knowledge and belief, that –
> (1) The amounts requested are only for performance in accordance with the specifications, terms, and conditions of the contract
> (2) All payments due to subcontractors and suppliers from previous payments received under the contract have been made, and timely payments will be made from the proceeds of the payment covered by this certification, in accordance with subcontract agreements and the requirements of chapter 39 of Title 31, United States Code;
> (3) This request for progress payments does not include any amounts which the prime contractor intends to withhold or retain from a subcontractor or supplier in accordance with the terms and conditions of the subcontract; and
> (4) This certification is not to be construed as final acceptance of a subcontractor's performance.

Id. at 91.

According to defendant, Mr. Rand was the senior Kullman "official who was responsible for the contract from the time he joined Kullman through the termination of the contract. During the time he was responsible for the contract, Mr. Rand was responsible for ensuring that the invoices Kullman submitted to the Government on that contract were prepared properly." Def.'s Prop. Findings of Uncontr. Fact No. 25. Plaintiff counter-proposes that Mr. Rand shared responsibility for submitting invoices with other employees,

such as Mr. Lefkus; Stuart Freiman, Chief Financial Officer; John Cody Pearson, Sr. Vice President; and Michael Kozinski. 4/  See Deposition of Alan Rand, Aug. 27, 2003, at 61.

Once construction commenced on-site in Dushanbe, Kullman began submitting draft progress payment requests or "pencil copies" to the DOS for review in advance of submitting a formal request.  See Deposition of John Cody Pearson, Aug. 27, 2008, at 21; Rand Dep. at 61.  A pencil copy differed from a normal invoice insofar as the former prompted discussions and negotiations regarding line items, whereas a typical invoice was submitted without discussion. 5/  If the DOS found an error in a formal payment request, it would pay less than the full amount requested, so that the amount paid matched the value of work according to the schedule of values.  Sutherland Dep. at 20-22.  During the design stage of the project, payment was measured as a percentage of design that had been completed; thereafter, at the building stage, payment was measured based on the percentage of completion.  Id. at 20-21.

Belcor, Inc., was one of Kullman's suppliers for diesel tanks and related equipment for construction of the Embassy.  Declaration of Robert Bell, President of Belcor, Inc., Nov. 4, 2008, ¶ ¶ 5-6.  By Purchase Order No. 111592, dated February 23, 2004, Kullman ordered from Belcor equipment totaling $170,259.06 with a specified delivery date of June 30, 2004. Plaintiff faults defendant's assertion that Belcor supplied all the materials ordered under Purchase Order No. 111592, for lack of any evidence.  Pl.'s Resp. to Def.'s Prop. Findings of Uncontr. Fact No. 40; see Def.'s App. at 191-92 (letter from Mr. Bell to Lori Lowther, Contracting Officer for DOS, dated Jan. 13, 2005, discussing delayed payments for equipment delivered under Purchase Order No. 111592); 443-45 (Kullman's internal e-mails dated Jan. 10, 18, and 21, 2004, discussing past-due payments to Belcor and stating that Belcor was not going to deliver a fuel pipe until it gets paid and that additional equipment that was needed by Kullman from Belcor and, thus, that Kullman needed to pay Belcor to

---

4/  Defendant points to Mr. Rand's deposition testimony:  "I did not have a specific understanding [of the implications of signing the certifications and invoices] other than the government paid Kullman money on this project and money was used to pay vendors and subcontractors, and I am told that more money was paid out on this project by Kullman than what came in."  Deposition of Alan Rand Aug. 27, 2003, at 57.  Defendant surmises that ultimately it does not have to prove that Mr. Rand was "personally culpable" for falsely certifying invoices, as it is plaintiff's responsibility not to submit false claims to the Government.  Def.'s Resp. to Pl.'s Corr. Prop. Findings of Uncontr. Fact No. 28.

5/  Defendant states that plaintiff does not provide any support for its assertion that certifications were executed after the parties negotiated the percentage of completion line items.

order more equipment); Rand Dep. at 123-24.   On January 21 and 27, 2005, Kullman executed two additional purchase orders – Nos. 118425 ($8,858.75) and 118502 ($1,878.00), respectively – with Belcor for additional equipment related to the Contract.

Kullman paid in full the first two invoices that Belcor sent to Kullman for the work supplies ordered under Purchase Order No. 111592. Bell Decl. ¶ 8; Def.'s App. at 176, 178. However, the third and fourth invoices that Belcor sent to Kullman dated August 9, 2004, and August 25, 2004, respectively, were not paid in part or in full until January 13, 2005. Def.'s App. at 181, 183. As of August 25, 2004, Kullman had a total outstanding balance of $98,975.90. Bell Decl. ¶ 8.

By letter dated December 27, 2004, Mr. Bell contacted Andy Linkowsky in Kullman's purchasing department stating, in part, that

> Belcor, Inc. has two invoices outstanding on this project totaling $98,975.90 (copies attached), both of these are now out 120 days with no payment received.  The terms on []your PO clearly state "Net 30".
>
> Numerous calls to Kullman by Belcor have gone unanswered.  No response, no call backs, no payments.  Belcor, Inc. is, as you know, a small business, and this lack of payment is creating undo financial hardship on our company.

Def.'s App. at 202.  On December 31, 2004, Mr. Linkowsky replied by e-mail that he had passed Belcor's letter on to Messrs. Rand and Freiman and had instructed Mr. Bell to contact Mr. Freiman directly if Mr. Bell did not receive a response within the next few days.  Id. at 204.  An e-mail dated January 10, 2005, from Mr. Freiman to Messrs. Pearson, Lefkus, and Kullman stated the following:

> As per our discussion on Saturday, we are sending Belcor 10M [$10,000.00] towards the 100M [$100,000.00] we owe them.  I spoke to Bob Bell of Belcor this morning to discuss the same.  Given that we are acknowledging the debt and are sending them 10M, he remained sane.

Id. at 443.  By letter dated January 13, 2005, Mr. Bell contacted Contracting Officer Lowther outlining the former's attempts to contact Kullman regarding the outstanding invoices.  Id. at 191-92.  Mr. Bell stated that he finally received a telephone call on January 11, 2005, from Mr. Freiman, who admitted to the "severe cash flow problems" that Kullman was having because the DOS was not paying Kullman.  Id. at 192.  Mr. Frieman acknowledged the outstanding debt and stated that he would send a $10,000.00 payment by no later than

January 12, 2005.  Id.  Contracting Officer Lowther, in turn, contacted Kullman by letter dated February 3, 2005, recapitulating Kullman's duties under FAR 52.232-27 timely to pay its subcontractors and to provide notice to the DOS if it withheld payments for "services provided."  Id. at 42-43.  Kullman did not reply to Contracting Officer Lowther's letter, explaining that "[w]ithholding would infer [sic] that [Kullman] had been paid funds earmarked for Belcor. It has not been so paid."  Pl.'s Resp. to Def.'s Prop. Findings of Uncontr. Fact No. 61.

From January 13, 2005, through April 19, 2005, Kullman made six payments to Belcor totaling $50,000.00.  Bell Decl. ¶ 11.  Kullman ordered and Belcor supplied Kullman with more equipment between February 8, 2005, and July 25, 2005, which was billed under Invoice Nos. 34073 ($9,475.97), 34087 ($465.00), and 34230 ($1,953.00). 6/ As of July 25, 2005, the last dated invoice, Kullman owed Belcor a total of $60,869.87 net amounts billed and paid.

On June 24, 2005, Mr. Bell contacted Mr. Rand by e-mail stating, "I e-mailed you a week or two ago. No response, no payments."  Def.'s App. at 211.  Mr. Bell reiterated Belcor's need to receive a "significant payment" from Kullman, warning that Belcor would have to go to the DOS if payment were not received soon.  Id.  Mr. Rand responded on the same date that he was sympathetic to the situation, but was unable to help as the payment decisions are made by the senior management team.  Id. at 213.  Mr. Bell replied the following date requesting from Mr. Rand a contact that could help him solve the situation if Mr. Rand did not have the power to do so.  Id.  By letter dated August 12, 2005, Belcor (through legal counsel) informed Kullman that it would take legal action if Kullman did not pay (or make satisfactory arrangements for paying) Belcor $60,869.87 within ten days.  Id. at 215.

Plaintiff maintains that the reason Kullman had difficulty paying Belcor is because of delays and non-payment from the DOS.  Defendant controverts this statement pointing to line item STF 1074 "Fab Fuel tanks, piping & ship to port" for $435,074.00 billed for 50% of the total on Invoice No. 13220 for the month of August 2004, id. at 99, and 50% on Invoice 13386 for the month of November 2004, id. at 109. 7/  The DOS, OBO approved

---

6/  It appears that Kullman was on a credit hold with Belcor as early as January 18, 2005, but needed to order more equipment in order to continue working on the project.  This need by Kullman appears to have been the impetus behind creating the payment plan.  See Rand Dep. at 123-24.

7/ This invoice contained the second certification language used by Kullman, which replicates the language in FAR 52.232-5(c)(1)-(4).  See Def.'s App. 123.

both of these invoices for full payment on August 31 and December 21, 2004, and payments were deposited in Kullman's account at Unity Bank on October 14, 2004, and January 6, 2005, respectively.

Defendant asserts that this is the only item for which Kullman properly could have billed the DOS for the materials that Belcor supplied to Kullman.  Def.'s Prop. Findings of Uncontr. Fact No. 63 (citing Decl. of Thomas M. Farley, Aug. 15, 2008, ¶ 9); see also Def.'s App. 223-25 (invoices Belcor billed Kullman) and 230-46 (invoices Kullman billed DOS). Plaintiff rejoins that this line item could constitute any number of things, as none of the line items represents one specific subcontractor.  See Kullman Dep.  at 33.

On June 17, 2005, the DOS terminated Kullman's Contract for default.  Shortly thereafter, on October 17, 2005, Kullman filed a voluntary petition for bankruptcy under Chapter 11 in the United States Bankruptcy Court for the District of New Jersey.  See In re K.I. Liquidation, Inc., Bankr. No. 05-60002, 2007 WL 4365308 (Bankr. D.N.J. Dec. 12, 2007).

On June 16, 2006, plaintiff filed its complaint in the United States Court of Federal Claims seeking to convert the termination of the Contract for default into a termination for convenience and alleging that the DOS, OBO improperly terminated Kullman's Contract for default.  Compl. filed June 16, 2006, at 1.  Before defendant filed its answer, plaintiff amended its complaint, only changing the language used in its request for relief.  Am. Compl. filed Nov. 13, 2006, at 14.

On June 19, 2007, defendant filed its answer asserting fraud as an affirmative defense and as two counterclaims: fraud under the False Claims Act, 31 U.S.C. §§ 3729(a)(1), (a)(2) (2006) (the "FCA"), and for forfeiture of all of plaintiff's claims pursuant to the Forfeiture and Fraudulent Claims Act, 28 U.S.C. § 2514 (2006).  Answer and Countercl. ¶¶ 145-150. Defendant asserts that the factual basis of the claim under the FCA stems from Kullman's falsely representing that it paid Belcor for supplies in order to receive full payment from the DOS.  Kullman had an affirmative obligation under 31 U.S.C. § 3903(b)(1)(B),  FAR 52.232-5(c), and Section G, Clause G.5 to certify the progress payments that it submitted to the DOS.  Answer and Countercl. ¶¶ 103-06.  Furthermore, Kullman was required under FAR 52.232-27, which was incorporated into the Contract, to provide the DOS with notice if it was withholding funds due to subcontractors and suppliers.  Id. ¶¶ 111-13.

Defendant moved for summary judgment on November 7, 2008.  Defendant predicated the relief sought on the factual assertion that Kullman falsely certified that it had paid its "subcontractors and suppliers in the monthly progress payment requests" that were submitted to the DOS.  Def.'s Br. filed Nov. 7, 2008, at 1 (citing 28 U.S.C. § 2514).

11

Defendant also moved, in the alternative, for partial summary judgment, contending that because Kullman's false certifications violated 31 U.S.C. §§ 3729(a)(1), (2), the court should dismiss Kullman's challenge to the termination of its Contract for default and assess statutory penalties against Kullman for each violation of the FCA.  Plaintiff cross-moved for summary judgment on April 21, 2009, arguing that defendant is not entitled to summary judgment because 1) the four certifications that allegedly are false, contained in Invoice Nos. 13442, 13493, 13561, 13647, were "[l]iterally [t]rue," Pl.'s Cross-Mot. for Summ. J., filed Apr. 21, 2009, at 9; and 2) Kullman did not possess the intent to deceive because the DOS had knowledge that Kullman was having cash flow problems and consequently could not pay all of its subcontractors in full, id. at 13.  Plaintiff also states that defendant is unable to prevail on summary judgment as the forfeiture statute cannot apply to defeat the claims of the liquidation trust's beneficiaries.  Pl.'s Br. filed Apr. 21, 2009, at 21.  Briefing was completed on July 10, 2009.

## DISCUSSION

I. Motions for partial summary judgment and summary judgment

   1. Standard of review

RCFC 56(c) allows the court to grant a motion for summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  The benefit of all presumptions and factual inferences runs in favor of the non-moving party when a court reviews a motion for summary judgment, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986), and the party moving for summary judgment bears the initial burden of demonstrating the absence of genuine issues of material fact, Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  To combat a movant's proposed absence of material fact, a respondent must establish that there is a genuine issue of material fact, beyond some "metaphysical doubt," that is a "genuine issue for trial." Matsushita, 475 U.S. at 586-87 (quotations omitted).

The substantive law determines which facts are material, and "[a]ny proof or evidentiary requirements imposed by the substantive law are not germane to this inquiry." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The inquiry as to materiality is critical to the court only when categorizing the factual disputes relevant to the substantive claims supporting the moving party's motion for summary judgment.  Id.  Therefore, when establishing entitlement to judgment as a matter of law, the movant must present material facts to support the legal elements of its claim.

When cross-motions for summary judgment are presented, the court evaluates each motion on its own merits and resolves all doubts and inferences against the party whose motion is being considered. Mingus Constructors Inc. v. United States, 812 F.2d 1387, 1390-91 (Fed. Cir. 1987). The court will deny both motions if, upon the required analysis, a genuine issue of material fact exists. Id.

The non-moving party is not required to produce affidavits or other evidence to defeat a summary judgment motion. See Zenith Elecs. Corp. v. PDI Commc'n Sys., 522 F.3d 1348, 1363 (Fed. Cir. 2008). Plaintiff moved on the ground that defendant has not satisfied its burden on summary judgment. Although plaintiff is not required to come forward with evidence to survive defendant's motion for summary judgment, id., plaintiff cannot prevail by merely controverting defendant's proffered facts with exiguous showings or conclusory statements of fact, see Young-Montenay, Inc. v. United States, 15 F.3d 1040, 1042 (Fed. Cir. 1994) (stating that plaintiff's proffer of conclusory, speculative affidavits cannot raise genuine issue of material fact on summary judgment against defendant's forfeiture claim); see also Sitrick v. Dreamworks, LLC, 516 F.3d 993, 1001 (Fed. Cir. 2008) (noting that conclusory expert assertions used by plaintiff to controvert facts asserted by defendant for establishing patent invalidity by clear and convincing evidence are not sufficient to raise triable issues of material fact on summary judgment). The court concludes that plaintiff has not submitted evidence that establishes defendant's lack of entitlement to summary judgment; specifically, plaintiff has not provided sufficient facts to establish that the four allegedly false certifications were "literally true," plaintiff has not shown that defendant cannot prove intent, and plaintiff has not provided sufficient facts (or law) to establish that defendant cannot defeat the claims of the liquidation trust's beneficiaries. See Pl.'s Cross-Mot. for Summ. J., filed Apr. 21, 2009, at 9, 13; Pl.'s Br. filed Apr. 21, 2009, at 21.

2. Fraud and forfeiture under 28 U.S.C. § 2514 and fraud and false claims under 31 U.S.C. § 3729

Defendant pleads fraud as both an affirmative defense against plaintiff's claims and as a counterclaim, seeking forfeiture pursuant to 28 U.S.C. § 2514 and civil penalties for the knowing presentation of false certifications to the DOS, 31 U.S.C. § 3729(a)(1)(G). See Answer and Countercl. ¶¶ 145-50. Section 2514 is titled "Forfeiture of Fraudulent Claims" and often is referred to as "a" or "the" "forfeiture statute." It provides, in full:

A claim against the United States shall be forfeited to the United States by any person who corruptly practices or attempts to practice any fraud against the United States in the proof, statement, establishment, or allowance thereof.

In such cases the United States Court of Federal Claims shall specifically find such fraud or attempt and render judgment of forfeiture.

28 U.S.C. § 2514.

The statutory forfeiture contemplated by 28 U.S.C. § 2514 is broad. The United States Court of Claims held that, upon a finding that claims are based on "a contract under which [a contractor] practiced fraud against the Government," as defined by this statute, "all of [a contractor's] claims under that contract will be forfeited pursuant to 28 U.S.C. § 2514." Little v. United States, 152 F. Supp. 84, 88 (Ct. Cl. 1957). The statutory language has been construed as proscribing fraud in the prosecution of claims against the United States, not fraud in the performance of the contract. See Baird v. United States, 76 Ct. Cl. 599, 610-13 (1933) (predecessor statute to 28 U.S.C. § 2514 with same operative language does not apply to fraud of subcontractor in performance of contract). In order to prevail on its counterclaim asserting forfeiture pursuant to 28 U.S.C. § 2514, defendant "'is required to establish by clear and convincing evidence that the contractor knew that its submitted claims were false, and that it intended to defraud the government by submitting those claims.'" Glendale Fed. Bank, FSB v. United States, 239 F.3d 1374, 1379 (Fed. Cir. 2001) (quoting Commercial Contractors, Inc. v. United States, 154 F.3d 1357, 1362 (Fed. Cir. 1998)); see also Daewoo Eng'g & Constr. Co. v. United States, 557 F.3d 1332, 1341 (Fed. Cir. 2009).

A false claim under 31 U.S.C. § 3729(a)(1)(A) inculpates any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." Defendant has the burden of establishing that the contractor violated the FCA by a preponderance of the evidence. Daewoo Eng'g, 557 F.3d at 1340. "Knowingly" is defined as "actual knowledge of the information" or actions by the contractor manifesting "deliberate ignorance" or "reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A)(i)-(iii). Defendant is not required, however, to provide proof of specific intent. Id. § 3729(b)(1)(B). To recover damages under the FCA, the Government must establish that it suffered damages as a result of the fraudulent claim. Young-Montenay, 15 F.3d at 1043 (noting that absent proof of harm Government can recover penalties, but not damages under FCA). 8/

---

8/ Defendant is not seeking damages, but only the assessment of penalties under the FCA. See Ans. and Countercl. ¶ 147. Section 3729(a)(1)(G) contemplates damages only upon a showing by the Government that harm or damages resulted from the culpable conduct and renders a person found in violation of the FCA

Defendant charges that Kullman violated 28 U.S.C. § 2514 by submitting four invoices, Invoice Nos. 13442, 13493, 13561, and 13647 (covering monthly billing periods from January through April 2005) that falsely certified that Kullman had paid Belcor when, in fact, it had not.  Relying on the Farley Declaration, defendant argues that the only line item on the schedule of values that properly could reflect the work provided by Belcor to Kullman is line item STF 1074.  9/  Def.'s Br. filed June 19, 2009, at 16 (citing Farley Decl. ¶ 9).  Mr. Farley states: "During my time on site, the requests for payment were reviewed by my staff for accuracy and then reviewed with Kullman prior to approval."  Farley Decl. ¶ 5.  In reviewing Invoice No. 13647, Mr. Farley concluded that, "[b]ased on my professional experiences and expertise, and my experience on-site when I was the project director for this project, there is only one line item in this invoice that fairly describes the work Belcor performed on this project: 'STF 1074, Fab fuel tanks, piping & ship to port.'"  Farley Decl. ¶ 9.

Defendant submits that the DOS paid Kullman $435,074.00, which is the total amount billed for line item STF 1074 in two payments: 1) 50% of the total on Invoice No. 13220 for the month of August 2004; and 2) 50% on Invoice 13386 for the month of November 2004.  By May 12, 2005, when Invoice No. 13647 was submitted to the DOS, Kullman had made only partial payment to Belcor and still owed its supplier approximately $58,000.00, but nonetheless had certified to the DOS that it had made "[a]ll payments due to subcontractors

---

8/  (Cont'd from page 14.)

liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains because of the act of that person.

The penalties are adjusted for inflation to $5,500 and $11,000, respectively.  Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. No. 101-410, § 5, 104 Stat. 890, 892 (1990).

9/  Although Mr. Farley has extensive experience working at the DOS as a Construction Engineer, he only intermittently served – August through November 2004, and August through November 2005 – as the Project Director for the Contract during time periods relevant to this litigation.  Farley Decl. ¶ 4.

and suppliers from previous payments received under the contract." 10/ Def.'s App. at 114, 117, 120, 123.

Plaintiff responds by invoking the plain meaning of the certification language and by attacking the veracity of defendant's evidence. First, plaintiff argues that the invoices that Kullman certified were "literally true" when they were signed. Pl.'s Br. filed July 10, 2009, at 4. Plaintiff emphasizes the word "received." Kullman paid its subcontractors and suppliers all of the payments that it received from the DOS; indeed, this assertion, plaintiff argues, is obvious from the facts, as Kullman was driven into bankruptcy.

Second, plaintiff objects to defendant's evidence – the Farley Declaration and the schedule of values – that purports to establish that Belcor's invoiced supplies are attributable only to line item STF 1074. Plaintiff explains that the schedule of values is not a line-for-line item match between the amounts billed to the DOS and the suppliers' work orders. The DOS made progress payments to Kullman based on the percentage of work completed, and each line item reflects this method of payment. Pl.'s Br. filed July 10, 2009, at 7. Plaintiff cites to Mr. Kullman's deposition testimony that the money Kullman requested under each line item was related to the percentage of work completed on the project and not to the dollars invoiced by subcontractors and suppliers. Id. (citing Kullman Dep. at 141). Plaintiff finds support in Contracting Officer Lowther's testimony that the project manager and project director verified Kullman's invoices based on the proportion of the project completed for plaintiff's assertion that Kullman cannot trace Belcor's invoices to STF 1074 or any other specific line item. Pl.'s Br. filed July 10, 2009, at 7-8 (citing Deposition of Lori Lowther, Aug. 28, 2008, at 50).

Plaintiff also cites to In re K.I. Liquidation, 2007 WL 4365308 at *6, stating that the U.S. Bankruptcy Court "held" that Mr. Kullman did not receive the money paid on the Contract with "'an intention to avoid paying sub-contractors.'" Pl.'s Br. filed July 10, 2009, at 6 n.5. The bankruptcy court did not make this finding. The language quoted merely distinguishes the facts in K.I. Liquidation from the facts in Reliance Ins. Co. v. Lott Group, Inc., 851 A.2d 766 (N.J. Super. App. Div. 2004), a case cited by the party-plaintiff Coronation Sheet Metal, Inc. Coronation offered Reliance as support for its argument that Mr. Kullman violated his trust obligation by indiscriminately paying subcontractors from

---

10/ Defendant also invokes the Prompt Payment Act, 31 U.S.C. § 3905(d) (2006), which was incorporated into the Contract through FAR 52.232-27, as authority that Kullman was required by statute to provide the DOS with notice if the contractor was withholding payment from Belcor. However, § 3905(d) contemplates withholding payment, not nonpayment based on a professed inability to pay.

intermingled funds held in a general bank account.  The bankruptcy court discerned that in Reliance "[t]he account in question was not a general bank account and the funds diverted from it were done so with an intention to avoid paying the sub-contractors." Id. at *6.  The court noted that evidence of such intention did not exist in the matter of K.I. Liquidation. Id. at *6-7.

Finally, plaintiff assails defendant's evidence as offering no support for a finding that Kullman possessed the requisite intent to deceive or defraud the DOS, pointing to numerous instances where Kullman alerted the DOS that it was having cash flow issues and that "subcontractors [were] struggl[ing] with large outstanding balances for work that has been performed and approved."  Pl.'s Br. filed July 10, 2009, at 9 (quoting Pl.'s App. at Tab 14 at 1 (e-mail dated December 5, 2003 from Mr. Rand to Contracting Officer Sutherland recapitulating discussion held on December 3, 2003)).  A letter dated January 13, 2005, from Mr. Bell to Contracting Officer Lowther reveals that the DOS knew that Belcor was owed significant amounts of money for equipment delivered under Purchase Order No. 111592 and that on that same date Kullman made the first of six installments to discharge the debt owed to Belcor.  The letter states that Mr. Bell was contacting Contracting Officer Lowther "to confirm [his] phone messages" to her and recapitulated the actions taken by Mr. Bell to collect payment from Kullman.  Pl.'s App. Tab 47 at 2.  Mr. Bell informed Contracting Officer Lowther on January 11, 2005, that he finally spoke to Mr. Frieman, who informed Mr. Bell that Kullman was having "severe cash flow problems due to a lack of payment of funds by D.O.S." Id. at 3.  According to Mr. Bell, Mr. Frieman "acknowledged the full debt amount" and had promised to pay Belcor $10,000.00 by no later than January 12, 2005. Id. With the letter Mr. Belcor enclosed copies of a purchase order, invoices, a registered letter, and an e-mail response from Mr. Linkowsky.  Evidently, Contracting Officer Lowther followed up with Belcor, as she made a handwritten notation on January 13, 2005, that stated "per Bob Bell Kullman made a $10,000.00 payment to day [sic]." Id. at 1.

Defendant discounts any evidence that the DOS knew about Kullman's cash flow problems as irrelevant: the "government knowledge defense"11/ cannot disprove scienter because plaintiff has not shown that the DOS knew of the specific facts underlying the false

---

11/  During oral argument held on July 14, 2009, defendant cited to United States ex rel. v. Hughes Helicopter, 71 F.3d 321 (9th Cir. 1995), in support of its argument that the facts in the case at hand do not "even get under the umbrella of the government knowledge defense." Transcript of Proceedings, The Liquidating Tr. Ester DuVal of KI Liquidation, Inc. f/k/a Kullman Indus., Inc. v. United States, No. 06-465C, at 21 (Fed. Cl. July 14, 2009).  To be more precise, the "government knowledge defense" is not a defense after the 1986 amendment of the FCA; knowledge and its effect on defendant's ability to prove fraud under the FCA is an inquiry (often treated as an inference) that is made on a case-by-case basis. Hughes Helicopter, 71 F.3d at 326-27.

certifications, or that the DOS consented, acquiesced, or agreed to Kullman's actions relating to the false certifications. This defense, defendant continues, is only available when "the contractor was so completely candid, forthcoming and cooperative that the contractor cannot be said to have acted with the requisite scienter." Def.'s Br. filed June 19, 2009, at 25.

Defendant's case law, however, relates to FCA actions and does not foreclose discussion about whether the Government's knowledge impacts the ability to prove an intent to deceive. 12/ The cases do reflect specified criteria that a contractor must meet to rebut defendant's showing of intent under the FCA and emphasize that the impact of the Government's knowledge of the wrongdoing on proof of intent is a factual inquiry. See, e.g., United States ex rel. Burlbaw v. Orenduff, 548 F.3d 931, 952 (10th Cir. 2008) (stating on review of trial court's grant of summary judgment in *qui tam* action that "government knowledge inference" is not a defense and arises when government knows and approves of facts underlying FCA that contractor did not knowingly present false or fraudulent claim); Shaw v. AAA Eng'g & Drafting, Inc., 213 F.3d 519, 534 (10th Cir. 2000) (stating on review of jury verdict under FCA in favor of relator in *qui tam* action that some level of knowledge on part of Government can negate intent requirement under FCA); United States ex rel. Hagood v. Sonoma County Water Agency, 929 F.2d 1416, 1421 (9th Cir. 1991) (reversing trial court's dismissal of complaint, noting that knowledge may be relevant to rebut required mental state, but that such determination cannot be made on mere inspection of complaint).

Any facts raised on summary judgment that tend to controvert defendant's proffer of facts in support of its fraud claims frustrate defendant's attempt to establish the absence of material issues of fact for trial. The evidence that would negate the level of intent under the FCA, as opposed to the forfeiture statute, involves different findings of fact. The application of these facts should not be conflated, as the legal requirements of the statutes differ significantly: first, § 2514 requires an elevated burden of proof, i.e., clear and convincing evidence, Daewoo Eng'g, 557 F.3d at 1341, not a preponderance of the evidence standard as required by the FCA, see id. at 1340; second, § 2514 requires proof of the intent to deceive, whereas the FCA requires knowledge, a general-intent standard, and explicitly stipulates that proof of specific intent is not required, see 31 U.S.C. § 3729(b)(1)(B) (stating that "no proof of specific intent to defraud" is required); finally, the consequences of each – forfeiture of plaintiff's entire claim versus comparatively minimal penalties under the FCA – exemplify the perceived gravitas of the fraud under each statute.

---

12/ Defendant concedes that, although neither the Court of Federal Claims nor the United States Court of Appeals for the Federal Circuit directly has addressed the "government knowledge defense, [] some cases appear to acknowledge it." Def.'s Br. filed June 19, 2009, at 22 n.12; see supra note 11.

In <u>Young-Montenay</u> the United States Court of Appeals for the Federal Circuit discussed 28 U.S.C. § 2514 in the context of a motion for summary judgment. 15 F.3d at 1042. Plaintiff contracted with the Department of Veteran Affairs to renovate boilers at the Medical Center in Kerrville, Texas. <u>Young-Montenay, Inc. v. United States</u>, No. 90-3862C, 1993 WL 721993 at *1 (Fed. Cl. Jan. 6, 1993). The contractor received an invoice from its supplier, Keeler, for three burners in the amount of $104,000.00. The contractor anticipated a dispute with Keeler over approximately $49,000.00 and thus decided to delete, with correction fluid, the $104,000.00 billed and insert $153,000.00 as the total amount billed. <u>Id.</u> Plaintiff submitted the doctored invoice in support of its progress payment to the Government. <u>Id.</u> Plaintiff's project manager and representative at the pre-construction conference provided an "uncommonly candid and forthcoming" deposition by openly confessing to altering the invoice amount in an attempt to "'get up front money'" from the Government. <u>Id.</u> at *2 (citation omitted). The Federal Circuit upheld the lower court's ruling that plaintiff was liable under the forfeiture statute as a matter of law, noting that "[c]learly, no genuine issue of fact was shown, for there was virtually no evidence to the contrary, and the conclusory, speculative affidavits of two company officials cannot raise one." <u>Young-Montenay</u>, 15 F.3d at 1042.

### 3. <u>Analysis of the evidence under 28 U.S.C. § 2514</u>

Defendant's factual showing to establish its counterclaim under 28 U.S.C. § 2514 does not provide clear and convincing evidence that Kullman possessed the requisite level of intent to commit fraud against the Government. Plaintiff's proffer of and citation to numerous record documents informing the DOS that Kullman did not have enough money to pay its subcontractors and suppliers preclude defendant from establishing intent as a matter of fact and law. Moreover, defendant's proffered facts in support of the claim that a fraud actually was committed by Kullman are insufficient, as the inferences that defendant asks the court to draw from those facts are too attenuated: Kullman was paid all the money billed for line item STF 1074; line item STF 1074 was the only line item that included the amounts billed by Belcor and owed to this supplier for supplies; Kullman did not pay Belcor the full amount invoiced for supplies; therefore, Kullman knew that its submitted and certified invoices were false, and Kullman intended to defraud the DOS by submitting those claims in order to induce payment. Defendant cannot link inferences drawn from each proffered fact and offer the whole as clear and convincing evidence that Kullman committed fraud under 28 U.S.C. § 2514.

### 4. <u>Analysis of the evidence under 31 U.S.C. § 3729</u>

Regarding defendant's counterclaim under 31 U.S.C. § 3729, defendant has not shown that Kullman knowingly falsified invoices with the purpose of receiving payment. Plaintiff

makes a strong argument that Kullman adhered to the literal meaning of the certifications "when it expended all payments it received under the Contract from the Government, based on percentage of completion, to cover subcontractor and supplier invoices in addition to various other expenses such as overhead and profit consistent with" the Contract.  Pl.'s Br. filed July 10, 2009, at 5.  Plaintiff maintains that the interpretation of the certification language, and Kullman's adherence thereto, hinge on the term "received."  Kullman paid all the money that it received to its subcontractors and suppliers.  Defendant counters that the pivotal term is "all" and that, as a consequence, Kullman falsely certified that it had made "all payments" to Belcor when, in reality, it had not done so.  Defendant maintains that the meaning of the certification language is plain and that Kullman understood its meaning each time that the contractor submitted the certified progress payments.  Def.'s Br. filed June 19, 2009, at 15 (citing Lamb Eng'g & Constr. Co. v. United States, No. 01-229C, 2002 WL 32933387 (Fed. Cl. Aug. 26, 2002) (finding no question of fact that contractor submitted facially false certifications, as contractor substituted its own certification language to subcontractors, did not follow applicable FAR provisions, and did not notify Government of changes made to certifications)).

When parties offer reasonable but differing interpretations of a contract, any ambiguous or unclear terms are construed against the drafter.  See Turner Constr. Co. v. United States, 367 F.3d 1319, 1321 (Fed. Cir. 2004).  13/  At this juncture genuine issues of material fact are present concerning whether Kullman submitted falsely certified invoices to the Government and, if so, whether plaintiff would be compelled to forfeit its claim against the Government pursuant to 28 U.S.C. § 2514.  Although the lack of clarity in the certification language, coupled with defendant's unsubstantiated facts, preclude ruling for defendant as a matter of law, plaintiff's success in combating the fraud counterclaims came

_____

13/ The 2002 amendments to FAR 52.232-5(c)(2) added the term "all" to precede "payments" in the language of the regulation.  Payments Under Fixed-Priced Construction Contracts, 67 Fed. Reg. 56,124 (Aug. 30, 2002) (to be codified at 47 C.F.R. pt. 52).  The discussion by the agency reveals that the word "all" was included in the FAR to address issues that arose when prime contractors requested payment from the Government, *vis-a-vis* progress-payment billings, but then did not pay all the payments due to their subcontractors. The new construction contemplated that subsequent partial payments to subcontractors from full proceeds of progress payments are deemed untimely, and, if a prime contractor certified that it had made all payments, but in fact had not, the progress requests would be considered to be falsely certified.  The exchange did not discuss the situation presented in this case where the prime contractor did not receive full payment from the Government.  The scope and applicability of the regulation's history cannot be assessed in this decision, as neither party offered it in support of its interpretation of the certification language.

under question during argument and should be reassessed by the parties under the Federal Circuit's rationale for a finding of fraud in Young-Montenay, a case cited by neither party to date. Young-Montenay involved "'frontload[ing],'" and the contractor cried no harm, no foul, as it never overbilled for more than it was due. 15 F.3d at 1043 (citation omitted). The Federal Circuit was not sympathetic to the exigencies of business realities because the Government was damaged by paying money before it was due. In light of the rule applied in Young-Montenay, plaintiff's rationale in the case at bar (that the DOS was behind overall on paying Kullman and consequently Kullman paid what it could when it received payment) does not bode well for plaintiff.

5. Application of 28 U.S.C. § 2514 to the liquidation trust's beneficiaries

In addition to defendant's burden to prove the element of scienter under 28 U.S.C. § 2514, plaintiff charges defendant with proving that plaintiff is a "person who corruptly practic[ed] or attempt[ed] to practice any fraud against the United States . . . ." Pl.'s Br. filed Apr. 21, 2009, at 21 (quoting 28 U.S.C. § 2514). The trust was created for the express purpose of "satisfying claims by liquidating the Trust Assets transferred to it" and to distribute to Kullman's creditors the proceeds of the liquidation. Pl.'s Br. filed Apr. 21, 2009, at 21 (quoting Trust Agreement at ¶ 2.2 (not provided by plaintiff)).

Plaintiff offers Goggin v. United States, 152 F. Supp. 78, 79 (Ct. Cl. 1957), for the proposition that the Government's forfeiture claims cannot be pursued because plaintiff is an innocent trustee that took the trust's corpus for value. In Goggin the court ruled that a bankruptcy trustee, assigned for the benefit of creditors, is vulnerable to forfeiture claims asserted by the Government because the trustee is not a purchaser for value and its rights are derivative, not superior, to those of the bankrupt. Id. Plaintiff distinguishes this case on the basis that plaintiff is a purchaser of value, having obtained its corpus via asset sale. Pl.'s Br. filed July 10, 2009, at 14-15 n.8. The first deficiency in plaintiff's argument is that it is not advanced by any factual showing other than a statement in defendant's brief that the corpus was passed through an asset sale. Pl.'s Br. filed Apr. 21, 2009, at 22 (citing Def.'s Br. filed Nov. 7, 2008, at 2). Secondly, plaintiff inhales the reasoning in Goggin, which held that because the trustee was not a purchaser for value it was subject to the forfeiture claims by the Government, and then exhales the inverse as legal authority for its (unsupported) argument that plaintiff, as a purchaser of value, is immune from forfeiture claims asserted by the Government.

As defendant adeptly states, Goggin and the other cases relied on by plaintiff are factually and legally distinguishable. See O'Brien Gear & Mach. Co. v. United States, 591 F.2d 666, 678-80 (Ct. Cl. 1979) (discussing that statutory forfeiture contemplated by 28 U.S.C. § 2514 is broad and any suit brought in Court of Claims is subject to forfeiture);

<u>Chelsea Factors, Inc. v. United States</u>, 181 F. Supp. 685, 694 (Ct. Cl. 1960) (finding that fraud is not imputable to, and forfeiture statute is not applicable against, innocent assignees of government contracts); <u>United States v. Hadden</u>, 192 F.2d 327, 329-30 (6th Cir. 1951) (stating that, pursuant to War Contract Settlement Act of 1944, court did not apply traditional rules of assignments, understanding that objective of Act was to facilitate maximum production during World War II). Plaintiff has not put forward a persuasive reading of these cases to apply to the situation presented.

## CONCLUSION

Accordingly, based on the foregoing,

**IT IS ORDERED**, as follows:

1.   Defendant's motion for summary judgment and partial summary judgment are denied, and plaintiff's cross-motion for summary judgment is denied.

2.   By August 31, 2009, the parties shall submit a proposed schedule for the completion of discovery, all pretrial proceedings, the pretrial conference, and trial.

s/ Christine O.C. Miller
_____
**Christine Odell Cook Miller**
Judge

22