# In the United States Court of Federal Claims

No. 06-465C
(Originally Filed: May 31, 2014)
(Reissued: June 11, 2014)[1]

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

LIQUIDATING TRUSTEE ESTER DU
VAL OF KI LIQUIDATION, INC.,

|  |  |
|---|---|
| *Plaintiff*, | Contract; Department of State; default termination; fraud counterclaim; differing site condition. |
| v. | |
| THE UNITED STATES, | |
| *Defendant*. | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

*Louis James D'Agostino*, McLean, VA, *David G. Barger*, McLean, VA, *Michael Snyder*, McLean, VA, and *Józef S. Przygrodzki*, McLean, VA, of counsel for plaintiff.

*Devin Andrew Wolak* and *Daniel B. Volk*, Civil Division, Department of Justice, Washington, DC, with whom are *Stuart F. Delery*, Principal Deputy Assistant Attorney General, *Bryant G. Snee*, Acting Director, and *Donald E. Kinner*, Assistant Director, for defendant. *John C. Sawyer*, Department of State, Washington, DC, and *Thomas D. Dinackus*, Department of State, Washington, DC, of counsel.

————————

OPINION

————————

---

[1] This opinion was originally filed under seal. Publication was deferred pending parties' review for redaction of protected material. The court adopted the parties' suggested redaction, which is indicated by brackets, and made other minor editorial changes. The opinion is now prepared for release.

BRUGGINK, *Judge*.

Before the court is a dispute involving a contract between the United States, acting through the Department of State ("DOS"), and Kullman Industries, Inc. ("KI"), a company now no longer in business, which at the time specialized in large-scale modular construction. The contract obligated KI to build the United States Embassy compound in Dushanbe, Tajikistan. Kullman Industries worked on the project for nearly three years and nearly brought it to completion before the contract was terminated by DOS for default. KI went into bankruptcy, and the trustee in bankruptcy succeeded to its interests, although we will refer to KI rather than the trustee throughout.

KI advances three claims here: first, it challenges the agency's termination for default and seeks conversion to a termination for convenience; second, it advances a claim of approximately $4.3 million for geotechnical work, which it contends was outside the terms of the contract; and it asserts a claim of approximately $1 million with respect to additional security remediation and related mold and mildew mitigation. The government has counterclaimed, asserting fraud and seeking both monetary penalties and forfeiture of KI's claims. The court has jurisdiction to resolve plaintiff's claims under the Contract Disputes Act of 1978, 41 U.S.C. §§ 7101-7109 (2012), and pursuant to 28 U.S.C. §§ 1503, 2508 (2012), to adjudicate defendant's counterclaims.

The various affirmative and defensive claims were tried between April and June, 2013. The trial dealt with four issues: 1) whether a portion of the geotechnical work was outside the scope of the contract;  2) whether the termination for default was justified; 3) whether certain pay certifications were false; and 4) which party bore the responsibility for delays and additional costs associated with construction of a secure part of the embassy. Post-trial briefs were filed by both parties, and oral argument was heard on January 15, 2014, after which supplemental briefs were filed. The matter is ready for final disposition. For the following reasons, we find that the geotechnical work was within the scope of the contract, the termination for default was justified, plaintiff did not violate the Forfeiture of Fraudulent Claims Act, although it did violate the False Claims Act, and the government bears responsibility for the delays and additional costs associated with the secure space. We reserve for later resolution the question of damages.

## BACKGROUND

I.      Kullman Industries

Kullman Industries was a family enterprise.  The most recent President and CEO of KI was Robert Kullman, who featured prominently as a witness at trial and whose testimony we find to be credible.   Mr. Kullman's grandfather founded Kullman Dining Car Company, Inc. in the 1920's. Kullman Dining Car Company successfully built and sold modular diners in a way that was faster and more easily financed than traditional construction. The company would fully construct the modular diner in its factory and then install it on the buyer's property.

Over the years, that company expanded from production of small diners to 6,000-plus square foot restaurants.  As a teenager, Robert Kullman got his start in the family business by sweeping floors, painting, and working carpentry jobs.   After high school, Robert Kullman attended Bucknell University.  During the summers, he continued to work at Kullman Dining Car Company.  The day after he graduated from college, Robert Kullman joined the family enterprise as Vice President.

In the 1970's, when the market for diners began to wane, Robert Kullman and his father jointly created Kullman Industries in an effort to broaden production and grow the business.  KI began using its modular method to construct bank branches, medical buildings, and schools.  The buildings became larger and more complicated.  When cellular telephones were in their infancy, KI got into market for building modular structures for the telecommunications industry.

In the 1990's, KI began working on projects for DOS.  KI built the United States Embassies in Bishkek, Kyrgyzstan; Ashgabat, Turkmenistan; and Bissau, Guinea-Bissau.  Just before KI contracted to build the embassy in Dushanbe, it was doing about $55 million dollars of business each year. Mr. Kullman was the President and CEO of KI from the 1980's until it was dissolved in bankruptcy.

II.     The Dushanbe Project: Phase I

In light of its satisfactory performance of its previous contracts, the State Department began discussing with KI in April of 2002 the project to build a new embassy in Dushanbe, Tajikistan.  According to the testimony of KI's Chief Operating Officer, John Joseph Lefkus, III, DOS was interested in

pursuing modular construction for the Dushanbe Embassy because of the short period of time required for construction and installation when compared with traditional construction and the added benefits to security when construction is controlled within a factory.

A.    Phase I - Design

Because of KI's unique qualifications, on July 2, 2002, the Director and Chief Operating Officer of DOS's Overseas Building Operations ("OBO"), General Charles E. Williams, agreed to use of a sole source contract with KI for the Dushanbe project.   The stated justification for using other than full and open competition was that "Kullman Industries, Inc. offers a more direct way to contract, provides a superior product that meets DS[2] requirements, and, in addition, has greater experience in servicing the requirements of the Department."   JX 128 at 3. OBO anticipated a   construction budget of $63,920,000.

The DOS Contracting Officer ("CO") assigned to the Dushanbe project at that time was Ralph R. Sutherland.   The Contracting Officer's Representative ("COR") was Robert H. Sanders.  John Lefkus, KI's Chief Operating Officer, represented KI in negotiations.

On July 12, 2002, DOS's Office of Acquisitions issued solicitation SALMEC-02-C-0025 for "Phase I"[3] to develop a plan for the adaptation of the standard embassy design to accommodate modular construction and to facilitate a cost estimate for the Dushanbe embassy.  The embassy compound was to include a New Office Building ("NOB"), also known as the chancery, the Marine Security Guard Quarters, Warehouse, Compound Access Control ("CAC" or "gate house") Building, Material Transfer Station, utility building, power plant, well water treatment system, septic system, and a perimeter wall for the compound.  The contractor would have 85 days to complete the Phase I design.  The solicitation included over one hundred pages of contract details covering everything from pricing to the Statement of Work ("SOW") and referenced additional attachments such as the Standard Embassy Design Intent

---

[2] Neither party has clarified what "DS" means.  In the absence of a clear definition of this acronym, we presume it to refer to "Diplomatic Security."

[3] The project was divided into two phases.  The first was the design phase and the second phase consisted of construction.

Application Manual ("SED manual"), the Site Utilization Plan, and a Preliminary Geotechnical Report. The SED manual included "the fixed design elements — the 'absolutes' that every project using the Standard Embassy Design (SED) must follow." JX 16 at 1, 4. Pursuant to the SED manual, some elements of the standard design were fixed while other elements could be adapted to fit the needs of each project.

The SED also provided specifications for a Controlled Access Area ("CAA"). The CAA was designed as a room within the embassy that contains special protections for information and occupants.

KI submitted its best and final offer for Phase I of the Dushanbe contract on August 20, 2002. DOS accepted KI's offer and issued the notice to proceed on August 22, 2002. JX 1 at 2. The contract for Phase I was not executed by Mr. Sutherland and Mr. Lefkus, however, until September 18, 2002. On that same day, Mr. Sutherland and Mr. Lefkus also executed Modification 001 ("M001"). M001 incorporated several attachments to Division 1 of the contract and rescinded "Section J," which included the Dushanbe Geological Overview, and replaced it with "Section J, Revision 1."[4]

While KI worked on Phase I, DOS commissioned the Committee of Architecture and Building within the Province of the Government of the Republic of Tajikistan ("SANIIOSP") to survey, test, and develop a report on the geotechnical conditions at potential sites for the project. SANIIOSP produced a report ("geotechnical report" or "SANIIOSP report"), initially in Russian and then translated into English, on the geotechnical conditions at the site that was eventually chosen for the Dushanbe project. The geotechnical report, while perhaps difficult to read, alerted the reader to what the drafters thought were unusual soil conditions. It reflected that the "main deformation characteristics of the dusty clay soils, which consist of the sand clay and loamy soils are the properties of the settlement while putting into the water and the first settlement pressure." JX 10 at 9. Additionally, "[t]he summary quantity of the possible settlement of the soils because of their own weight can reach 54.84cm with the power of the depth of settlement 16.7m." JX 10 at 16.

_____

[4] In addition, M001 provided that "[t]he contractor's proposal for Phase II of the contract shall include costs to perform requirements described in the documents" newly incorporated by M001. JX 2 at 1. The contract for Phase I had a firm fixed-price of $1,025,000.00. Phase II construction of the Embassy was not guaranteed after the completion of Phase I.

Furthermore, the report provided the following:

> The experience of the exploitation of the buildings in the analogous soil conditions on the territory of Dushanbe shows that the increase of the moisture content of the soils inevitably takes place while the engineering development of the territory because of the break down of the natural regime of the expense of the different factors (natural and anthropogene).  These changes make [worse] the deformation and strength properties of the clay soils, the properties of the settlement take place, the lack of the engineering preparation of the territory can lead to the deformation of the buildings. . . . [I]t is recommended to do the projection taking into consideration the full water satiation of the clay soils.

JX 10 at 15-16.  The geotechnical report therefore recommended wetting "the soil thickness up to the depth of 17m . . . ."  JX 10 at 18-19.

KI teamed with the Louis Berger Group ("LBG"), which specializes in geotechnical engineering, to address the issues involved in developing a foundation appropriate to the natural conditions of the site.  According to an August 30, 2002 memo, LBG "received a copy of the Geotechnical Report from OBO on August 16, 2002."  JX 135 at 1.[5]  On August 30, 2002, Vassilios Magginas, an architect with DOS, wrote in an e-mail that he had reviewed the SANIIOSP report and that it was "good, confirms our previous findings, and contains the basic information to be used for the project."  JX 134 at 1.

B.    Site Visit

Phase I included a visit to potential construction sites in Dushanbe, Tajikistan.  KI's representatives, including Mike Kosinski and Bob Airikka, traveled to Dushanbe on September 10, 2002, to conduct a site visit and to explore local resources.  According to the Contractor's Trip Report ("Trip Report") authored by KI, the site visit lasted until September 14, 2002. JX 137 at 10.  The KI representatives were joined by Michael "Mike" Ross, the

---

[5] Although there was a dispute at trial as to when KI or its representatives first saw the SANIIOSP Report, we find that it was available to plaintiff before it provided its late-September cost estimate.

Contracting Officer's Representative and Pete Stella from the government.[6] During a meeting that occurred on September 10, 2002, KI attendees were given a CD-ROM disc containing the "Section-J attachments from the RFQ." JX 137 at 22.  Pete Stella, Reese Richardson, John Smith, Mike Kosinski and Bob Airikka met with the Director of SANIIOSP, Saidor Rakhmatullo, who "indicated that much of the information available for the site was already included in the geotech report they had prepared."  JX 137 at 9.  Mr. Rakhmatullo offered to provide additional services such as soil testing, surveying, and designing, but told the meeting participants that SANIIOSP did not have the necessary equipment to meet the standards set by the American Society for Testing and Materials ("ASTM").  According to the meeting minutes, OBO was satisfied with the content of the SANIIOSP report.  In the Trip Report, KI expressed general satisfaction with the information gathered during the site visit and acknowledged that "OBO provided a geotechnical report for the property prior to the site visit."  JX 137 at 3-4.

      C.     Negotiations

      Negotiations for Phase II, the separate contract to build the embassy, began in earnest promptly after the site visit ended.  The key issue was price.  On September 20, 2002, Ralph Sutherland wrote the following to his superiors within OBO, Leroy Wallin, the Director of the Facilities Design and Construction Division, and Patricia Regalo-Warren, the Branch Chief:

> The contractor cannot currently provide an accurate cost proposal for construction and is reluctant to enter into a GMP contract at this point. . . .  Assuming that the cost [that KI proposes] is not too outrageous, we will work with the contractor to establish mutually acceptable terms in determining the mechanics of converting the construction portion of the contract into a negotiated fixed price at the (approximate) 30% design stage.  The contract can be structured in a manner that will obligate the money (using options for other means) for the construction phase of the project at the time of contract award.

JX 138 at 1.

---

[6] Although Mr. Sutherland is listed as a team member in the trip report, he testified that he was not in Dushanbe for the site visit.

As of September 24, 2002, the government estimated that the Dushanbe Embassy complex could be built for approximately $58,365,000. According to this estimate, the "substructure" or foundations for the NOB should cost about $1,200,000. "SITEWORK - (EXCLUDING PERIMETER WALLS)" showed a line item value of $2,750,000. JX 139 at 7. Site work included site preparation, improvements, civil and mechanical utilities, and electrical utilities. $12,700,000 was allocated for estimated transportation costs associated with moving materials and personnel to the site.

On September 25, 2002, KI submitted its "Order of Magnitude Pricing" to the government. Plaintiff offered Contracting Officer Ralph Sutherland a total cost estimate of $85,761,803. "Local geotech" was a $25,000 line item included in that number. Transportation of materials to the site, security design, landscaping, and furniture, however, were listed as allowances in specific amounts, presumably meaning that costs in excess of those allowances would be borne by DOS.

Ralph Sutherland wrote to Bob Sanders on September 25, 2002, that KI's initial proposed price of $85,181,803 was $26,816,803 above the government's estimate. Mr. Sutherland asked that Mr. Sanders "advise OBO senior management accordingly and **show me the money** if OBO wishes to continue pursuing the Kullman design-build SED/modular approach for the Dushanbe NOB project." JX 140 at 1 (emphasis in original). Mr. Sutherland emphasized, "**I need to know how much money we have before I can establish negotiation objectives and limitations and I need time to put a pre-negotiation plan together.** I do not have any funded requisitions for this project at the present time." JX 140 at 1 (emphasis in original). Mr. Sutherland added, "John Lefkus has informed me that the prices are high because of limited time and information to put together a proposal for a project of this magnitude. He will be able to negotiate a realistic firm fixed price with us at the end of the Phase I design development (November 2002)." JX 140 at 1.

Negotiations continued during the period September 27-30, 2002. On September 30, 2002, Mr. Sutherland wrote to John Lefkus that KI's September 25 proposal was unacceptable. Mr. Sutherland explained that the estimate was too high and asked KI to "consider a GMP [guaranteed maximum price] offer of **$60,730,000** in a fixed price contract, without incentives." JX 143 at 1 (emphasis in original). Mr. Sutherland concluded the e-mail by writing, "If we do not reach agreement this morning, the project may not be awarded to Kullman because of what we can afford." JX 143 at 1. Presumably this was

because September 30 was the last day of the government's fiscal year.  Mr. Sutherland also proposed certain deletions from the SOW.

Later that day, Mr. Lefkus responded to Mr. Sutherland's communication.  Mr. Lefkus summed up the changes in the scope of work, which included reducing the number of gate houses, reducing by 200 lineal meters the perimeter wall, and reducing the size and function of the utility building.  Mr. Lefkus then lowered the proposed allowance for transportation to $10 million based on the following: "[f]actors which reduce project scope;" "[p]otential of local sourcing;" and "[r]equirement to ship only 50% of volume U.S. flag."  JX 145 at 1.  Based on these changes, KI agreed to "entertain a GMP of $60,730,000.00 noting the $10 million transportation allowance."  JX 145 at 1.

On September 30, 2002, DOS issued Modification number two ("M002") to the contract and obligated available funds.  The amendment was issued "for a guaranteed maximum price of $50.730 Mil plus an allowance of $10.0 Mil for transportation."  JX 149 at 5.

Shortly after Mr. Sutherland closed this deal, Mr. Sanders referred to Mr. Sutherland as a "miracle worker."  JX 148 at 1.  Mr. Sanders was replaced as COR by Michael ("Mike") Ross on October 2, 2002.[7]

D.     Terms of the Contract

Through M002, the terms of and attachments to the solicitation were made part of the contract pursuant to which KI agreed to build the embassy.

---

[7] There was a lot of turnover in the OBO employees who managed the Dushanbe Project.  The parties stipulated to the following chronology of the Contracting Officers: from July 2002 until December 11, 2003, Ralph Sutherland was the CO; from December 11, 2003, until June 16, 2004, Lorri Lowther was the CO; from June 17, 2004, until July 15, 2004, Lisa Goodwine was the CO; from July 15, 2004, until October 26, 2004, Brian Mulcahy was the CO; and then from October 26, 2004, until the contract was terminated on June 17, 2005, Lorri Lowther served a second stint as CO.  The CO was assisted by a COR who also carried the title of Project Executive.  The first COR was Robert Sanders from July 2002 to October 2, 2002, then Michael Ross served in this position from October 2, 2002, until January of 2004, and lastly from January 2004 through June 17, 2005, Sharmeena Salam-Haughton was employed in this capacity.

In addition, it provided the following with respect to pricing:

> Kullman Industries [sic] proposal of $60,730,000 dated September 30, 2002[,] is hereby accepted by the Government. The Contractor shall perform Phase II design, construction and fabrication of the new U.S. Embassy compound in Dushanbe, Tajikistan in accordance with contract number SALMEC-02-C-0025, as modified heretofore.  This work is to be performed for a Guaranteed Maximum Price (GMP) of $50,730,000, plus an allowance of $10,000,000 for Transportation.  The GMP will be evaluated and a fixed price for phase II will be negotiated upon completion of Phase I of this contract.  A written Notice to Proceed must be issued prior to performance of Phase II services.

JX 3 at 1.  The following provisions regarding price were also included in or attached to the solicitation and were thereby incorporated by reference into M002:

> B.1   PRICING
> B.1.1 The Contract Price includes all labor, materials, equipment, and services necessary to accomplish the design and construction required by the Contract Documents, including applicable customs duties, transportation to the site, storage, premiums for insurance and bonds required by the Solicitation Documents and/or the Contract Documents, permits, license, and inspection fees, and all other items called for by the contract or otherwise necessary for performance of the contract.  The Contract Price may be adjusted only by a written Contract modification signed by the Contract Officer.
>
> B.1.2 The contractor shall complete all work, including furnishing all labor, material, equipment and services as called for and required by the terms and conditions of this contract document and all attachments hereto.  The maximum time allowable for performance has been identified on the SF Form 1442 at the time of Request for Proposal (RFP) Issuance.  The actual time set for performance and completion shall be negotiated and set forth in the contract at time of award.  The price is firm fixed-price and shall include all labor, materials, overhead and cost for insurance required by Section/Paragraph

I.42, 52.228-3, Workers' Compensation Insurance (Defense Base Act).

. . . .

B.2    CONTRACT PRICE - CONTRACT LINE ITEM NUMBERS (CLIN)

PROJECT TITLE:   Dushanbe NOB

0001 The contractor shall complete all work, including furnishing all professional services, labor, material, equipment and services, unless otherwise specified herein, required under this contract for the following firm fixed price and within the time specified herein.   This price shall include all labor, materials, overhead insurance and fees, and profit.

. . . .

B.3    TYPE OF CONTRACT

This contract is a Firm Fixed-Price payable entirely in the currency indicated on the SF1442.  No additional sums will be payable on account of any escalation in the cost of materials, equipment or labor, or because of the contractor's failure to properly estimate or accurately predict the cost or difficulty of achieving the results required by this contract. . . .  Changes in the contract price or time to complete will be made only due to changes made by the Government in the work to be performed, or by delays caused by the Government.

. . . .

B.5    COST OF MATERIALS/EQUIPMENT

The cost of any materials or equipment required in conjunction with the services rendered herein shall be included in the proposed firm fixed-price.

JX 1 at 13-14.

The SOW, which is Section C of the solicitation, includes the following concerning geotechnical work:

The Contractor shall engage the services of a geotechnical consultant to perform all necessary geotechnical work for the project. . . . The Contractor's geotechnical engineer shall review all available geotechnical information provided in the Contract package and become familiar with the soil and site conditions at the project site by visiting the site.  During the site visit and in subsequent phases of the project, the Contractor shall examine

and/or verify the information provided and obtain any additional information to complete the design and construction of the project. The Contractor remains solely responsible and liable for design sufficiency and should not depend on reports provided by the USG as part of the contract documents.

JX 1 at 26. Additionally, the SOW provides,

The geotechnical consultant shall be consulted during the site design to provide recommendations and design for site retaining structures, ground modification[] methods, pavement structural design, and subsurface drainage.

JX 1 at 31. The SOW continues with the following directions about the geotechnical consultant's role in the project:

The geotechnical consultant shall continue providing services during construction, especially during the construction of foundations, pile loading test, ground modification, retaining systems, etc. to confirm the recommendations provided during the design stage of the project.

JX 1 at 34.

Pursuant to Section F of the contract, KI was required to submit a report detailing its geotechnical investigation 57 days after the date of the first Notice to Proceed. Similarly, it was the contractor's responsibility to visit "the project site and verifying all pertinent site conditions." JX 1 at 83. The contract also referenced an attachment, J.3.7 "Dushanbe Geological Overview," which provided the following general description of the geotechnical conditions:

From the engineering and geotechnical standpoint, the site is suitable for the proposed NOB. However, due to the geologic setting of the entire city as well as the high seismicity of the area, additional site development costs may be anticipated including sub-grade preparation and foundations, re-grading/fill of the site, and utilities.

Dushanbe is located in a region in which collapsible silt/clay soils occupy the upper 15-18 meters. *These soils are very sensitive to moisture and require special foundation sub-grade*

*preparation*. Below the silt/clay layer, alluvial sand and gravel soils extend to a depth greater than 50 meters. The permanent water table may exist at much shallower depths at this site. For a NOB up to 3 stories in height, a mat foundation is anticipated as the most likely system to support the proposed structure. For heavier structures, piles may be required. Both systems are commonly used in Dushanbe. Further geotechnical studies are required to confirm our findings. A thorough geological investigation of the site is currently in progress and will be completed within the next few weeks.

According to the local Geologic and Foundation Institute, the site is located in seismic zone 9 (per Soviet standards). OBO's level of seismicity defines Dushanbe as zone 4 per UBC. Regardless, the seismicity level is considered very high and any future structures need to be designed accordingly. As compared to other locations, the site has a thicker overburden of collapsible soils.

JX 11 (emphasis added); s*ee also* JX 1 at 109.

The contract incorporated FAR 52.211-12, giving the government authority to assess liquidate damages, which initially were set at $8,500.00 per day. With respect to excusable days of delay, it provided that "[t]he Contractor will be allowed time, not money, for excusable delays as defined in FAR 52.249-10." JX 1 at 48. Excusable delays include, among other things, "(1) acts of God or of the public enemy, (2) acts of the United States Government in either its sovereign or contractual capacity, (3) acts of the government of the host country in its sovereign capacity, . . . (11) delays in delivery of Government furnished equipment and (12) unusually severe weather." JX 1 at 48.

Division 1 of the contract, which was included in the solicitation pursuant to M001, contained provisions about security details, temporary utilities, and the schedule of values. The contract required the contractor to invoice the government for periodic payment based on the percentage of work completed for each line item on a schedule of values developed by the contracting officer and to include on the invoice a certification stating that the contractor had paid its subcontractors and suppliers.

The security measures described in Division 1 were necessary to

maintain the integrity of the CAA.   One of the ways to ensure the security of the CAA is to limit access by "[u]ncleared personnel" unless "accompanied by a [Construction Surveillance Technician] CST."  JX 14 at 5.  In order for foreign nationals to be cleared for access to work on the CAA, they had to "submit to a background investigation and be approved by the [Site Security Manager] SSM before access is granted to Project Site."  JX 14 at 4.  If the foreign national's application for access to the site was pending but not yet approved, the Site Security Manager ("SSM") had discretion to permit the foreign national to perform limited work on site.

In addition to describing who could access the CAA during construction, and in order to maintain the integrity of the CAA once built, Division 1 also set out procedures for securely producing and shipping to the site the materials incorporated into the CAA.[8]  Once the modular panels that were to be used as floors and walls were built in New Jersey and certified as compliant with relevant security precautions, containers of materials or modules traveled to the project site in Dushanbe, where security officers would "de-certify" the container.  This involved the following: "1.) inspection of container exterior and dunnage wall, 2.) removal of dunnage wall by contractor, 3.) removal of all material by contractor in accordance with site security procedures and 4.) inspection of interior of container by decertifying officer."  JX 15 at 9.

Once the secure shipment was inspected it would be moved "to [a] secure storage area until required for installation in CAA."  JX 14 at 16.  Elsewhere the contract provided that "[t]he Government shall consider noncompliance with the security regulations by the Contractor or his employees, subcontractors, suppliers, etc. to be sufficient grounds for termination of the contract for default."  JX 1 at 84.

The government also maintained the right, after a secure shipment was complete, "to determine whether products have been compromised and therefore cannot be used in a CAA or contiguous space.  Where such compromise results from the Contractor's failure to comply with security procedures, the Contractor shall bear entire cost associated with rectifying compromise and restoration of fundamental secure nature of product(s) affected."  JX 14 at 7-8.  Division 1 provided, however, that "[i]n instances

---

[8] The details of secure shipping and production are classified and will not be described.

where authorized work must be disassembled, uncovered, or demolished to accommodate inspection and then reassembled, recovered, or rebuilt, resultant costs of such actions shall be borne by Government where inspected work is found to be in conformance with Construction Specifications and security requirements." JX 14 at 19.

Regarding utilities, Division 1 required the contractor to provide temporary water, sewer, electrical power, and telecommunications, throughout the course of the project. The contractor was directed to "[c]onnect to existing franchised utilities for required services, where reasonably possible." JX 12 at 5. "At the earliest reasonable date, [the contractor should] connect with permanent utility lines and service connections, and remove temporary utilities/services; comply with the Project Director's requests." JX 12 at 6. In addition to temporary utilities, the contractor was obligated to provide temporary office facilities and equipment, including computer systems.

E.    Performing Phase I

In November of 2002, KI submitted an initial design, which the government rejected in part because the design for the foundation was deficient. KI then sent LBG representatives to Dushanbe in January of 2003 to test the soil conditions and recommend a foundation design. LBG issued a draft report in late March that agreed with the SANIIOSP findings and recommended the same approach contained in the earlier SANIIOSP geotechnical report, i.e., attempting to compress the foundation soils by an extensive flooding and de-watering system.

DOS eventually approved KI's Phase I plan to use a modular approach to constructing most of the embassy structures. The NOB, for example, was assembled of six sided metal boxes, approximately 10 feet wide, 10 feet high, and 30 feet long. Each module weighed anywhere from 30,000 to 100,000 pounds. These boxes were fabricated at KI's New Jersey plant in a process that started with constructing a six-sided steel frame, pouring concrete in the base, building walls, and then adding finishes like drywall, flooring, and infrastructure for utilities. Then the modules were shipped via boat and train to Dushanbe where they were stacked up on the foundation to constitute the building. Once the module was hoisted into place with a crane, KI employees would weld them together. The process would repeat as more stories were added to the building. Over 200 modules were used in the construction of the Dushanbe NOB.

III.    The Dushanbe Project: Phase II

A.    Continued Negotiations Over Price

Although M002 reads as if it were a complete agreement by the parties, KI took the position early on in contract performance, and argues in this litigation, that M002 left room for the parties to revisit the contract price, specifically in connection with what it would cost plaintiff to do the preliminary work (geotechnical) for the foundations. Mr. Lefkus testified that, when KI agreed to M002, it did so with the understanding that the parties would renegotiate a firm fixed price once Phase I was complete and that KI was not at risk because, even though it had agreed to perform the project for a GMP of $60.7 million, that did not obligate KI to a specific type of performance when there was no agreed upon design. Mr. Lefkus believed that the sole function of M002 was to secure the funding that was available in fiscal year 2002, which would have otherwise lapsed on October 1, 2002. This is contrary to Mr. Sutherland's understanding that under M002, the government could require the contractor to perform the contract as written for the agreed upon price.

Mr. Sutherland was willing, however, to discuss an adjustment in price. In an effort to negotiate a mutually acceptable price, Mr. Sutherland met on May 1, 2003, with KI representatives, including Alan Rand,[9] who was newly appointed by KI as its Vice President for Federal Contracts, and who was given responsibility for overseeing the Dushanbe project. In a letter dated May 2, 2003, Mr. Rand, wrote the following to Mr. Sutherland:

> As we discussed on May 1, we will treat the unknown and unforeseen geo-technical issues as a change to the base line price comparison. Therefore, we have not included a price for this work in the attached Final Price spreadsheet. We are, however, prepared to provide OBO with a "hard" number as part of a change to the base line price for this project.

JX 191 at 2. Mr. Sutherland responded by referring to the agreement established in M002. He wrote the following in a May 6, 2003 e-mail to Mr. Rand:

---

[9] Mr. Rand had proposed $69.5 million as a firm fixed price for the contract on April 21, 2003.

16

On September 30, 2002 we reached a mutual agreement on $60,730,000 for Phase II design, construction and fabrication. This consisted of a promise by KI to complete all work required for a guaranteed maximum price (GMP) of $50,730,000, plus an allowance of $10,000,000 for transportation. . . . While the Government was willing to take the risk that transportation costs could move up or down as an allowance cost, we fully expected KI to perform the work at or below the guaranteed maximum price as promised in accordance with the terms of the contract.

JX 195 at 3.

Mike Ross, the OBO Project Executive who worked with Mr. Sutherland on the Dushanbe project, joined the conversation by e-mailing Mr. Rand: "When John [Lefkus] submitted his proposal on Sept. 30, he took no exceptions to the contract.  Now, 7 months into the project, I'm not sure if there is anything he doesn't take exception to."  JX 195 at 2.  Mr. Rand responded to both Mr. Sutherland and Mr. Ross that "I hope that I have been clear with regard to the items that are not included in our price i.e. . . . geotech work."  JX 195 at 1.  On May 7, 2003, Mr. Ross wrote[10] to Mr. Rand the following:

You're not at all clear.  You're [sic] proposal of Sept. 30, 02 provided a guaranteed maximum price for the construction of the building and took no exceptions to the contract as you are mentioning below.  The only allowance you mentioned in the proposal was for transportation.  If the geotech work turns out to be a differing site condition you will pursue it as such.  Your delays in completing your foundation analysis are your responsibility.

JX 195 at 1.

Meanwhile, Mr. Prior, Mr. Sutherland, and Mr. Ross agreed among themselves to reserve $2 million in funding to be used in the event that KI proved that it was entitled to an equitable adjustment for differing site conditions.  Prior to the in-person negotiations that occurred in May 2003, Mr.

---

[10] Mr. Lefkus, Eduardo Gaarder, Mr. Prior, and Mr. Sutherland were copied on this e-mail.  JX 195 at 1.

Sutherland prepared a "pre-negotiation plan," which states that "the Government will take the position that [the geotech] contingency is covered by the Differing Site Conditions clause of the contract" when KI requests, as anticipated, "$2 million for unknown geotechnical conditions." JX 1341 at 3.

Final negotiations concerning Phase II were held on May 8, 2003, in Arlington, VA.   Mr. Sutherland, Mr. Prior, and Mr. Ross represented the government and Mr. Lefkus, Mr. Rand, and two others attended on KI's behalf.

Following the May 2003 negotiations, Mr. Sutherland recorded that the parties agreed to convert the contract from a guaranteed maximum price to a firm fixed price and to raise the contract price by $2 million by changing the $10 million transportation allowance into a $12 million fixed price item.   JX 1342 at 3.  He also wrote, "The Contractor's proposed $2 million for unknown geotechnical conditions was considered by the Government to be an unjustified contingency and was rejected."   JX 1342 at 3 (Price Negotiation Memorandum).  That change was later confirmed in M004, discussed below.

The third interim notice to proceed was issued by Mr. Sutherland on May 8, 2003, which authorized KI to "[p]roceed with mobilization and site preparation, not to exceed $1,000,000."  JX 198 at 1.  Thus, the project moved forward as negotiations over price continued in May 2003.[11]

In a May 14, 2003 e-mail to employees of Greenway Enterprises, KI's main subcontractor on the Dushanbe project, Mr. Kosinski explained KI's understanding of how the parties would address the geotechnical work in light of the negotiations in the following way:

> We have agreed to approach the geotech remediation work as a "separate issue" in terms of both cost and schedule.  This will be addressed later on with a change order.  What this means to you is that for the time being, you need to submit your schedule based on the assumption that we do not have to do any of the geotech prep work. . . .  Based on this we will back out the $874,958.00 from your contract amount for the geotech, and the

---

[11] Chris Matise, KI's Project Manager, arrived on site in Dushanbe on May 12, 2003.  KI submitted its detailed project schedule on May 15, 2003, which was later approved by the government on May 30, 2003.

revised baseline schedule will show a contract completion of
June 24, 2004. Once the actual cost and schedule impacts are
confirmed, we will submit a change order to OBO for the
additional cost and time.

JX 200 at 1.

Mr. Sutherland also understood that the geotechnical work would be the
subject of a possible change order, although he probably had a different
understanding than KI representatives as to what that meant. As he testified
at trial:

The government's position was always, unless you show
us that there's some sort of differing site conditions, we're not
going to allow that. So we stuck with that position, and, as far
as the government was concerned, they were never able to prove
that, though    we never added it during negotiations, even
though Kullman would have liked to have seen an extra $2
million for that contingency. That's exactly what it was. It was
contingency in our eyes.

We felt, well, we should prepare for the contingency, but
since they haven't yet demonstrated to us that it is a differing
site condition, we're not going to put it in the contract.

Tr. 2216-17 (Sutherland).

The final adjustment to price was captured in M004.[12]  M004 made
several changes to the contract. As discussed above, the original guaranteed
maximum price of $60,730,000 was changed to a firm fixed price of
$62,700,000.00, which resulted in an overall increase in the total contract price
of $1,970,000. Also, the contract completion date was extended to June 20,
2004. Finally, the potential daily liquidated damages was decreased from
$8,500 to $3,380.

M004 also incorporated other documents into the contract. First, it

---

[12] M003, which is dated December 12, 2002, clarified that certain work had to
be performed by workers that had obtained security clearance at the secret
level. JX 4 at 1.

referenced a May 1, 2003 classified document on the "Dushanbe Chancery Ceiling Heights" given to KI by Mike Ross. Second, the May 29, 2003 letter from KI was also incorporated into M004. In this letter, John Lefkus memorialized the following understanding:

> Final [notice to proceed] to be issued by June 1st or before. This references DS Certification. Contract will be adjusted if the [notice to proceed] is not issued by then. Contract is extended 65 days for a June 20, 2004 completion. This extension takes in[to] account the weeks to the [notice to proceed] and previous suspension and delays.

JX 5 at 5. The letter continues, "The government acknowledges that with the exception of a single DS condition, no other outstanding issues remain for DS Certification." JX 5 at 5. KI's letter does not mention the geotechnical issue.

Although M004 was not signed by Mr. Sutherland until August 7, 2003, and Mr. Lefkus on September 16, 2003, it was given an effective date of May 29, 2003. May 29 was also the date that KI was issued the unlimited notice to proceed. Plaintiff makes much of the fact that KI waited to execute M004 until it submitted the differing site condition request for equitable adjustment, but we attach no contractual significance to that fact.

    B.    Geotechnical Work

    1.    Breaking Ground: The Geotechnical Work Begins

On June 1, 2003, Catherine Wilkins arrived on site to serve as the OBO Project Director. There was a ground-breaking ceremony held at the site on June 10, 2003. General Williams, Suzanne Conrad, Antonio Delgado, Thomas Quinzio, Mike Ross, Kevin Sarring, Barbara Richter, Jay Neustel, and Bob Cult from OBO and Mr. Lefkus, Mr. Rand, and Mr. Kosinski from KI were in Dushanbe for the ground-breaking ceremony and the pre-construction conference.

Even after the work began on site, the parties continued to quibble over how the geotechnical work would be financed. As the newcomer, Ms. Wilkins was told by KI that the geotech "work is specifically not included in [KI's] contract at this time and that they are preparing a price proposal to be negotiated." JX 219 at 1. In light of KI's assertion, Ms. Wilkins e-mailed Mr. Sutherland and Mr. Ross on June 18, 2003, to reaffirm that the government's

position was that "the government expects the contractor to proceed with the construction, and, if they feel that the geotech work is not in their contract, to file a request for equitable adjustment." JX 219 at 1. Mr. Ross responded on June 25 with the following:

> The government does not accept any claim from the contractor that the foundation is not in their contract. They have never given us anything in writing to that effect nor have they mentioned an exclusion. They have a design-build contract that includes putting the building on a competent foundation.
>
> . . . .
>
> Further, it has been explained to them that any request for equitable adjustment must be presented to the contracting officer with a comprehensive schedule and cost analysis attached. Otherwise we have nothing to talk about.

JX 224 at 2. After receiving this message, Ms. Wilkins wrote back to Mr. Ross informing him that the contractor was threatening to suspend work until there was a signed contract modification addressing this issue. Mr. Ross then e-mailed Mr. Alan with the following note:

> What Catherine is telling me is NOT what we agreed. You told me at site last week that you would proceed with the foundation work and once you determined what, if anything, was a differing site condition, you would apply for a request for equitable adjustment.
>
> As of now, the Government does NOT agree that this work is not in your contract and if you delay the project and fail to prove otherwise, you're going to be on the hook for making up the lost time.
>
> I would suggest that you get rolling with the foundation work and start putting together your RFEA if you believe you are entitled to one.

JX 224 at 1. Mr Sutherland echoed these sentiments two days later when he e-mailed Mr. Rand and instructed KI to "Get Going!" with the site work. JX 225 at 1. In this e-mail, Mr. Sutherland reminded Mr. Rand of KI's obligation

to prosecute the work diligently.  Mr. Sutherland wrote, "I have yet to see any evidence that there are in fact any differing site conditions relating to soils or any other geotech concerns.  So far it's been speculation.  The contract does not provide for any delay of work based on unsupported speculation."  JX 225 at 1.

Despite the foregoing, Ms. Wilkins' Project Director Summary for July 2003 characterized contractor relations and customer satisfaction as "good."  JX 60 at 1.[13]  The project status was characterized as "green," or positive, even though "[c]onstruction activity in the field has been slow to get started."  JX 60 at 1.  Ms. Wilkins recorded that excavation, grubbing, grading, and soil wetting had begun.  JX 60 at 2.  Joseph Allen, KI's Site Superintendent who worked on the geotechnical and soil remediation efforts, recalled the following:

> [T]o remedy those [poor and collapsible] soil conditions, there were some processes we had to do after we excavated to get the soil prepared for the load that was going to be put on it . . . .
>
> So it was a process of excavating, flooding the area, having it hold standing water.  And   and that was for, if I remember correctly, I think it was for 28 days was what the requirement was.  And then you remove that, you excavate a portion of it, compact it, test the soil.

Tr. 824-25.  KI sent the test samples to LBG for analysis.  KI repeated this process for several months with little resulting soil settlement.  LBG released a report, JX 420, in March of 2004 that concluded the soils had settled only 2 centimeters as a result of the compaction efforts.

### 2.   KI Submits a Request for Equitable Adjustment and Then Signs M004

Before the results of the settlement efforts were known however, on June 9, 2003, Mr. Ross sent KI the cost estimate forms to complete and submit along with the request for equitable adjustment ("REA") concerning the site

---

[13] In this document, Ms. Wilkins also reported that the contract completion date was June 20, 2004, although the "[s]tatus of mod #4 not confirmed."  JX 60 at 2.

conditions. KI submitted its differing site condition REA to Mr. Sutherland on August 15, 2003. The REA asserted that the geological conditions were "extreme and differ[ent] from standards applied at the time of the initial contract award/[notice to proceed] and during negotiations." JX 22 at 3. In the REA, KI requested a monetary adjustment of $3,032,915 and a time extension that would move substantial completion to November 15, 2004. The time extension was requested because KI estimated that "an eight-week time period" was necessary for soil subsidence. JX 22 at 6. In its submission, KI asserted that the equitable adjustment was warranted because "during final contract negotiations, all costs and schedule impact that relate to the geotechnical work were specifically excluded from the negotiated price pending issuance of the final geotechnical report, completion of the structural/geotechnical design effort, and cost and schedule analysis." JX 22 at 3.

Mr. Lefkus signed M004 on September 16, 2003. At the time that KI submitted its REA and executed M004, the remedial geotechnical work was not included in the Schedule of Values. JX 214, JX 230, JX 237, JX 250; *see* Tr. 2442 (Lefkus) ("[W]e had not yet acknowledged the contractor's obligation to do those [geotech] activities because they did not appear on the schedule.").

### 3.   The Site Work Continues

As August 2003 came to a close, Ms. Wilkins described the project status as "yellow," and the contractor performance as "significantly behind schedule." JX 61 at 1. Ms. Wilkins recorded that "[e]xcavation was completed during the month of August at the building footprints" but "[s]oil wetting operations continued at the perimeter wall foundations." JX 61 at 1.

#### a.   Delay

In September 2003, Ms. Wilkins' characterization of the project status changed to red, which she testified meant that there was a serious problem because the contractor was behind schedule. KI was so far behind schedule at this point that Ms. Wilkins wrote, that KI was "unlikely to complete within the contract performance period." JX 62 at 1. She estimated that the job was 20.35% complete. JX 62 at 2. Ms. Wilkins recorded that "[a]ctivity at the site continues to focus on the geotechnical work required to prepare the soil prior to construction of the foundations." JX 62 at 1.

#### b.   Geotech is Added to the Schedule of Values

In order to receive periodic compensation for work performed, KI submitted invoices to the agency.  It billed for the percentage of work completed for each line item on a Schedule of Values ("SOV").  The SOV submitted by KI with the August 2003 invoice showed a line item of $12 million for transportation and did not include a line item for geotechnical work.  JX 250. The September 2003 invoice is the first one submitted by KI that included a line item for geotechnical work, valued at $3,032,915.  This entry corresponded with a reduction in the transportation line item in the September 2003 schedule of values, which became six new line items titled "Transport Modules from Port to Site" with a total value of approximately $8.8 million.  JX 270 at 15.

Although KI had initially excluded line items for geotechnical work in the SOV,[14] inclusion of these line items became the topic of discussion at the

---

[14] The SOV originates with the contractor and is then reviewed and approved by the government.  Tr. 209 (Farley). The contract states:

> Before the first progress payment under this contract becomes due, the contractor shall prepare a Detailed Estimate for Progress Payments itemizing the Contract Price in the form and in such detail as is required by the Contract Documents.  The values in the Detailed Estimate will be used as a basis for determining progress payments, but will not be conclusive as to the amounts due the Contractor or as to the value of changes in the work.  The Contractor's overhead and profit shall be prorated throughout the life of the contract.

JX 1 at 60.  The contract documents further prescribe:

> 1.  The Contractor shall submit applications for progress payment monthly.
> 2.  Monthly Progress Payment applications shall be:
>     a) Substantiated by progress report submittals, as specified.
>     b) Consistent with previous applications.
>     c) Accurately coordinated with the Schedule of Values produced by the progress cost loaded schedule process defined in Section 01314,

(continued...)

end of September 2003. Mr. Ross wrote the following to Mr. Rand on October 1, 2003: "Per our meeting with Anne last week, you were going to adjust your schedule to reflect the geotech work. Those activities and there [sic] values should then be exported to your schedule of values." JX 119 at 897.

KI did include a new group of line items under the heading of "GeoTech" that totaled $3,032,915 in its September invoice. JX 270 at 12-13. The bottom line contract value did not change in order to accommodate these new line items. Rather, the transportation budget of $12 million was broken down into smaller line items that then totaled to just short of $9 million. In other words, money was moved from transportation to geotechnical work, although the overall contract amount remained the same. Mr. Rand testified that he discussed this change with Mr. Ross and Ms. Wilkins and obtained government approval to move funds from the transportation line item to the newly created line item for geotechnical work.

Around the same time that the geotechnical work was included within the SOV, representatives from the government met with members of KI to discuss the geotechnical issues raised in the REA. JX 24 at 1 (stating the meeting occurred on October 16, 2003). At this meeting, "KI/LBG representatives confirmed that soil samples brought back to the United States and tested were consistent with the [SANIIOSP] report." JX 24 at 4.

At the end of October 2003, Ms. Wilkins recorded in her Project Director's Summary that progress had been made on the geotechnical work, but the soil wetting and monitoring phase was not complete. JX 63 at 1. KI also prepared a monthly progress report for October which stated that the contractor "continue[s] to anticipate approximately two months of field activities that relate almost exclusively to the geotech effort." JX 94 at 1. KI's

---

[14](...continued)

> *Project Schedules*.
> d) As directed by the Project Director, coordinated with required meetings, inspections, certifications, and similar actions.
> e) Submitted subsequent to completion of specified prerequisite work elements for which partial payment has been requested.

JX 57 at 14-15.

prediction proved true as Ms. Wilkins reported in both her November and December Project Director's summaries that the contractor continued to flood and monitor the soils.  JX 64 at 1, JX 65 at 1.  As indicated above, after months of soil wetting, excavation, fill and drying, there was virtually no settlement.

c. The Government Denies the REA

On November 12, 2003, Mr. Sutherland sent a letter to KI denying the REA.  JX 24 at 1.  The letter provided the following:

> Section C of the contract requires the Contractor to perform geotechnical services in Dushanbe.  Since execution of the contract, the Government has not made any changes to the contract requirements regarding performance of geotechnical activities.  The contract does not contain any exceptions or special provisions providing for additional consideration to perform required geotechnical services.  As a result of reviews, evaluations, and discussions, the Government has determined that the REA does not support any adjustment to the contract price or performance schedule.  Therefore, the REA is denied in its entirety.

JX 24 at 1.  Additionally, Mr. Sutherland noted that KI received "Section C" of the contract on July 2, 2002, which included clauses C.2.8 and C.4.2.5 that included geotechnical activities within the scope of work, and that the July 12, 2002 solicitation included attachment J.3.7, which should have put KI on notice of the potential geological issues at the site.  Mr. Sutherland also wrote,

> The RFP and the contract contain FAR clauses 52.236-3, Site Investigation and Conditions Affecting the Work (APR 1984).  The clause states that the Contractor has investigated and satisfied itself of conditions that can affect the work or its cost, including 'the confirmation and conditions of the ground.'  The clause goes on, '. . . . The Contractor also acknowledges that it has satisfied itself as to the character, quality, and quantity of surface and subsurface materials or obstacles to be encountered insofar as this information is reasonably ascertainable from an inspection of the site, including all exploratory work done by the Government . . . failure of the Contractor to take the actions described and acknowledged in this paragraph will not relieve

26

the Contractor from responsibility for estimating properly the difficulty and cost of performing the work without additional expense to the Government . . . The Government assumes no responsibility for any conclusions or interpretations made by the Contractor based on information made available by the Government.'

JX 24 at 3.

Mr. Sutherland noted that "KI's decision to hold off sending a geotechnical engineer to Dushanbe until January 2003 showed negligence and likely contributed to delays." JX 24 at 4.  Regarding the September 30, 2002 GMP, Mr. Sutherland wrote, "Although the final offer did include some mutually agreed upon conditions, it did not include any conditions regarding geotechnical issues." JX 24 at 4 (underline in original).  Mr. Sutherland concluded, "Based on field reports and observations, it is believed that Kullman Industries failed to prosecute the geotechnical work diligently, as required by [the] contract." JX 24 at 8.  DOS architect Vassilios Magginas wrote in the analysis attached to Mr. Sutherland's letter, "I do not see any reason why OBO has to pay for something extra for a design decision made by [KI] and, overall, is a requirement of the project." JX 24 at 13.

4.     Retainage and Liquidated Damages

The government began retaining a portion of KI's progress payments in April of 2003 pursuant to Federal Acquisition Regulation Part 52.232-5(e) (2003), which provides,

(e) Retainage. If the Contracting Officer finds that satisfactory progress was achieved during any period for which a progress payment is to be made, the Contracting Officer shall authorize payment to be made in full. However, if satisfactory progress has not been made, the Contracting Officer may retain a maximum of 10 percent of the amount of the payment until satisfactory progress is achieved. When the work is substantially complete, the Contracting Officer may retain from previously withheld funds and future progress payments that amount the Contracting Officer considers adequate for protection of the Government and shall release to the Contractor all the remaining withheld funds. Also, on completion and acceptance of each separate building, public work, or other division of the contract,

27

for which the price is stated separately in the contract, payment shall be made for the completed work without retention of a percentage.

The government's rationale for the initial withholding was unsatisfactory progress with the design.  Then, as geotechnical work threatened satisfactory progress on the rest of the project, the government once again justified retaining a small percent of KI's progress payments.

Mr. Rand wrote to Mr. Sutherland on December 5, 2003, describing the impact of the government's decision to retain part of KI's progress payments:

> [T]he recent lack of payment and withholding by the government has created an intolerable condition . . . . Withholdings for non-payment of applications not in terms (September and earlier) is over 30% of the [sic] Kullman's undisputed earnings.  I believe that the lack of payment for approved undisputed work technically constitutes a breach by the government. . . .

> This lack of cash flow has a direct negative impact on the project team and the project's success. . . . Professional consultants along with foreign and domestic subcontractors struggle with large outstanding balances for work that has been performed and approved.

> . . . .

> During the meeting, Mike Ross made me aware of OBO's rationale for withholding 10% of each of Kullman's invoices. His rationale is schedule related and is directly attributed to the geotech work now taking place.  If we were able to show a geotech recovery plan related to schedule, all sums currently retained would be returned to Kullman.

JX 303 at 1.  Throughout the contract, the government continued to periodically exercise its right to withhold up to 10% of the value of KI's invoices and at no time did the government exceed its authority to collect retainage pursuant to the FAR.  The total retention withheld by the government at the end of the contract was $2,187,022.

On June 18, 2004, Lisa Goodwine, the contracting officer at the time, sent Mr. Rand formal notice that the government intended to assess liquidated damages in the amount of $3,380 per day beginning on June 21, 2004, because the contract completion date was June 20, 2004.[15]  JX 539; *see* Tr. 447-48 (Lowther).   However, we find no reference to a formal assessment of liquidated damages, and the government has not made liquidated damages part of its counter-claim here.

C.      Security Breach & Mold Remediation

Once the foundations were in place, the construction of the Embassy progressed until a problem was encountered with the CAA within the NOB. Unlike the other modules within the NOB, the original intent of the parties was that the modules comprising the CAA would be built in segregated facilities in New Jersey by screened employees under DOS observation.[16]  What the parties had to accommodate, however, is that because the CAA is room within a room (the space between the interior room and the full expanse of the CAA accommodates periodic inspections to verify the security of the structure), the CAA module needed to have a ceiling height of twelve feet.  The maximum height of a module that could be shipped, however, was ten feet.  As one might expect, some of the details about this area within the Embassy are classified. Not only is information regarding the CAA restricted, but strict security measures were followed throughout the project in order to preserve the integrity of this space.

The security problem created by the adaptation of the Standard Embassy Design ("SED") to modular construction was anticipated during Phase I.  *See* JX 174 (March 20, 2003 e-mail discussing CAA ceiling height design issues).  Mr. Lefkus, Mr. Rand, Mr. Sutherland, Mr. Ross, Eduardo Gaarder, Patricia Regalo-Warren, Branch Chief within OBO, and others

---

[15] The letter was actually signed by James G. Thomas, Jr., as the CO, and was sent by Lisa Goodwine.  However, the parties stipulated that Lisa Goodwine was the CO for the Dushanbe project from June 17, 2004, until July 15, 2004. Ms. Lowther explained that Mr. Thomas was the Senior Contracting Officer in the division.

[16] The parties called the screened workers "Cleared American Workers" or "CAW" and the DOS employees who were tasked with observing were reffered to as "Construction Surveillance Technicians" or "CST."

representing either KI or the government met on April 1, 2003, to address the security concerns identified during the design phase.  Mr. Sutherland wrote a memorandum after the meeting which recorded the following:

> The contract is based on Standard Embassy Design (SED) documents and attachments thereto.  Design submittals [sic] to date show the ceiling at less than the 12-foot height.  The Government maintains that the contract documents require a 12-foot ceiling.  Kullman points out that Section C of the contract states ". . . (SED) shall be modified as necessary to execute using off-site modular technology. . ."  Kullman explained that it would not be practical to have the 12 foot ceiling for modular construction because of transportation limitations, involving oceanic shipping, rail cars in Europe, high-risk areas, low tunnels, and other reasons.  Alternative possibilities were discussed.
>
> . . . . Pending resolution of the ceiling issue, the Contracting Officer has suspended all work under the contract.

JX 179 at 1.  Three days after this meeting, on April 4, 2003, DOS approved KI's revised Construction and Transit Security Plan.  This plan was originally drafted on October 30, 2002, and revised on March 6, 2003.  It included the following language:

> The goal of this plan is to facilitate the project schedule by limiting the program to actual CAA area(s) and implementing security measures to maintain an acceptable level of protection . . . . [I]t is the contractor's understanding that the CAA area(s) impact the second and third floor modules on one specific portion of the NOB.

JX 153 at 4.  The plan went on to state that

> The unique nature of modular construction lends itself to the security aspects of this project.  We can readily identify and segregate the modules requiring special protection.  Unlike conventional construction, where contiguous areas are connected throughout the construction process, modular construction allows for the separation of modules containing sensitive areas to be assembled under segregated, controlled

conditions.   With modular construction, floor and ceiling structures are not shared elements; therefore the need to control vertically adjacent areas is eliminated.

JX 153 at 4-5.  When the government approved the Construction and Transit Security Plan, it also noted that KI had not yet submitted a Transit Security Plan, which presumably would describe in detail the plan to transport modules and materials from New Jersey where they were assembled to Dushanbe.

At trial, several witnesses testified that KI did indeed create such a plan and that the government approved it.  *See, e.g.* Tr. 2781-83 (Algire).  The shipping plan, however, was classified and Mr. Kullman testified that KI was required to return to the government all classified documents once it was terminated. Tr. 1766-67. While witnesses confirmed that the plan listed which modules and materials were to be shipped securely, *see* Tr. 5031 (Charles Kuehne, Senior Desk Officer for Central Asia and team leader for security procedures at DOS), the details of the list are unknown to the court because neither party produced it.   Additionally, during trial, the court asked the government to produce the classified blue prints, shipping lists, and any other exhibits that might aid our resolution of this issue and the government was unable or unwilling to do so.  This gap becomes important, as discussed below, because a dispute arose as to whether the materials for the mechanical suite on the fourth floor of the NOB above the CAA had to be shipped securely. Because the government was in the best position to produce the secure shipping list and failed to do so, we draw the inference that the fourth-floor floor panels were not on the list.  *See Huthnance v. Dist. of Columbia*, 722 F.3d 371, 378 (D.D.C. 2013).

The ceiling height of the CAA was a topic of conversation during the negotiations leading to M004.  M004 incorporated a May 1, 2003 classified document on the "Dushanbe Chancery Ceiling Heights" given to KI by Mike Ross.  The May 29, 2003 letter from KI, which was also incorporated into M004 provides the following:

Final [notice to proceed] to be issued by June 1st or before.  This references DS Certification.  Contract will be adjusted if the [notice to proceed] is not issued by then.  Contract is extended 65 days for a June 20, 2004 completion.  This extension takes into account the weeks to the [notice to proceed] and previous suspension and delays.

31

JX 5 at 5.  Finally, this letter acknowledges that, as of May 29, 2003, "DS" certification was still an outstanding issue.

Mr. Rand and Mr. Lefkus once again met with Mr. Ross and others from diplomatic security on November 6, 2003, to address this issue.  Mr. Lekus recalled that

> we couldn't achieve [the necessary ceiling height] within a single module, but our solution was to show them, represent that, while the third floor module itself could not achieve that space, that most of that space could be achieved with its relationship with the fourth floor floor panels, which was for the mechanical suite.

Tr. 2391.  KI brought a proposed solution to this meeting in the form of a three-dimensional model.[17]  Although the model was not produced at trial, Mr. Lefkus described it as a shoe box with lid; "the third floor module looked like the bottom of a shoe box and the fourth floor panel looked like the top of a shoe box."  Tr. 2393.  The way in which KI proposed to solve the height issue was by welding extenders on the floor of the fourth floor and then welding that panel on the ten foot high third floor module.  This added approximately two feet to the standard module.  Mr. Lefkus testified that the three-dimensional model remained in the custody of the government after the meeting.  Tr. 2394. It was not introduced at trial.

When asked whether there was any discussion at the November 6 meeting about how the "lid" would be manufactured and shipped, Mr. Lefkus responded,

> A.      Yeah.  We understood at that meeting that the third floor, which was cleared space, was built securely, and the fourth floor elements, which was mechanical space, was not built securely.
> Q.      Did the government understand that?
> A.      The focus on the meeting was the clearance.  I know we discussed, you know, the fabrication of each spaces, so

---

[17] Mr. Lefkus also testified that KI representatives provided "a series of plans" and the model to illustrate the relationship between the third and fourth floor in physical form.  Tr. 2393.

> I would say they did, but that was further discussed with their transit security team. Every piece of the building was approved for transportation. It was either sent secure transportation or unsecure. So every element in the building was designated for secure. If the product was not built secure, you'd never send it secure transportation. Conversely, if you built something in a secure environment, you wouldn't send it unsecured. So, they're always related to each other.
>
> The Court:   When you say designated, by whom?
>
> The Witness: It's a process with the government to determine what spaces they deem to be secure in nature. Some are easy calls.
>
> The Court:   Spaces or mods?   Spaces or elements of the construction
>
> The Witness: Both, sir. It could be a module or it could be a container with a product in it. So, anything that got transported to the site   anything   whether it went in a container, freight bulk, as a module, there was a designated way that it was going to be transported.
>
> The Court:   Where did that designation originate?
>
> The Witness: It designated through the government's transit security team and their site security by reviewing the plans and determining an approach to transport the project from our facility to its destination in Dushanbe.

Tr. 2397-98.

On December 10, 2003, Mr. Kosinski e-mailed Mr. Ross and other government representatives with several attachments regarding general shipping plans. In a December 9, 2003 letter, which was the first attachment to Mr. Kosinski's e-mail, he wrote that the attached "shipping plans have now been revised to include the specific details requested and direction provided by the USG [United States Government] during recent meetings and discussions on this topic." JX 306 at 2. After briefly describing the shipping plans for the modules and some of the measures to be employed to ensure the security of those designated secure modules, Mr. Kosinksi wrote that "[a]s discussed during our meeting on November 6th, the panelized sections for the NOB mechanical penthouse spaces and atrium areas do not need to travel with the modules shipments and may follow alternate routing if desired." JX 306 at 3. The rest of the attachments described the plans to transport three different

groups of modules from New Jersey to Dushanbe.

Once DS certification was resolved, KI moved forward with construction of modules and panels in its warehouse in New Jersey. When modules had to be manufactured securely, they were constructed by cleared American workers under guard in a secure area of KI's manufacturing plant. There is no disagreement over the fact that the fourth-floor floor panels were not constructed securely.

The next time that the subject of the panels was discussed was on July 12, 2004, when Wayne Algire, the Site Security Manager, became concerned that the fourth floor panels were not included in the secure shipments. He e-mailed Charles "Chick" Little, Mr. Algire's Desk Officer and point of contact within the Washington, DC office of OBO, and Charles Kuehne, Senior Desk Officer for Central Asia and team leader for security procedures at DOS, JX 541 at 12, asking, "As there are no more secure shipments, that I am aware of, how is this stuff getting here[?] . . . Is the fourth floor south wing not CAA, just contiguous with the CAA?" JX 541 at 13. Mr. Little responded that, although he had to reference the drawings[18] before he gave a final answer, he could advise that, "IF it is for the CAA, it needs to be securely purchased and shipped, unless it can be randomly selected at 25% or less out of the whole of the exact same item. If it is for non-CAA, no restrictions." JX 541 at 12.

Then, Ms. Wilkins added the following to the e-mail chain:

> The Fourth Floor immediately above the CAA on the south wing of the building has full height parapet walls. The enclosed area is partially open to the sky. Those walls were not shipped secure. They cannot be randomly selected from other stock as they are custom. They have already shipped (non-secure) and will be here within a few days. Please advise whether we should allow them to be installed.

JX 541 at 11. Mr. Algire agreed with Ms. Wilkins' assessment and wrote to Mr. Little and Ms. Wilkins, "The steel as I read the drawings is for the CAA on the fourth floor above the CAA on the second and third floor of the CAA south wing." JX 541 at 8.

On July 20, 2004, Mr. Little provided his answer as follows:

---

[18] These design drawings of the CAA were also classified and not produced for our inspection at trial.

> I have looked at the drawings for this.  I have also talked with Sharmeena [Salam-Haughton]. . . .
>
> . . . .
>
> This fourth floor for the South side is a "penthouse" a "mechanical penthouse".  Yes, it is covered.  Why?  We do this sometimes.   All the equipment that goes into this area is procured and shipped non-secure.
>
> This area is completely a non-CAA area.   For construction, this means locals with CSTs [Construction Surveillance Technicians], since it is General Work area. . . . Since the floor is contiguous, the the [sic] installation of the floor slab itself should be by cleared Americans.
>
> I hope this resolves the issues about the fourth floor. This is rather normal for all NECs [New Embassy Compounds] as far as how the area is constructed.  In actuality, for NECs at the same level as yours, general construction, which includes the floor and ceiling slabs, can be done by locals under CST surveillance, so in essence requiring Cleared Americans for doing the slab is a step above what occurs on normal stick build projects.

JX 541 at 2.

The fourth-floor floor steel panels arrived in Dushanbe sometime between July 22 and August 20, 2004, after being constructed and shipped non-securely.  Once the panels arrived, KI began installing them.  KI was able to begin installing the panels in August of 2004 because, at this time, all of the modules for the South side of the NOB, the side that housed the CAA, were in place.  JX 71 at 1 (OBO Project Director's June 2004 Report); JX 48 at 129 (Expert Demonstrative showing the sequence in which each module and panel was set in place); Tr. 934 (Allen).  Mr. Allen testified that "[t]he area had around the building had been completely backfilled because we had set all the modules.  We wouldn't have been able to set all the modules if we weren't completely backfilled."  Tr. 935.  We find Mr. Allen to be a credible witness. KI had installed 6 fourth-floor floor panels when it was ordered to stop work.

On August 20, the CO wrote to Mr. Rand to notify him that KI was responsible for rectifying what he viewed as a security breach in accordance

with direction from OBO.  The issue was framed in the following manner: "[T]he third floor modules were fabricated and shipped without the required steel plating.  Instead, the third floor ceiling steel plating was fabricated as part of the fourth floor modules.  The fourth floor (penthouse) modules were fabricated and shipped, unsecured, and cannot be used as part of the third floor." JX 611 at 1.  In response, KI asserted that it had followed the OBO approved plans for secure manufacturing and shipping.  Ms. Salam-Haughton followed up on August 26, 2004, with potential mitigation strategies suggested by OBO.

Mitigation involved inspection of the panels; OBO sent a security team to conduct the inspection on site from September 17 - 28, 2004.  There were 36 panels in total, some of which were stored in the secure storage area and six of which were already installed in the main embassy building.  In order to determine whether the panels[19] had been compromised, the OBO security team, with the help of KI cleared personnel, moved the panels to the inspection area,[20] cut holes as large as 6 inches by 6 inches in the sides, top, and bottom of each panel so that the team could explore the interior of the panel, and then verified that there were no listening devices or other abnormalities.  This inspection process "required the contractor to provide additional manpower for cutting holes, a heavy lift crane with operator, [and] workers to maneuver the panels into place." JX 677 at 12.  The OBO security team found no major issues or anomalies, although the team noted that there was "water in the majority of roof panels." JX 677 at 1.  KI was not permitted to install the panels until the entire inspection was complete.   Once the inspection was complete, KI was left with the work of repairing the panels.  In addition, OBO later insisted on the installation of additional acoustic material to protect against the possibility that the inspection had missed a listening device.

Lorri Lowther, who was returned to her former position as CO at the end of October 2004, gave KI written notice on November 23, 2004, to "immediately proceed with Phase II mitigation above the three specific areas on the third floor." JX 807 at 120.  The parties, however, continued to seek a strategy for full mitigation.  On December 6, 2004, Ms. Lowther wrote the

---

[19] The panels were "3 meters x 9 meters and constructed of 6" steel tube framing, steel I-beam cross members dividing each panel into 9 sections, with 6mm steel on one side and 8mm steel on the other to enclose the panels." JX 677 at 11.

[20] KI did not remove the six panels that had already been installed.  They were inspected in place.

following to Mr. Rand:

> OBO agreed to four different [mitigation] options that would be acceptable for Kullman to execute with the understanding that Kullman would propose their preferred option within the following days. In discussions on December 3, 2004 with Sharmeena Salam-Haughton and Eric Rumpf, we understand that Kullman intends to pursue the systematic solution for Part II consisting of ceiling tile, the enhanced gypboard [quiet rock] and an expandable material in the voids.

> This is to again advise that OBO accepts Kullman's choice and Kullman is authorized to proceed immediately with execution.

> . . . .

> This guidance is provided to Kullman Industries to mitigate Kullman's improper shipment of third floor ceiling panels. The Government will not consider an equitable adjustment for either time or costs . . . .

> Mitigation, by definition, is not a change to the contract.

JX 807 at 122-23.

Shortly after the inspections concluded, KI resumed installing the fourth-floor floor panels. KI finished installation of the fourth-floor floor panels on October 20, 2004. By the end of October, all of the modules and 12 wall panels had been set. In November, KI installed "all remaining wall and floor panels at [the] NOB." JX 76 at 1. "[S]etting and welding steel columns and roof panels at NOB mechanical levels" continued into December. JX 76 at 1. By the end of December, the roof was in place, although the roof membrane was not finished, meaning that the roof was not yet fully watertight.

Joseph Allen, KI's Site Superintendent since May 2004, testified that Dushanbe experienced an unprecedented rainy reason, which began on November 17, 2004, and lasted into February of 2005. Because of the delay associated with the CAA security concerns, KI was not able to complete the roof of the NOB by the time the rains began.[21] As a result water infiltrated the

---

[21] Mr. Allen testified that KI was not able to get the roof installed and
(continued...)

rest of the building, which had been paneled with gypsum board.  Mr. Allen recalled that the building sustained water damage and subsequently mold damage.  He testified that KI tried "to keep up with it and replace the areas we knew were getting     that got damaged.  But it got too extensive.  It temperature was right, weather condition was right and, you know, mold just grew."  Tr. 837.[22]  The mold issue was not unique to the NOB but also plagued the other buildings being constructed at the embassy compound.  *See* Tr. 923-27 (Allen) (stating that there was a minor mold problem in the gate houses and that there was a mold in the Marine Security Guard Quarters).

The mold problem in the NOB grew so severe that the OBO Project Director ordered KI to stop work until there was an approved mold removal strategy.  All of KI resources were diverted to the mold issue, and an industrial hygienist was brought in to assess the damage and propose a remediation strategy.  Mr. Allen recalled the process for removing the mold beginning with closing a room and then "we'd seal off the room.  So we'd seal it off.  And the reason we did that is the industrial hygienist, when     when you pull the sheetrock off you can spread more mold spores."  Tr. 929.  The crew bagged up the sheetrock that had been ripped off the walls and disposed of it off-site.

---

[21](...continued)
watertight before the rains came because of the delay with the fourth-floor floor panels.  Once the floor panels were welded into place, KI had to install "wall panels that had to sit on top of those panels that made up the mechanical space on the fourth floor."  Tr. 840.  Then, KI "had to bring in all the mechanical equipment that went in that section into the building, and set that before we put the roof on the building."  Tr. 840 (Allen).  Mr. Allen recalled that it took two months to get the waterproofing "roof on even with the rain, which delayed us quite a bit."  Tr. 840.  When asked if KI anticipated the possibility of rain or attempted to fashion a temporary roof during the rainy season, Mr. Allen explained that the modules had been shipped with temporary roofs that had to be removed once the floor panels were installed and that KI tried to build a temporary roof on site but, "[i]t was like trying to tent a football field."  Tr. 841-42.

[22] Mr. Allen contrasted the mold issue spawned by the winter rains to the minor amounts of mold that had been encountered in late spring 2004, which developed during shipping.  There had been a few modules that developed a small amount of mold because they had gotten wet during ocean transit.  Mr. Allen's team eliminated the mold in these modules by cutting out the sheet rock, removing the wet insulation, cleaning up the area, and replacing the moldy materials with clean new materials.

In order to keep track of the man hours spent on mold remediation, Mr. Allen created a spreadsheet and directed Dennis Vance, KI's on-site Safety Manager who worked with the industrial hygienist, to input the hours for labor.   Mold remediation continued throughout the spring of 2005.

On February 9, 2005, KI submitted a formal request for an equitable adjustment[23] to cover the delay and cost of the security mitigation measures to Walter Cate and Robert Powell, the Division Directors in DOS' Office of Acquisition Management.   JX 807.   In its request, KI asserted that it "emphatically believes that it operated within the OBO approved construction security and transit security plans for the factory fabrication and shipment of the general construction items in question."   JX 807 at 4.   KI wrote the following:

> Kullman communicated its intentions regarding the secure and non-secure shipment of these items with the Government through multiple document revisions, product models, and in meetings during the construction and transit process.   At no time were the steel panels identified by OBO as requiring secure shipment.   Additionally, each of the secure shipping plans is clear as to the tentative shipping schedule, route description, and a list of the items being securely shipped.

> Until August 20, 2004, and despite our thorough documentation of the fabrication and shipment of the modules and panelized sections for the NOB, at no time was Kullman ever notified that the factory fabrication or shipment plans were incorrectly implemented.

JX 807 at 4.   Ms. Lowther eventually denied the REA on June 15, 2005, two days before KI would later be terminated for default.   In her letter of decision, Ms. Lowther wrote, "I . . . disagree with your letter's efforts to imply that OBO is somehow responsible for or approved the improper shipping of the third floor ceiling panels."   JX 1129 at 1.

On August 18, 2010, plaintiff filed a certified claim for the additional security work and mitigation, seeking $1,083,734.91, which includes mold mitigation costs for only one building: the NOB.   At trial, KI reduced the

---

[23] KI sent an initial REA for the security mitigation to the CO at the time, Brian Mulcahy, on September 9, 2004, which was subsequently denied by Ms. Lowther during her second stint as CO.

amount of the claim to $934,611.

D.      Finances

1.      The Audit of KI's Geotechnical Claim

KI filed a claim on July 1, 2004, seeking $3,728,358.62 for costs associated with the geotechnical work.  In its claim, KI asserted various theories for why it was entitled to additional compensation for the soil remediation efforts.  First, KI reasoned that "[a]n equitable adjustment is dictated by the fact that the parties understood and agreed that the geotechnical program was not part of the negotiated price on May 9, 2003. . . . It is now unconscionable for the OBO to disingenuously assert that the negotiated price included the geotechnical programs."  JX 25 at 9.  If the government did not understand KI's position during negotiations, then KI argues that "there was no meeting of the minds."  JX 25 at 13.  Finally, KI claimed that "the government is obtaining the soil stabilization program without paying for it."  JX 25 at 14.  According to KI, "the government was fully aware that Kullman had not submitted and negotiated a price for the geotechnical program.  In similar situations, the courts have held that the contract may be reformed in order to reflect the true intention of the parties . . . ."  JX 25 at 14.

Faced with KI's geotechnical claim, Ms. Lowther and John C. Sawyer, an attorney in the DOS Office of General Counsel, turned to the Office of Inspector General ("OIG").  On December 1, 2004, Ms. Lowther and Mr. Sawyer met with the OIG employees, Michelle "Mickie" Selby and August Van Dessel, and requested that OIG audit Kullman's geotechnical claim because the Department of State believed that it "had paid Kullman for the items that Kullman is basing its claim on."  JX 119 at 226.

Before the audit began, Robert Powell, the Division Director in the Office of Acquisition Management, issued his final decision regarding KI's July 2004 geotechnical claim on December 9, 2004.[24]  Mr. Powell wrote the following with help from Lorri Lowther:

> Your . . . statements make it clear that according to your claim KI has not been paid for the geotechnical work which KI has performed.  These statements are very troubling.  My staff has made a thorough review of KI's invoices to date and the payments which the Government has made in response to those invoices.   This review indicates that KI has been paid

---

[24] KI appealed this decision on January 19, 2005.  JX 119 at 990.

> approximately $2,629,547.00 specifically for all geotechnical work. . . . The invoices reflect that KI has billed for 100% of the geotechnical work and has been paid for the billed amount less contract retainage. This evidence indicates the [sic] KI either believed at some point prior to raising this claim that the contract provided for the cost for geotechnical work and KI was properly billing for the work performed and its associated costs, or KI improperly charged the government for work which was not in the contract. In either case, the evidence to date is that the government has already paid for all geotechnical work performed . . . . My perception is that your claim for $3,728,358.62 is for reimbursement for work already performed and paid for. . . . Wherefore, in light of all the above facts and evidence I deny your claim in its entirety.

JX 26 at 9-10. Mr. Powell also pointed out that KI was required to perform its own geotechnical analysis and had even invoiced the government for doing so before the LBG traveled to the site in January 2003 and throughout the May 2003 negotiations: "the Department did not once indicate that soil preparation was to be taken out of the contract nor did KI claim that soil preparation was not part of the their GMP Phase II proposal. . . . The only allowance mentioned in KI's September 27, 2002 proposal was for transportation." JX 26 at 4-5.

Mr. Powell's puzzlement about the apparent conflict between the premise behind the REA  KI had not been paid for the additional geotechnical work with the premise behind previous progress payments that KI had performed and been paid for over $2 million in geotechnical work is understandable. The apparent contradiction, of course, is that the contractor should not have been seeking payment for work as to which it had already been paid. The contradiction is not real, however, given the explanation for it. As is more fully explained below in connection with how the SOV was used, what Mr. Powell apparently did not know is that KI, with the concurrence of OBO's Mr. Ross and Ms. Wilkins, put geotechnical work into the SOV and funded it by moving money from transportation to the geotech line item. There seems to have been no objection by the contracting officers to paying invoices on this basis.

KI's decision to budget very little for geotechnical work, of course, was based on the incorrect assumption that the government had agreed in advance to approve a differing site condition claim for geotechnical work, up to $2 million. That assumption was misguided, and as we conclude below, this misunderstanding was entirely of KI's making. Unfortunately, moreover, not

only did it cause KI continual financial stress throughout the contract, but it led to a quixotic crusade by DOS legal officers to pursue a fraud investigation of KI, which unnecessarily poisoned the working relationship between the parties.

"OIG conducted its review in Lebanon, New Jersey, from February 7 to February 17, 2005, inclusive." JX 119 at 55. KI provided many documents for OIG to review in the course of the audit, but KI did not provide any information on its initial pricing proposal or supporting data. The auditors were permitted to "identify information bearing on entitlement" to the claim. JX 119 at 226. As part of the audit, the OIG looked for indicators associated with fraudulent claims. The auditors concluded that "[t]here was no one indicator present. The contractor was able to support the transactions OIG selected for review and we found no exceptions that would indicate fraud." JX 119 at 962.

Mr. Sawyer and Ms. Lowther were privy to updates on the audit and communicated about it via e-mail. Mr. Sawyer wrote the following to Ms. Lowther:

> In reference to the audit. It appears that Kullman did bill the Government for the for the [sic] Geo tech [sic] and have credited it in the books. . . . Kullman put in an REA for a differing site condition on the grounds that the Geotect [sic] was not in the contract . . . . Subsequently Kullman billed for the work as if it were in the contract and we paid the invoices. I believe this counts as an action against interest on the part of Kullman and acceptance of our payment constitutes payment of the debt "satisfaction and accord." For Kullman, Inc. to have asked for the funds now in a[] claim before the GSBCA I think constitutes a false claim.

JX 811 at 2. Ms. Lowther responded,

> WOW! You never want to believe that anyone could do something like this, but if it had to be one of our contractors then Kullman is the one who I would believe it of. You're right Kullman did first come in with the REA claiming that Geotech was not part of the contract . . . . Once Kullman received the denial of the REA, they started billing the government . . . .

JX 811 at 1. We find this professed ignorance of what KI was doing to be

42

inexcusable.  If Ms. Lowther was genuinely surprised that KI had been given permission to move money from transportation to geotech, then she had not been properly briefed about events prior to her tenure as contracting officer.

A draft of the OIG audit report was issued in March of 2005.  On March 11, 2005, August Van Dessel e-mailed a draft of the Kullman Claim Report to Fay Ropella and Alma Wolfe.  JX 119 at 44.  The e-mail receipt shows that both Ms. Ropella and Ms. Wolfe received and read the draft on this date.  The March 11, 2005 draft did not contain any financial figures or conclusions, however.  Mr. Van Dessel sent another draft to Ms. Wolfe on March 21, 2005. This draft included the following assessment: "Our audit determined that Kullman had, through February 16, 2005, incurred $3,523,728 of costs related to the claim and $11,040,1[2]3 [sic] related to transportation costs."  JX 119 at 51.  On April 7, 2005, Mr. Van Dessel e-mailed Mr. Lefkus a draft of the Audit Report for review and comment.

The draft of the audit report contained in JX 119 includes changes proposed by KI in an e-mail dated April 11, 2005.  This draft contained the following language, which was ultimately omitted from the final report: "We also determined that the claimed amounts were reasonable, allocable and otherwise allowable in accordance with the terms and conditions of the contract and with the cost principles set forth in Part 31 of the Federal Acquisition Regulation (FAR)."  JX 119 at 59.  Mr. Van Dessel also inserted this sentence that was provided by KI, "The Modification of the schedule of values was a cooperative and open effort between OBO and Kullman.  The 'shifting of funds' in the schedule never increased the fixed lump sum contract and the Contractor only did this after communication and guidance."  JX 119 at 62.  Mr. Van Dessel testified that when Mr. Sawyer was informed of the contents of the draft audit report, he was visibly upset and annoyed.  He was also annoyed that KI had been given an advanced draft of the report and been asked to comment on it.

On June 15, 2005, OIG held a meeting of department officials regarding the review of the claim submitted by KI.  Mark Duda, Karen Holcomb, Alma Wolfe, Michelle Selby, Lorri Lowther, John Sawyer, and Dennis Gallagher attended this meeting.  "Mr. Sawyer prefaced the discussions by thanking OIG for the draft report."  JX 119 at 144.  "Ms. Lowther informed all that OBO was taking over the job with the expectation of building what could be done in 60 days."  JX 119 at 144.  "Ms. Lowther stated that she was receiving calls from Kullman subcontractors regarding them not being paid by Kullman.  Ms. Lowther was concerned due to the fact that Kullman is certifying on their vouchers that the subcontractors have been paid for their work."  JX 119 at

43

145.  "Mr. Sawyer is hoping DOJ will try the False Claim."  JX 119 at 145. "Mr. Sawyer stated that the OIG draft report released to Kullman for their comments was being paraded through the halls of Congress and that it was likely that OIG would be called into court to testify on behalf of Kullman."  JX 119 at 145.

The Office of Inspector General's "Report of Audit" is dated July 2005. Its purpose:

> to determine whether amounts claimed were: (1) substantiated as having been incurred; and (2) were reasonable, allocable, and otherwise allowable in accordance with the terms and conditions of the contract and with the cost principles set forth in Part 31 of the Federal Acquisitions Regulation (FAR).  OIG extended the scope of its review to include transportation costs incurred by Kullman through February 9, 2005, because Kullman had adjusted this item from $12 million to $8.8 million to provide funding to bill for geotechnical costs.

JX 118 at 3.  OIG judgmentally selected and tested 82.8%, or $2,552,278, of the geotechnical costs claimed and 82.4%, or $9,094,366, of transportation costs.  For both the geotechnical and transportation costs, OIG found adequate support for costs tested and noted no exceptions.  In sum, the audit confirmed KI's costs with respect to the geotechnical claim.  There was nothing deceptive about the claim, moreover, because KI knew that the agency was taking the position that the additional geotechnical work was not part of the contract and could only become part of the contract through a REA. If the claim had been successful, monies would have been added to the contract and funds presumably would have been restored to the transportation budget.

2.    Kullman Industries' Financial Practices

a.    The Procedure for Obtaining a Progress Payment

Despite its financial problems, KI continued to work on the Dushanbe project and to seek payment from the government.  In order to receive a periodic payment under the contract for overhead, profit, and "the value of labor and materials completed and in place," JX 1 at 61, KI would submit an invoice, including a certification, to DOS based on the percent of the work completed compared to the SOV.

i.    The Schedule of Values

44

Much like a project budget, the SOV was a list comprised of line items that each corresponded to a particular task or activity required to complete the contract.  Jt. Stip. ¶ 40; Tr. 1378 (Rand) ("[T]here are no subcontractors or suppliers listed on our invoices to the government, only activities.").  The contract price was allocated among these various line items, such that the estimated amounts stated for all the line items added up to the contract price.  Together these various line items, and dollar estimates allocated to them, corresponded to the SOV.  As Mr. Farley, the on-site DOS Project Director, testified, "[a] schedule of values is basically a breakdown of the contract price or contract value into its component parts to assist in the payment process."[25]  Tr. 209.  Specifically, the SOV "breaks the large contract sum of $60 plus million down into digestible pieces that you can actually evaluate and assign percentages of completion against each of the line items in the schedule of values and arrive at a total for the month."  Tr. 209 (Farley); *see* JX 57 at 15.

Arriving at the monthly percent completion for each line item on the SOV was a collaborative process between KI and DOS.[26]  Mr. Kosinski, KI's

---

[25] This understanding of the SOV is consistent with the definition in the contract, which provides:

> The Schedule of Values is a tabulation of cost-loaded work elements or activities as defined in the Contractor's project execution schedule to include all design, construction, and all other cost elements of the project.  The Schedule of Values shall segregate major project elements to reflect design and construction costs for each major building and area of the project.

JX 57 at 15.

[26] Mr. Farley gave the following explanation of how the parties would arrive at the percent of work completed:

> Essentially a contractor would sit down and go through the schedule of values and would mark up what he felt he was entitled to be paid for that month, [and] submit it to our office.

> Our engineers would review the various line items as proposed that concern their particular discipline, check off on them or not.  And then I would review it, would pass it back to the contractor.

(continued...)

on-site Project Manager, who was part of that collaborative process, explained that because the SOV was an estimate made at the beginning of the job, the value of each line item did not always match what eventually was spent on accomplishing that task.  He testified that "there weren't direct one-for-one correlations between everything.  Once we actually got to the construction phase, you know, the   the design was developed further along and there were aspects of the construction work that weren't directly identified or addressed on the schedule of values."  Tr. 750-51 (Kosinski).  One of the illustrations of this lack of precision has been discussed previously, namely, that "[i]n the fall of 2003, DOS and Kullman agreed that the SOV would be modified to add line items specific to the geotech work by reallocating $3 million from the transportation line item to the new geotech line items, so that the total contract price did not change."  Jt. Stip. ¶ 40.

This collaborative effort to move transportation monies into the geotechnical item had the beneficial effect, at least for KI, of giving it money up front to cover its actual geotechnical expenses.  The unfortunate collateral effect of doing so, however, was to camouflage a fundamental disagreement, namely, whether the geotechnical work was covered by the fixed price.  By moving $3 million from transportation to geotechnical, KI financed its earlier activities, but it merely postponed the pain of running into the cap on a fixed price contract.

ii.    The Certifications

When it submitted invoices, in addition to attaching the relevant portion

---

[26](...continued)
> The way that we would do this is through an informal discussion if we had disagreements with percentages or amounts that were complete or not complete.
>
> They would submit it to us.  We would review it.  We would then discuss and resolve any differences that we may have.  It would go back to the contractor, who would then submit a clean copy.  We would review it to make sure it agreed with the agreements that we had made.  I would sign it, and that would be the payment.

Tr. 210-11.

of the SOV, KI was required[27] to make certain certified representations.  The precise wording of that certification varied over the life of the contract, but the certification relevant to the government's fraud claim was that it "has made full payment from the proceeds of prior payments," and that it "will make timely payment from the proceeds of the progress or final payment for which request is being made, to [the] subcontractors and suppliers in accordance with [its] contractual arrangements with them."  JX 1 a t 61.[28]

KI's initial invoices pertaining to the Dushanbe project  did not include

---

[27] The contract incorporates by reference FAR 52.232-5(c) (1997) and FAR 52.232-27 (Prompt payment for subs).  The former states that,

> Along with each request for progress payment, the Contractor shall furnish the following certification, or payment shall not be made: (However, if the Contractor elects to delete paragraph (c)(4) from the certification, the certification is still acceptable.)

> I here by certify, to the best of my knowledge and belief, that
> (1) The amounts requested are only for performance in accordance with the specifications, terms, and conditions of the contract;
> (2) Payments to subcontractors and suppliers have been made from previous payments received under the contract, and timely payments will be made from the proceeds of the payment covered by this certification, in accordance with subcontract agreements and the requirements of chapter 39 of Title 31, United States Code;
> (3) This request for progress payments does not include any amounts which the prime contractor intends to withhold or retain from a subcontractor or supplier in accordance with the terms and conditions of the subcontract; and
> (4) This certification is not to be construed as final acceptance of a subcontractor's performance.

[28] The form and content of the progress payment application was directed by the Project Director.  JX 1513 at 84 (Division I of the contract documents) ("The Project Director shall provide to the Contractor an example form, [which] . . . . shall delineate information required for each application [for progress payment].  The Contractor shall comply with format as directed . . . by the Project Director.").

any certification.  Then, on November 13, 2003, Eduardo Gaarder, the Chief of the European and Eurasian Branch of the Construction and Commissioning Division of OBO, contacted Mr. Rand about KI's pending application and certification for payment.  Mr. Gaarder sent Mr. Rand two example pay application forms, noting in particular the importance of the certification.  KI began using the following certification from one of the examples provided:

> The undersigned Contractor certifies that to the best of the Contractor's knowledge, information and belief of Work covered by this Application for Payment has been completed in accordance with the Contract Documents, that all amounts have been paid by the Contractor for Work for which previous Certificated for Payment were issued and payments received from the Owner, and that current payment shown herein is now due.

JX 288 at 2.

At the end of March 2004, Catherine Wilkins, the DOS Project Director, Sharmeena Salam-Haughton, the OBO Project Executive, and Mr. Gaarder indicated to Mr. Rand their view that the certification was not explicit enough regarding payments made to subcontractors and suppliers.  Mr. Gaarder e-mailed Mr. Rand with an acceptable certification, which Mr. Rand began using on KI's subsequent pay applications.  Consequently, during the period of May 2004 through April 2005, KI submitted invoices that bore the following certification:

> I hereby certify that, to the best of my knowledge and belief, that
> (1) The amounts requested are only for performance in accordance with the specifications, terms, and conditions of the contract[;] (2) All payments due to subcontractors and suppliers from previous payments received under the contract have been made, and timely payments will be made from the proceeds of the payment covered by this certification, in accordance with subcontract agreements and the requirements of chapter 39 of Title 31, United States Code; (3) This request for progress payments does not include any amounts which the prime contractor intends to withhold or retain from a subcontractor or supplier in accordance with the terms and conditions of the subcontract; and (4) This certification is not to be construed as final acceptance of a subcontractor's performance.

Jt. Stip. ¶ 42; JX 999 at 1.

Each of the invoices at issue were prepared and certified by Alan Rand. Mr. Rand, whom the court found to be a straightforward witness, testified that he understood that "[t]he certification meant that we were paying suppliers in accordance with the contracts with the government. And also the fact that the money coming in for the project was being spent on the project." Tr. 1267. Mr. Rand further explained that,

> I was certifying that the money that the government was paying Kullman was being used to pay its sub and suppliers, but once that money ran out there may have been more subs and suppliers that still needed to be paid. But that the money came in from the government, that money was used to pay whatever subs and suppliers could be paid. And, in fact, Kullman paid out more money than they [sic] had received from the government by the end of the project in May or June.

Tr. 1453-54. Mr. Rand admitted he was aware that, toward the end of the project, KI had to juggle payments to subcontractors and suppliers and that Belcor, Inc. ("Belcor"), the supplier of parts related to the fuel distribution system, had not been fully paid. Despite this, Mr. Rand believed that he was truthful in signing the certification because all of the money received from each progress payment was used to pay subcontractors and suppliers. KI was retaining no funds for itself, but it was doing triage in terms of paying some, but not all, of the amounts owed.

b.    KI's Dealings with Belcor, Inc.

KI initially ordered tanks and accessories from Belcor in February of 2004. This first order totaled $170,259, and the term for payment was "NET 30," which according to Mr. Bell, meant that Belcor would invoice KI for the items once they were delivered and KI agreed to pay Belcor within 30 days of receiving Belcor's invoice. Delivery of the tanks and accessories was scheduled for June 30, 2004.

The items supplied by Belcor, including fuel tanks, day tanks, and their accessories, correspond with line item "STF 1074 Fab Fuel tanks, piping & ship to port" on the SOV. JX 640 at 6; *see* Tr. 236 (Farley). Of the total contract funds, $435,074 was designated for this line item.

Belcor sent KI the first invoice on May 5, 2004, in the amount of $43,475 for items delivered in accordance with the first purchase order.  KI paid this invoice in full on July 12, 2004, which was more than 30 days from the date of the invoice but before KI billed DOS for any work attributable to line item STF 1074.   On June 29, 2004, Belcor sent KI a second invoice for $27,808.16 for more items requested in the first purchase order.  KI paid this bill in full on August 23, 2004, which was again more than 30 days from the date of the invoice but before KI billed DOS for any work attributable to line item STF 1074.  Belcor sent two more invoices to KI in the month of August: August 9, 2004, in the amount of $76,855 and August 25, 2004, in the amount of $22,120.90.  These two invoices, together totaling $98,975.90, remained unpaid until January 2005.

KI first requested reimbursement for work performed under line item STF 1074 through invoice No. 13220, which covered work performed on the project through August 31, 2004.  KI requested half of the funds from this line item and received the requested amount, $217,537, as part of the periodic payment[29] DOS approved on September 22, 2004.   The parties stipulated that KI received the funds from invoice No. 13220 on October 14, 2004. On December 10, 2004, KI requested payment for the remainder of line item STF 1074 as part of invoice No. 13386, which covered work performed through November 30, 2004.  Invoice No. 13386 contained the certification.   DOS approved the payment[30] on December 21, 2004, but KI did not receive the funds until January 6, 2005.  As of January 6, 2005, KI had received the full amount of contract funds designated in the SOV for prefabricated tanks.

On December 27, 2004, Robert B. Bell, President of Belcor, wrote the following in a letter to KI:

> Belcor, Inc. has two invoices outstanding on this project totaling $98,975.90 (copies attached), both of these are now out 120 days with no payment received.  The terms on []your PO clearly state "Net 30".

> Numerous calls to Kullman by Belcor have gone unanswered. No response, no call backs, no payments.  Belcor, Inc. is, as you know, a small business, and this lack of payment is creating undo financial hardship on our company.

---

[29] DOS did not withhold retainage from this payment.

[30] Again, DOS did not elect to withhold retainage from this payment.

> I would appreciate a response from Kullman Industries, but more importantly, fulfilment of the contract obligations by make [sic] payment.

JX 721 at 1.  This letter began a series of communications between Mr. Bell and KI employees.

Andy Linkowsky, an employee in KI's purchasing department, responded via e-mail on December 31, 2004, providing a contact telephone number and informing Mr. Bell that Mr. Rand and Stuart Freiman, the Chief Financial Officer, had been made aware of Mr. Bell's letter and that someone from KI would contact Mr. Bell within a few business days.  On January 10, 2005, Mr. Freiman sent an e-mail to Mr. Pearson, Mr. Lefkus, and Mr. Kullman that contained the following:

> As per our discussion on Saturday, we are sending Belcor 10M towards the 100M we owe them.  I spoke to Bob Bell of Belcor this morning to discuss the same.  Given that we are acknowledging the debt and are sending them 10M, he remained sane.

JX 734.  As promised, KI paid Belcor $10,000 on January 13, 2005.  Although Belcor received this payment, Mr. Bell wrote to Ms. Lowther on January 13 to inform her of the remaining unpaid invoices.

After making the $10,000 payment, KI requested additional supplies from Belcor.  In response, Belcor provided a price estimate and indicated its willingness to provide the additional items but wrote in a January 18 letter that fulfilling the order would be a problem because "Kullman Industries is on credit hold with Belcor, Inc. due to a past due balance of $88,000.00 which is over 5 months past due.  Without resolution of this outstanding obligation . . . Belcor, Inc. cannot authorize further shipments of materials."  JX 745.  On January 20, 2005, Mr. Rand e-mailed Mr. Freiman the following message:

> Stu,
>
> KI owes Belcor approximately $88,000.  We need to order an additional $10,000 (approximately) worth of materials.  Thus, our total outstanding debt with Belcor will soon be $98,000.
>
> I spoke to Bob Bell today.  He has agreed to continue to sell us materials, etc.  However, he is looking for some type of payment

plan.  The $88,000 is a very large open receivable for his firm.

I have agreed to pay him $20,000 within the next seven to ten days.  This will reduce his debt to effectively $78,000.  From that point we need some general understanding of a payment plan that he can expect.

Please plug the $20,000 commitment into your calculations for cash flow, etc.

JX 757.[31]

On January 21, 2005, KI issued a purchase order to Belcor for filler, pipe, couplings, and an adhesive kit totaling $8,858.75.  KI sent Belcor another payment of $10,000 on January 25, 2005.  Two days later, KI ordered from Belcor another $1,878 worth of supplies, including straps for securing the tanks.

Daniel Jordan, a KI project manager assigned to the Dushanbe project, e-mailed Mr. Freiman on February 2, 2005, with a list of creditors "to be paid," one of which was Belcor.  JX 779.  Mr. Jordan wrote, "we owe [Belcor] $78,975.90, but pay whatever we can spare.  Bob Bell has bent over backwards to get his material on our recent air shipment."  JX 779.  Mr. Rand was copied on this e-mail.  KI paid Belcor $10,000 on February 7, 2005.  The next day, Belcor sent KI invoice No. 34073 in the amount of $9,475.97.  On February 23, 2005, Belcor invoiced KI another $465 and KI paid Belcor another $10,000.  KI made a $5,000 payment to Belcor on March 22, 2005.

On April 18, 2005, Mr. Bell sent an e-mail to Mr. Linkowsky at KI checking on the status of payment.  KI paid Belcor another $5,000 the following day.  This was the final payment that KI would make to Belcor.  The balance remaining at that time was $60,869.

c.      The Government's Knowledge Of KI's Position

Before KI fell behind on its payments to Belcor, it notified the government of its financial problems, which KI attributed to difficulties with the Dushanbe project.  *See* JX 303 (KI informed the government of its

---

[31] Mr. Freiman's response to Mr. Rand was less than enthusiastic as he questioned "who authorized you to make a commitment for $ without talking to me."  JX 757.

precarious financial position and that "subcontractors struggle with large outstanding balances for work that has already been performed and approved" as early as December 5, 2003). On April 30, 2004, Mr. Lefkus sent Ms. Lowther a letter in response to an April 13 meeting attended by Ms. Lowther, Mr. Lefkus, and Mr. Rand. In the letter, Mr. Lefkus lists "Contractor's Out-of-Pocket" unpaid expenses for which the agency was withholding payment, including the costs for geotechnical work, two unpaid invoices, and another transportation invoice, which totaled over $9.5 million. JX 475 at 2. Mr. Lefkus also pointed out that KI faced an additional $6.5 million in "Immediate Future Obligations." JX 475 at 2. In light of these unreimbursed expenses, Mr. Lefkus informed Ms. Lowther that "[t]he project economics simply do not work for Kullman . . . . [because of] the severity of these economic issues." JX 475 at 2. Mr. Lefkus conceded that "[t]he resources to float this amount of money simply do not exist." JX 475 at 2. To address this situation, KI sought "a reasonable remedy where OBO can feel it maintains appropriate security while the project funding ensures robust performance." JX 475 at 2.

In a June 2, 2004 e-mail Mr. Lefkus once again stressed the importance of a meeting between officials from KI and the government to discuss the cash flow from the Dushanbe project. Mr. Lefkus sent this e-mail to Walter Cate, the Division Director in the DOS Bureau of Acquisitions and copied Mr. Rand and Mr. Kullman. Mr. Cate forwarded the original e-mail to Mr. Powell, directing him to set up a meeting including Ms. Lowther. Ms. Lowther responded internally to Mr. Powell and Mr. Cate on June 3, 2004,[32] that she did not believe a meeting would prove useful until KI provided "HARD DATA," in writing, to "back-up their wild accusations" especially in light of the fact that the contract was almost a year behind schedule, that there were ongoing security issues, and that "[w]e have subcontractors that have not been paid." JX 521 at 1.

Additionally, Ms. Lowther testified at trial that subcontractors and suppliers called her and sent her letters informing her that KI had not paid for work performed on, or supplies provided for, the Dushanbe project. *See* JX 1495 (November 18, 2004 letter sent by Ms. Lowther to Mr. Rand informing him that York International Corporation ("York") had complained to her about KI's failure to pay in full); *see also* JX 692 (Mr. Rand's November 22, 2004 response asserting that KI had paid York substantially more money than DOS

---

[32] As of June 3, 2004, KI had received the first invoice from Belcor and was within the "NET 30" period for payment. KI did not invoice the government for line item STF 1074 until August 31, 2004, but paid Belcor's two initial invoices by August 23, 2004.

had paid KI for line items attributable to work performed by York).[33]

Despite these facts, Ms. Lowther maintained at trial that KI did not notify DOS that it was withholding payment from Belcor. According to Ms. Lowther, notification under the contract was a formal process. Ms. Lowther pointed to the fact that KI formally notified her, via e-mail, of its intent to withhold funds from Greenway Enterprises due to a dispute with the subcontractor. Mr. Rand did,[34] in fact, notify Ms. Lowther and Ms. Salam-Haughton in writing that KI was withholding funds from Greenway Enterprises because that subcontractor was being terminated for default.

As a practical matter, however, by January 13, 2005, Ms. Lowther clearly knew that KI had not fully paid Belcor because Mr. Bell wrote to Ms. Lowther informing her of the situation. Ms. Lowther responded to Mr. Bell in a February 3, 2005 letter by summarizing the applicable regulations, noting that the "government is not privy to the information contained in any prime-subcontract agreements" and was therefore not involved in the dispute, pointing to the contract between KI and Belcor as the "key document" for determining whether KI was within its rights to withhold funds, and assuring Mr. Bell that she would remind KI of its obligation to pay subcontractors and suppliers. JX 782. On the same day, Ms. Lowther sent a letter to KI reminding it that "[o]fficial notification must be provided to the subcontractor and the Contracting Officer in order to fulfill these requirements [under the FAR] or else payment must be made." JX 783 at 1. Ms. Lowther also forwarded to KI her response to Mr. Bell.

While KI did not respond in writing, it did attempt to address the issue in person. Ms. Lowther recorded the interaction in an e-mail she sent to Mr. Sawyer:

> Today was the site meeting and both Mr. Rand and I attended the meeting and we were both very professional. However, in the meeting they just couldn't help themselves knowing, I was

[33] Ms. Lowther testified that her role was limited to communicating with KI about alleged shortfalls in payment to suppliers or subcontractors. She typically did not investigate such allegations but would turn them over to her supervisor and the Office of Inspector General.

[34] According to Mr. Rand, this notification was required under the certification because Greenway Enterprises was a major subcontractor on the project and KI was anticipating major shortfalls due to the issues with Greenway.

> in the room and they starting [sic] complaining how they
> couldn't pay their subcontractors because the government owed
> them money for Geotech, Mitigation and blah, blah, blah.

JX 811 at 1.  After this, KI continued to submit certified invoices through the
spring of 2005,[35] and the agency continued to pay them.

After KI's April 2005 payment of $5,000, Belcor continued pressing KI
to satisfy the outstanding balance of $60,869.  Mr. Bell called KI, he e-mailed,
and he threatened to get DOS involved; all to no avail.  Although Mr. Bell did
not know it at the time, during May through July of 2005, KI was winding
down construction on the Dushanbe project and preparing to abandon the job.

IV.     Termination for Default

A.      Final Efforts

Toward the end of the contract, KI sought additional funds from the
government and from private sources to ameliorate the project deficit caused
by the accumulation of several issues: the geotechnical work, the security and
mold mitigation issue, and retainage.

1.      KI Petitions Ms. Lowther for Return of Retainage

KI formally petitioned Mr. Cate and Mr. Powell to return a portion of
the retained funds on February 18, 2005.  On behalf of KI, Mr. Rand wrote,

> Over the course of the past twelve months Kullman Industries
> has been promised a reduction in the current high amount of
> retainage held on the Dushanbe NEC project initially based
> upon our ability to successfully transport the modules from our
> Lebanon, NJ fabrication site to the Dushanbe NEC site.  In fact,
> we were promised a pro-rata reduction in the retainage based
> upon successful monthly arrivals of the modules in Dushanbe.
> Despite successfully delivering the modules to the site, the
> retainage was never reduced.  Subsequently, we were promised
> a reduction in retainage based upon the completion and
> submission of a 'final' Geotech report.  Attached, please see a

---

[35] Invoice No. 13442 was submitted on February 1, 2005, Invoice No. 13493
was submitted on March 2, 2005, Invoice No. 13561 was submitted on April
11, 2005, and Invoice No. 13647 was submitted on May 12, 2005.

copy of the final Geotech report.

I trust that we are now at a point where the retainage on this project can be reduced to a more appropriate level given the fact that Kullman Industries is approximately 87% complete with the project, and to a level that more accurately reflects any remaining risk that OBO deems required.

JX 826 at 1.

Ms. Lowther denied this request on March 4, stating that it was the CO's right under FAR 52.232-5 to retain up to 10% of the contract value when the contractor had not made adequate or satisfactory progress.  JX 863 at 1 ("The promises Kullman references that were made last year to reduce the retainage were based on the successful transporting of the modules, significant progress of work and development of an accurate completion schedule.  To date, Kullman has not demonstrated significant progress.").  Ms. Lowther did not mention liquidated damages as a justification for withholding the previously retained funds.

## 2.    KI's Attempt to Obtain Private Funding

In February of 2005, KI began an effort to borrow approximately $2,000,000 from Tatonka Capital Corporation ("Tatonka").  By May 5, 2005, KI and Tatonka had worked out the terms of a loan.

Carol Hansen, Tatonka's Chief Executive Officer, contacted Ms. Lowther "for confirmation of the Dushanbe numbers."  JX 1007 at 1.  After speaking to Ms. Lowther, Ms. Hansen called Mr. Kullman and informed him that Tatonka could not go through with the loan.  According to Mr. Kullman, Ms. Hansen told him that "Lorri told her that my money was being held for retainage, that there was mold litigation going on, I was never going to get retainage, and, you know, things weren't in too good shape."  Tr. 1823. Following this telephone conversation, Mr. Kullman e-mailed Ms. Hansen with a draft letter memorializing what she had told him about her conversation with Ms. Lowther and asked her to sign and send the letter to KI if she agreed with the content.  Ms. Hansen agreed with the content and sent the letter on May 13, 2005, which detailed her conversation with Ms. Lowther and formally denied KI's request for funding. Ms. Hansen wrote to Mr. Kullman, "While Ms. Lowther confirmed the retainage amount you indicated, she stated that Kullman was involved with mold litigation and that liquidated damages would

be assessed.  While you made us aware of the geotech claim, these undisclosed issues prevent us from moving forward."  JX 1007 at 1.

When asked at trial about her conversation with Ms. Hansen, Ms. Lowther maintained her position that the government was assessing liquidated damages but admitted that she knew there was no litigation involving the mold mitigation.

After failing to secure private funding, KI wrote the following to Ms. Lowther:

> In an effort to keep the project moving despite excessive funds being retained, Kullman sought financing.  However, when a representative of the financing institution contacted you regarding the status of the project, you incorrectly stated that there was mold litigation, and that you were withholding funds due to that litigation.  This misstatement caused the financing institution to retract its offer of financing to Kullman.  In addition, the financing institution was advised that liquidated damages were being assessed.  We have no knowledge of any assessment of liquidated damages.  Whether it was your intention or not, you certainly damaged Kullman's financial resources, which may affect the completion of the project.

JX 1031 at 2 (KI's response to the government's cure notice).

### 3.     KI Meets with DOS Officials in a Final Attempt to Obtain Funding

After exhausting options for private funding, KI once again approached the government in an attempt to convince it to release all or part of the money that it had retained on the contract.  Mr. Kullman testified that he contacted General Williams, congressmen, senators, and even "Arlen Specter to go to Connie Rice who was the head of the State Department."  Tr. 1522-23.  Eventually, Mr. Kullman got in touch with Mr. Prior, the Construction and Commissioning Director at OBO within DOS.  Mr. Prior set up a meeting that occurred in May of 2005.  Mr. Kullman recalled the following:

> So then I speak to Mr. Prior, and he's, you know, he speaks to General Williams.  And he says, General Williams is upset about the whole thing and he's upset how your finance company was interfered with, and there is a recording of that conversation

. . . . And we had a meeting. And it was in a large conference room filled with the Cates of the world and all the top people were there.

And I told them, I can't finish this job. I am going to go out of business. I am going to go bankrupt. I can't pay people. And they sit there    and now all these people had never heard of the Geotech Report. You're telling me that the people in that room didn't know there was a Geotech Report? Okay. Anyway I walked out of that room, and what they said was they were either going to figure out how they could release some retainage, how to maybe find out, do something on the geotech, do something in all these different items to free up some money so we could finish the job. So that's the first time I ever saw a meeting where everyone wanted to get together and finish this job.

Tr. 1524-25. Despite KI's persistent efforts to have the government address one of the pending requests for equitable adjustments or to release some of the retained funds, it was unsuccessful.

B.     The Cure Notice

Instead of responding to KI's latest request for money, Ms. Lowther sent a formal cure notice to KI on May 21, 2005. JX 1027 at 1 (noting that KI and the government had met extensively during the previous week about the "current situation"). In the letter, she reminded KI that the Dushanbe Project was awarded as a sole-source contract because of the project's urgent and compelling nature. She wrote, "[n]othing has changed to lessen the urgency of the completion of this project. . . . [T]ime is of the essence in the completion of this project." JX 1027 at 1. Then, Ms. Lowther listed the following reasons that KI was failing to make adequate progress:

1.     The Government understands that York International is retaining necessary parts for air conditioning because of lack of payment.

2.     The Government understands that PDI has not returned to the site. PDI's work is on the critical path to completing this project.

3.     The Government understands that there is 60,000 lbs of materials remaining at Baltimore Packing. This material needs to be shipped to the site immediately.

> 4. The Government understands that there are 6 containers
> in Riga awaiting trans [sic] shipment to Dushanbe.

JX 1027 at 1. Unless KI cured these conditions by June 17, 2005, "the Government will be forced to consider termination for default under the terms and conditions of the contract." JX 1027 at 1. Although the contract completion date of June 20, 2004, had not been changed as of the date of the cure notice, Ms. Lowther indicated that the government expected substantial completion of the Dushanbe Project by September 1, 2005.

KI responded on the following business day May 23, 2005, with a letter addressing the issues raised in the cure notice. JX 1032. KI asserted that it complied with the first condition and ordered the parts requested from York International. Next, KI requested DOS's assistance to secure PDI's return to the job site because PDI was currently occupied with another DOS project. KI explained that the materials remaining in Baltimore were not delaying the project even if they arrived after June 17, as scheduled. It indicated, however, that it was willing to expedite the shipping if the government was willing to pay for the increased air freight shipping costs. Regarding the final condition, KI pointed out that the containers were delayed in Riga because of political unrest, which was beyond KI's control.

After explaining its position on the conditions to be cured, KI reasserted its position on the release of funds being retained and the financial difficulties of the project. Finally, KI expressed the following:

> Although Kullman wants to complete the Dushanbe project, it may be forced by the State Department's actions, including its material breaches of the contract, to reduce its forces to an appropriate economic level. This step, if taken, is not take lightly or without considerable forethought. It is somewhat incongruous and disconcerting that when the project is nearly complete, the State Department has acted in an arbitrary and capricious manner, has breached its duty of cooperation and has interfered with Kullman's ability to prosecute the work to completion, including impairment of its ability to obtain financing.

JX 1031 at 2.

Ms. Lowther mailed and faxed a response to KI on May 24, 2005, which noted KI's failure to affirm that it would cure all conditions by the

stated deadlines.  She also noted that KI had reduced its on-site workforce by 50% and that an "increase in manpower remains a condition of Cure."  JX 1035 at 3.  Ms. Lowther reiterated that the project remained urgent and compelling and that the government expected KI to cure and make adequate progress to remain in compliance with the contract.

C.    "Winding Down"

Following its response to the cure notice, KI began to reduce its participation at the Dushanbe job site to what it considered an economically feasible level.  In fact, KI had been considering whether it should wind down its participation at the Dushanbe project site for some time prior to the cure notice.

KI's internal discussions about whether to reduce the scope of work at the Dushanbe Project began in March of 2005.  *See* JX 860 (discussing plans to increase the workforce with 15 additional cleared American workers, noting that the lack of funding made paying current workers difficult, and concluding that "[w]e may very well have reached the point where we need to pull back the American staff and slow down the operation until OBO releases additional funds"); Tr. 577-79 (Kosinski).  Ms. Lowther recorded that "[b]eginning on May 11, 2005, Kullman initiated a draw down in its workforce by cutting approximately 50 percent of its cleared American workers on site."  JX 1035 at 3 (May 24, 2005 letter to KI regarding KI's response to the cure notice).

On May 21, 2005, Mr. Kosinski discussed with Mr. Rand and Mr. Lefkus the cost of travel "to fly everyone out of here if that's where we end up."  JX 1030 at 1 (suggesting also that five individuals remain in Dushanbe "to wrap things up").  By the time that KI had responded to the cure notice, Mr. Kosinski had prepared a spreadsheet of KI's minimum monthly operating costs that could be adjusted  depending on "how far we want to scale back."  JX 1033 at 1.  Mr. Kosinski recommended leaving the "Case backhoe, the Bobcat, . . . the small compactor" and the "Lull" on site so that KI could "continue with at least some of the excavation and grading work even if we decide to pull everything else out."  JX 1033 at 1.  The plan to send a majority of the workforce home continued to develop over the next few days.  *See* JX 1038 (including a detailed travel plan), JX 1059 (stating the need to purchase tickets so that the workforce could travel home between the twenty-second and twenty-fifth of June).

Part of KI's internal conversation about whether and to what extent the company should diminish its forces in Dushanbe concerned an effort to predict

how the government would respond.   Some KI decision-makers hoped that reducing the workforce in Dushanbe would cause the agency to take seriously KI's claims regarding its dire financial situation and would lead it to grant one of KI's various requests for funding.   Mr. Rand was not optimistic about the outcome, however, and wrote the following to Mr. Lefkus: "As we get closer to D-day with OBO I feel that everyone should be very clear of 'the end game'.   I would not put it past OBO to terminate KI for default, and then to hire a [general contractor] to complete."   JX 1064 at 1 (e-mail dated May 29, 2005).   He warned Mr. Lefkus that "[w]e are thinking much to [sic] logically and from a business sense to understand how the government works."   JX 1064 at 2.

In June, the Dushanbe project was nearing completion as KI worked on the interior and exterior finishes of the buildings and prepared to lay the curbs where the roads had been graded.   Even as work continued, however, KI further developed its plan for how to move most of its workforce out of Dushanbe.   JX 1086 (June 7, 2005 e-mail with attachment "showing how much additional funding is required to pay off all our local accounts as of June 15th"); JX 1090 (June 7, 2005 e-mail working out travel details).   Mr. Kosinski testified that while there was a possibility that KI could re-mobilize the workforce if the government provided additional funding, the only people who were scheduled to return to Dushanbe were himself, Fred Martinez, and Joseph Allen.

Despite the fact that KI planned to leave the job site in June, it kept its intentions concealed from subcontractors and from the government.   JX 1090 at 1 ("At some point - BUT NOT YET!!!! - we will need to notify Atlantic Group to make . . . arrangements for their (5) remaining guys who are also scheduled to depart via Istanbul on the 22nd.   Please take direction from Alan on the appropriate time to contact the Atlantic Group - NOT YET!!!"); Tr. 596 (Kosinski) ("[I]t seems that we didn't want to let Atlantic Group know what we were planning to do at that point. . . . Maybe it was we didn't want them to pull their guys out or to get concerned that we were pulling off the project. Maybe we didn't want them to tip our hand to the government at that point.").   One reason was that DOS had approved a $679,423.00 progress payment on June 2, 2005, which KI was waiting to receive as of June 7, 2005.   JX 1087 at 1 ("Mr. Kullman confidentially explained to us that he will be collecting a fairly large receivable from the State Department.   After receiving this payment, he will begin pulling his people off the State Department job.").

Between June 1 and June 18, KI maintained only minimal labor on site. On June 13, 2005, Mr. Kosinski wrote to Christine Byrnes, Alan Rand's

Administrative Assistant,[36] that the local workers would be laid off the next day.  The June 13 travel plan listed departure dates for local workers and KI employees between June 8 and June 25.  KI began sending letters to its subcontractors on June 14, 2005, asking them to cease work on the Dushanbe project, remove any on-site workers or materials, and halt any plans to deploy materials or personnel.  KI included in these stop work orders a sentence expressing that "[w]e are hoping to work out disputes with the US State Department in order to remobilize the project.  However, we do not know what the outcome of these discussions will be."  JX 1114 at 1.  Mr. Kullman attempted to contact Ms. Lowther by phone and e-mail on June 14, 2005, to "discuss the current situation on the project." JX 1118 at 1.  Nevertheless, Mr. Kosinski meanwhile was destroying contract files as part of preparations to leave the job site.  As of June 20, 2005, KI had suspended all contractor and subcontractor activities on site.

D.     The End

On June 17, 2005, DOS terminated the contract for default.  Ms. Lowther wrote the following:

> Based on our telephone conversation the afternoon of June 14, 2005 the Government understands that Kullman Industries is demobilizing from the Dushanbe NEC project site effective Monday June 13, 2005.  The Government also understands that Kullman has written to all of its subcontractors on the project and informed them that they will not be paid and should leave the project site.  This information has been confirmed today by the OBO representative at the site.  The OBO representative at site telephoned OBO Washington this morning to notify OBO that your project manager has confirmed that all subcontractors have been terminated and that all work on the project has ceased.  You are hereby notified that the Department of State considers such unilateral action on the part of Kullman Industries to be an intentional and inexcusable breach of contract.

JX 1133 at 1, JX 1135 at 1.[37]  Ms. Lowther testified that after "looking at

---

[36] Mr. Rand, Mr. Jordan, and Mr. Allen were copied on this e-mail.

[37] In the CO's June 17, 2005 Final Decision letter, she asserted that she had
(continued...)

everything as a whole and with them basically leaving the job site and not progressing on the contract, I felt like I had no other recourse than to terminate them." Tr. 450. When asked by the court if her decision might have been different if she had considered KI's assertion that its inability to pay subcontractors was caused by the government's failure to release previously earned but retained funds, Ms. Lowther answered, "[a]t the time of the Termination for Default? Without sounding cold, I would have to say [no] because they were leaving the job site and that was primarily what I was basing the determination on, was lack of progress with the work." Tr. 481. Thus, the CO's ultimate justification for terminating KI was that it had abandoned the job.

When work ceased, the Dushanbe Project was, according to the OBO Project Director's Monthly Progress Report, 91.29% complete. On June 6, 2005, Irving Fontaine, the on site Project Director recorded that KI had recently completed the following activities:

> [I]nstalled external window trims at NOB; completed floor tiles at NOB dining; installed spandrel windows at NOB and MSGQ stair towers; installed area heaters and overhead coiling doors at warehouse; completed backfill at fuel diesel tanks; completed wall insulation [      ] at MSGQ; completed two electrical manholes; installed acoustic inclosure at water chillers; completed utility shell, installed HVAC unit and duct work at

------

[37](...continued)

"assessed liquidated damages as a result of Kullman's failure to complete this project on time" and that KI would "be liable for any damages to the Government resulting from the Contractor's refusal and failure to complete the work within the specified time" including costs incurred to complete the work. JX 1133 at 2, JX 1135 at 2. There is no evidence that Ms. Lowther actually followed up with a formal assessment of liquidated damages or reprocurement costs. She had previously stated in the May 24, 2005 letter, however, which was in the series of communications regarding the cure notice, that the government had notified KI in writing on June 18, 2004 that it was assessing liquidated damages and that "[t]o date, Kullman has incurred $1,139,060.00 in [liquidated damages]. In addition, the June 18, 2004 letter explained that any retainage released would be less the amount of accumulated [liquidated damages]." JX 1035 at 3; Tr. 483 (Lowther). As Ms. Lowther pointed out, the government was within its rights under the FAR to retain roughly 4% of the contract, which in this case amounted to $2,169,521.50. FAR 52.232-5(e) (2003).

service CAC.

JX 82 at 1 (May OBO Project Director's Monthly Progress Report).   The following activities were ongoing:

> sealing between exterio[r] stone panels, removing mold damage GWB and plywood in NOB; vacuum cleaning and wet wiping throughout NOB building; installing GWB and plywood throughout NOB north 2nd floor; plastering and painting walls at NOB south 1st floor; installing HVAC ducts at NOB 4th floor; installing studs for internal spaces at service CAC sally port area; installing rebar for delta barrier at service CAC . . . .

JX 82 at 1.

There is other credible evidence, however, that the progress reports were inaccurate, and that more than 9% of the work remained.   Eric Rumpf, who was OBO's Branch Chief for the Europe and Eurasian Construction and Commissioning Division, traveled to Dushanbe to assess the project status at the end of June 2005, after KI's termination.   Mr. Rumpf testified that the project was not nearly complete:  there was still work left to be done on the central utility building, which connected the other buildings with utilities,[38] there was no landscaping, the roads and sidewalks were not complete, twenty percent of the protective perimeter wall was not finished, the buildings were still missing some exterior facade, there was still work left to be done in the interiors of the buildings owing to the mold mediation measures, there was still mold and water damage in the Marine Security Guard Quarters that required a "major overhaul," PDI's work within the CAA had not concluded, and there were a few windows that still needed to be installed.   Tr. 81-100.

V.    Bankruptcy

On October 17, 2005, KI filed for bankruptcy.   Mr. Kullman recalled that, "even when I did go bankrupt, every job that I was working on, those clients all got their buildings. . . . The only client that didn't get a completed building was the State Department.   And why?   Because I was terminated."   Tr. 1528.   During the same time frame, DOS was seeking to debar KI.

---

[38] Although the internal utilities connections between buildings were not yet finished, the only utility that was available on site at the time of termination was water.   The government had not yet fulfilled its obligation to provide external sources of electricity and telecommunications.

The Trustee in Bankruptcy filed her complaint here on June 16, 2006. The government counterclaimed on June 19, 2007.

## DISCUSSION

Trying a default termination frequently takes on the character of a juridical autopsy, an after-the-fact effort to determine what went wrong and who was responsible. The autopsy we are called on to perform here is particularly poignant, given that, at the end of the day, a successful, family owned business no longer exists. We have no doubt that KI undertook the contract to build the embassy in Dushanbe fully capable of completing it and fully intending to do so. We are also satisfied, however, that virtually all the problems which arose and kept it from completing the work can be traced to one mistake KI made early on and which continued to do mischief through the following two years: KI's misunderstanding of the effect of M002.

Ultimately it was KI's self deception concerning what it had agreed to do, and at what price, that launched contract performance onto a doomed trajectory. As we will see below, KI bound itself to perform all the work, including the geotechnical aspects, at a fixed price. Its willingness to hazard the contract was prompted by an unwarranted assumption that it could ask for more money if the geotechnical aspects of the foundation proved to be difficult. That mistake was then compounded by its subsequent reliance on erroneous advice about the difficulty of preparing the foundation, leading it to spend, unnecessarily as it turned out, far more than it budgeted for geotechnical work. The combination of those two mistakes, neither of which can be shifted to the government, put KI over budget and behind schedule virtually from the beginning and ultimately accounts for the default termination.

The fact, for example, that what should have been the routine, bilateral development of a schedule of values to trigger progress payments became impossible to establish with accuracy. In order for KI to develop cash flow up front, it became necessary for the parties to collude on a disingenuous schedule, postponing the inevitable collision of that contrived schedule with the reality of more remaining work than remaining money. That, in turn, prompted KI's inability to keep up with payments to its subcontractors. KI's misguided REA also triggered the government's belief that KI was attempting to perpetrate a fraud. Our evaluation must begin, therefore, with the contract negotiations over price and the subsequent disagreement over who was responsible to pay for the geotechnical work.

65

I.     The Geotechnical Claim

Plaintiff's geotechnical claim is difficult for the court to classify. On occasions it appears to be a differing site condition claim for unusual soil conditions. Occasionally it is presented as a straight contract claim. I.e., that the parties agreed to also pay KI whatever it took to complete the foundation work. It has been presented as a species of bad faith breach of contract claim or an argument that the government is estopped from denying that it owes KI more than the fixed price of the contract. In whatever form it is argued, however, there can be only one outcome. The claim fails because a literal reading of the contract plainly supports defendant's contention that plaintiff assumed the risk for how much the geotechnical and foundation work would cost when it agreed to a fixed price. The facts set out above demonstrate that the contract obligated KI to perform all the work, including the foundation, at that price.

The parties did not, contrary to plaintiff's argument, reserve for a later day a full reckoning on the price for geotechnical work. It may well be the case that Messrs. Lefkus, Rand and Kullman believed that they had negotiated such a reservation, but it does not appear in writing. In fact, the written evidence is that what KI representatives assumed was in effect an allowance for geotechnical work was merely the agency's recognition that, only if KI could establish a differing site condition due to unusual soil condition would the agency have to face additional cost. Even assuming Mr. Lefkus knew that Mr. Sutherland had set aside up to $2,000,000 for a possible differing site condition claim, he was wrong to leap to the conclusion that the agency would not contest it.

Nor is there any support for KI's argument that Mr. Sutherland or others in DOS knew that KI was operating under the false impression that any work beyond "standard" foundations was not included in the original contract, and that this reflected a cynicism bordering on bad faith. KI asserts that it signed M004 and performed the geotechnical work in reliance on the agency's purposeful silence and misleading actions indicating that the geotechnical work would be paid for through a request for equitable adjustment: "DOS undertook the conduct with the intention of having Kullman believe DOS was in agreement with Kullman's view of the Geotech [issue] to ensure the execution of Mod 4." Pl's. Post-Trial Br. 17.

We disagree. Plaintiff has the obligation to prove that agency representatives affirmatively misled it. *See Zacharin v. United States*, 213 F.3d 1366, 1371 (Fed. Cir. 2001). Mr. Sutherland can be charged with

knowing that KI did not want to include geotechnical within a fixed price contract, but he and others made it as plain as they could that the agency would not agree to those terms.  It would only hold out the possibility of entertaining a differing site condition claim at a later date.  Although Mr. Lefkus may be a good salesman, and Mr. Kullman is unquestionably a first class manufacturer and businessman, both gentlemen were naive in their negotiations with Mr. Sutherland and in not taking him at his word.

We recognize that Mr. Sutherland and other DOS contracting employees were eager, indeed desperate, to close the deal on a fixed price contract before September 30, 2002.  And they may have welcomed KI's naivete in agreeing to take on the risk that it could perform at a profit.  None of that amounts to bad faith, however, or grounds for concluding that there was no meeting of the minds.  Either there was a differing site condition or there was not.  If there was, KI would be entitled to an equitable adjustment whether the agency agreed to one or not.  If there was not a differing site condition, then the fact that Mr. Sutherland held out the possibility of KI attempting to prove one does not mean that KI is entitled to an equitable adjustment without proving a differing site condition.

It is ironic, and indeed tragic, that the SANIIOSP report prompted plaintiff to invest millions in what probably was over-engineering with respect to the foundation work.  But KI's own experts came to the same conclusion and the result was investment in an elaborate watering/compaction/de-watering scheme, which appears to have been unnecessary.  The fact that the extra work was undertaken at all precludes the argument that the possibility of soil subsidence was unknown to KI.  The fact that it was probably unnecessary also means that there was not a differing site condition.

Nor can the government be held responsible for any possible alarmist language in the SANIIOSP report because the contract put the burden of site investigation on plaintiff and its expert.  The fact that plaintiff had little time to do a thorough investigation is also unavailing, as M002 was negotiated after KI had been given the opportunity to conduct its own investigation.  If plaintiff had been concerned that it was being pressed into making a premature decision, it had the option of simply not agreeing to the government's terms, unpalatable as that might have appeared at the time.

The fact that the schedule of values was amended to include more money for geotechnical work does not constitute a waiver by the government of its right to objectively assess whether there was a differing site condition.  It is certainly clear that the agency consented to moving money from

transportation to geotechnical work, but that was done to keep the project moving, not by way of an agreement in advance to a differing site condition claim.[39]  The phrase, "no good deed will go unpunished," comes to mind.

We will not venture to estimate the number of DOS offices that had a role in the formation or administration of this contract, much less the number of individuals involved.  So it is ironic that not enough of the many DOS employees who had a role in this contract appreciated the implications of the shift of funds from transportation to geotechnical work.  Lack of the most basic communication on this score triggered a wholly unwarranted fraud investigation by DOS' contracting office against KI.  The REA, of course, was based on the assertion of extra-contractual work on a differing site condition.  The shift of funds within the budgeted total contract amount, however, was predicated on the contrary assumption that the work paid for was part of the contract.  Plaintiff can be forgiven for ignoring the obvious inconsistency; it was desperate to keep up the cash flow, and it did not hold itself out as knowledgeable about contracting niceties.  The same cannot be said of the agency's employees. Mr. Sawyer leapt to the conclusion that the inconsistency could only be explained by fraud, without, apparently, ever contemplating the obvious implications of the contracting officer's acquiescence to moving funds around.  That no one with knowledge of the facts had the common sense to intercept this juggernaut is distressing.  We hasten to point out, however, that this is not the fraudulent conduct that the government still asserts, which is discussed below.

In sum, plaintiff was contractually bound to perform all the geotechnical work for the original fixed price.  And none of the agency's conduct surrounding the geotechnical issue gave rise to a new contract or grounds for revoking or supplementing the old contract, nor do they constitute bad faith.

---

[39] We therefore attach no significance to the testimony of Mr. Powell, who signed the REA denial as CO.  He was asked at trial whether he was aware that the schedule of values had been amended to include geotechnical work or whether he was aware of the internal communications regarding a $2 million contingency being reserved for geotechnical work.  If he had been informed of the reserved contingency, Mr. Powell said that "[i]t would have been taken into consideration."  Tr. 4680.  Even if there had been a "contingency" in the event an REA was advanced, payment for an equitable adjustment would depend on whether there actually was a differing site condition.  There was not.

II.     Whether the pay certification on invoices 13386, 13442, 13493, 13561, and 13647 was false.

In its counterclaims, the government asserts that KI fraudulently submitted invoices for payment which included false information. Specifically, the government alleges that KI falsely certified in invoices 13386, 13442, 13493, 13561, and 13647 that

> (2) All payments due to subcontractors and suppliers from previous payments received under the contract have been made, and timely payments will be made from the proceeds of the payment covered by this certification, in accordance with subcontract agreements and the requirements of chapter 39 of Title 31, United States Code; [and] (3) this request for progress payments does not include any amounts which the prime contractor intends to withhold or retain from a subcontractor or supplier in accordance with the terms and conditions of the subcontract.

Jt. Stip. ¶ 42.  The certification was false, according to the government because KI knew that, at least with respect to one supplier, Belcor, KI had been paid by the government for all that Belcor had supplied, but KI had not in fact paid Belcor all that it was owed.  The government interprets this certification to mean that KI warranted that it had paid each subcontractor and supplier in full for all work completed in the past and would timely pay them in full for work completed during the pay period for which it submitted each invoice.

Plaintiff argues that the certification could reasonably be interpreted as meaning that KI had paid its subcontractors and suppliers as much as it could of the amounts due under the subcontract agreements, or, alternatively, that KI could make the certification so long as it had some understanding with the suppliers about paying amounts due over time.  This is, in fact, the meaning that Mr. Rand ascribed to the certification when he signed it.

We find the following from the facts set out earlier in this opinion. First, defendant is correct that KI certified something that was not true.  Belcor provided $180,236.03 worth of supplies[40] which were included in line item STF 1074 for $435,074.  The government paid KI $217,537 (half of the value of the line item) on October 14, 2004, under Invoice No. 13220 and $217,537

---

[40] STF 1074 was earmarked for "Fab Fuel tanks, piping & ship to port" and Belcor supplied prefabricated fuel tanks and other related accessories.

(the remaining half) on January 6, 2005, under Invoice No. 13386.   There is no question that KI never fully paid Belcor for those materials despite having been reimbursed in full for the amounts billed.   In certifying in subsequent invoices that all payments due to subcontractors and suppliers from earlier invoice payments have been made, Mr. Rand must have known that statement to be inaccurate.[41]

KI responds that defendant's assertion of fraud ignores the larger context of the financial issues attributable to the Dushanbe project.   The fact that plaintiff was having financial difficulties does not vitiate the inaccuracy of the statement, however.   DOS and KI did not specifically agree to waive the terms of the certification, and we reject the notion that Belcor agreed to a "payment" plan under the terms of which KI was not actually in arrears to Belcor.

In fairness to Mr. Rand, however, we find that he did not mean to deceive the government.   He says, and we believe him, that he thought it was perfectly appropriate to do triage with limited funds by paying whatever suppliers could be paid or whichever ones could be minimally satisfied with a partial payment.   One hundred percent of the proceeds of those invoices went to placate suppliers, and thus he was willing to sign the certification.   We conclude that this nuanced interpretation does not, however, overcome its clear inaccuracy.   We remain persuaded that he should have known the statement was inaccurate and should not have signed it.[42]

The government asserts that these facts warrant two types of fraud defenses.   The first is premised on the Forfeiture of Fraudulent Claims Act, 28 U.S.C. § 2514 (2006) ("FFCA").   Under the FFCA, a claim against the United States is forfeited if there is fraud in the proof, statement, establishment or allowance of it.   The government argues that Mr. Rand's certifications are fraudulent within the meaning of the FFCA and result in the forfeiture of KI's affirmative claims.

To prevail under this statute, defendant must prove "'by clear and

---

[41] As of June 2005, KI still owed Belcor $60,869.87 even though KI had received all of the funds for STF 1074 by January 6, 2005.

[42] Defendant asserts that the administrative agency's decision to disbar KI because "Kullman's certifications were not accurate," JX 1249, bars the court from coming to a different finding here.   We need not consider the parties' arguments on collateral estoppel.   We agree with the finding.

convincing evidence that the contractor knew that its submitted claims were false, and that [the contractor] intended to defraud the government by submitting those claims.'" *Daewoo Eng'g and Const. Co. v. United States*, 557 F.3d 1332, 1341 (Fed. Cir. 2009) (quoting *Commercial Contractors, Inc. v. United States*, 154 F.3d 1357, 1362 (Fed. Cir. 1998)). Mere negligence or ineptitude does not clear the government's hurdle of establishing clear and convincing evidence of intent to defraud. *Veridyne, Corp. v. United States*, 105 Fed. Cl. 769, 801 (2012) (citing *Miller v. United States*, 550 F.2d 17, 22 (Ct. Cl. 1977)).

The Federal Circuit recently addressed the scope of 28 U.S.C. § 2514 in *Kellogg Brown & Root Services, Inc. v. United States*, 728 F.3d 1348, 1366 (Fed. Cir. 2013). After examining the statutory context of the provision, the Court of Appeals concluded that "the forfeiture statute is best understood as a companion requirement of claims procedure rather than a catch-all anti-fraud provision." *Id.* It wrote, "On its face, the statute is limited to those circumstances where the Government proves fraud 'in the proof, statement, establishment or allowance' of a claim at the Court of Federal Claims, not in the execution of a contract." *Id.* (quoting 28 U.S.C. § 2514) (rejecting Court of Federal Claims decisions which had read the statute to include fraud practiced during contract performance).

Defendant recognizes that this interpretation makes liability under the FFCA problematic here. KI has taken some pains to explain the circumstances of the certifications in the court proceedings. No fraud is being perpetrated on the court. There was certainly no effort to hide the facts or claim entitlement under a literal reading of the certifications. We conclude that plaintiff's claims cannot be forfeited under the FFCA.

The government also seeks a statutory penalty under the False Claims Act ("FCA"), which provides the following:

> [A]ny person who
>
> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
>
> . . . .
>
> (G) . . . is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000 . . . plus 3 times the amount of damages which the Government

sustains because of the act of that person.

31 U.S.C. § 3729(a)(1) (2006).  Under current regulations, the range of the fine is increased to $5,500 to $11,000.  28 C.F.R. § 85.3(a)(9) (2014).

To establish KI's liability under the FCA, the government must prove by a preponderance of the evidence, *Daewoo*, 557 F.3d at 1340, that "(1) the contractor presented or caused to be presented to an agent of the United States a claim for payment; (2) the claim was false or fraudulent; [and] (3) the contractor knew the claim was false or fraudulent."[43] *Young-Montenay, Inc. v. United States*, 15 F.3d 1040, 1043 (Fed. Cir. 1994). The government has "the burden to allege and prove that the statements were false under any reasonable interpretation." *United States v. Adler*, 623 F.2d 1287, 1289 (8th Cir. 1980).

While the FCA does not require proof of specific intent to defraud, it does require that the person or entity acted with knowledge.  31 U.S.C. § 3729(b).  The statute defines "knowing" or "knowingly" to "mean that a person" "with  actual knowledge of the information" either "acts in deliberate ignorance of the truth or falsity of the information" or "acts in reckless disregard of the truth or falsity of the information." *Id*.  The requisite scienter in a FCA claim is present in "not just those who set out to defraud the government, but also those who ignore obvious deficiencies in a claim." *Gulf Group Enters. Co. v. United States*, 114 Fed. Cl. 258, 314 (2013).  "An innocent mistake or mere negligence," however, is not enough to trigger FCA liability.  *Id.* at 316.  It is reckless when a company submits a request for payment that had not first been reviewed.  *United States v. Krizek*, 111 F.3d 934, 942 (D.C. Cir. 1997).

As we explain above, we find that Mr. Rand should have known that what he was certifying was false.  The fact that he thought it was accurate under a strained view of the circumstances does not make it any less false in the sense meant by the statute.

KI contends that there could have been no reliance by the agency on the certifications because the contracting officer and others were aware of KI's

---

[43] The government only seeks the statutory penalty and is not therefore required to show actual injury or damages.  *See Veridyne*, 105 Fed. Cl. at 808 ("To bring an FCA claim, the Government is not tasked to show that it incurred damages, although a showing of damages as a result of the fraudulent claim is required if the Government seeks to recover damages.").

financial distress.  Relevant individuals within DOS plainly were aware that KI was in financial distress, and some had reason to know that KI was not paying all its suppliers.  The question is whether that fact has any mitigating legal effect.

The Federal Circuit has not spoken to the question of when government knowledge of the circumstances behind an alleged fraud vitiates the fraud.  A number of other courts have spoken to the issue, however.[44]  The consensus of those courts appears to be that the government must have full knowledge of the particular fraud, which can, in some circumstances, show that the claimant "did not submit its claim in deliberate ignorance or reckless disregard of the truth."  *United States ex rel. Hagood v. Sonoma Cnty. Water Agency*, 929 F.2d 1416, 1421 (9th Cir. 1991).

Accepting that rationale and applying it to the present facts does not help KI.  While the relevant government officials were aware that KI was in financial distress, and Ms. Lowther must have been aware of the possibility in January of 2005 that KI was not making full payments to some suppliers and subcontractors, including Belcor, we are persuaded that she did not specifically know that the certifications submitted later in the Spring of 2005 were not correct with respect to Belcor.  Although Mr. Lowther heard from Mr. Bell in

---

[44] *See generally*, "The Government Knowledge Defense To The Civil False Claims Act: A Misnomer By Any Other Name Does Not Sound As Sweet," 45 Idaho L. Rev. 41 (2008) (The vast majority of cases have determined that government knowledge is not an absolute defense to an FCA action. . . . The significance of the government's knowledge is determined on a case by case basis.").  "The knowledge possessed by officials of the United States may be . . . relevant . . . [to] show that the defendant did not submit its claim in deliberate ignorance or reckless disregard of the truth."  *United States, ex rel. Hagood v. Sonoma County Water Agency*, 929 F.2d 1416, 1421 (9th Cir. 1991).  The Ninth Circuit's decision in *Hagood* has been cited and followed in the Second, Sixth, Seventh, and Tenth Circuits, as well as by this court and numerous other district courts.  *E.g., United States ex rel. Kriendler & Kriendler v. United Techs. Corp.*, 985 F.2d 1148, 1156 (2d. Cir. 1993); *Varljen v. Cleveland Gear Co.*, 250 F.3d 426, 430 (6th Cir. 2001); *United States ex rel. Durcholz v. FKW, Inc.*, 189 F.3d 542, 544-45 (7th Cir. 1999); *Shaw v. AAA Eng'g & Drafting, Inc.*, 213 F.3d 519, 543 (10th Cir. 2000); *Tyger Constr. Co. v. United States*, 28 Fed. Cl. 35, 59 (1993); *United States v. Fiske*, 968 F. Supp. 1347, 1352 (E.D. Ark. 1997); *X Corp. v. Doe*, 816 F. Supp. 1086, 1094 (E.D. Va. 1993).

January 2005 that KI was in arrears, Ms. Lowther did not have first hand knowledge of the situation. When she sent KI a letter requesting a response to the accusations being made by Belcor, KI never responded. Without being informed of KI's position on the issue, Ms. Lowther did not know whether KI was within its rights to withhold funds pursuant to the terms of the subcontract or whether KI was, in fact, unjustifiably behind in its payments to Belcor. She perhaps could have guessed the certifications were inaccurate, but we believe that for government knowledge to vitiate fraud, it must approach something like specific consent or an agreed-upon interpretation of the terms of the certification such that the parties agree that the certification does not mean what it otherwise appears to mean.[45] Passivity or lack of inquisitiveness would not vitiate the fraud.

In sum, we find that the five certifications from February through June were inaccurate insofar as they asserted that Belcor had been fully paid and KI officials should have known they were inaccurate. They were made with the intent to obtain payment from the agency and without concern as to whether the agency understood the real facts. We conclude that KI is responsible for five false certifications and award the government $27,500 on its counterclaim.

III.   Which party bore the responsibility for delays and additional costs associated with construction of a secure part of the embassy

As explained above, the agency halted work on the NOB due to concerns that portions of the CAA were being assembled from materials which had not been built or shipped under secure controls. This decision was an artifact of the mutually agreed upon changes made to the CAA design due to KI's inability to ship a module twelve feet high. The original plan called for the unsecure fourth floor utility space to be built of metal panels on top of the

---

[45] *See, e.g., United States ex rel. Ubl v. IIF Data Solutions*, 650 F.3d 445, 453 (4th Cir. 2011) (holding that the trial court properly admitted evidence of agency knowledge and approval of the contractor's billing practices and stating, "[f]or example, if the government with full knowledge of the relevant facts directed a contractor to file a claim that was later challenged as false, the fact that the contractor did what the government told it to do would go a long way towards establishing that the contractor did not knowingly file a claim known to be false."); *United States ex rel. Becker v. Westinghouse Savannah River Co.*, 305 F.3d 284, 288 (4th Cir. 2002) (holding that the agency's direction to the contractor to change budgeting and reporting codes vitiated any FCA liability because the agency colluded with the contractor in the falsehood).

enclosed third floor CAA. The parties agreed to a fix that turned the third floor modules at that point into five rather than six-sided boxes. The secure portion of the third floor was built and shipped in a secure manner, but it had no heavy metal roof. Because the additional two feet of space in the third floor was generated by welding two feet to the fourth-floor floor panel, the lid to the "shoebox" was integrated into the unsecure fourth floor design.

Plaintiff asserts that DOS required KI to undertake security mitigation efforts that were not part of the agreed upon statement of work at its own expense. It seeks compensation for extra work and material beyond the scope of the contract. It also contends that the delay caused the NOB to remain open to rain, which resulted in the need to do substantial mold remediation. KI was required to replace drywall and insulation in certain areas of the NOB. It argues that, if DOS had allowed Kullman to install the fourth floor panels when they first arrived on site, most, if not all, of the mold remediation effort at the NOB would have been unnecessary. There is no claim for mold remediation in any building other than the NOB.

The panels were not manufactured or shipped securely. It was only after the panels arrived in Dushanbe and six had been installed that the CO notified KI on August 20, 2004, that the panels could not be used because they had not been shipped securely. There is no question that DOS halted work and ordered KI to invest substantial time and money in retroactively determining whether the CAA space, including the fourth-floor floor panels, was safe. The question the court must answer is whether the contract required secure construction and shipment of the floor panels of the fourth floor because they became the roof of the secure space below. If not, then the agency ordered a constructive change under the contract's changes clause.

KI prepared and DOS approved a classified list of items that were to be manufactured and shipped securely. Both parties had a copy of the list. KI's copy of the list was kept in the safe and returned to the government when the contract terminated. Mr. Algire, Site Security Manager in Dushanbe, had a copy of the list. Thus, there can be no doubt there was a list that indicated what components were required to be shipped securely. Messrs. Algire and Lefkus testified that the fourth-floor floor panels were not on the secure shipping list. This makes sense, because otherwise Mr. Algire would not have alerted DOS in Washington to the problem. We also draw an inference against the government for its failure to produce the list at trial.

The fact that the components of the fourth floor were not on the secure list is also made likely by the way modifications were made to the height of the

CAA modules.  It appears that when the parties agreed on a design to separate the lower part of the CAA box modules from their tops by making the tops part of the fourth-floor floor panels, the need to maintain the identity of the roof panels with the third floor secure space was simply ignored.  The government seeks to shift to KI the responsibility for that mistake.

The government gives the following interpretation of events:

> Prior to the presentation of Kullman's solution, the fourth-floor floor panels  did not form a physical barrier to the NOB's CAA space, so they were not designated as secure.  However, Kullman's solution made the fourth-floor floor panels serve double-duty, both as flooring panels for the fourth-floor mechanical space (non-secure), and as the uppermost physical barrier of the CAA space (secure).

> At the November 6, 2003 meeting, Kullman did not raise any issues related to the manufacture or transportation of the fourth-floor floor panels in light of Kullman's proposed "shoebox" solution.  During that meeting, however   and even though neither party expressly discussed it with the other   both Kullman and the DOS generally understood that material designations as "secure" or "non-secure" were assigned prior to the fabrication stage and subsequently governed the treatment of the designated material at all stages of the project.  However, Kullman did not communicate that, as of November 2003, it had already completed the (non-secure) fabrication of the fourth-floor floor panels that it had now proposed to use as the uppermost physical barrier for the third-floor CAA space.

Def.'s Post-Trial Br. 24 (citations omitted).  We find no factual support for the assertion that KI understood that the prior designation of the CAA box as secure meant that the designation carried forward to the fourth floor redesign. This argument assumes that it was KI's responsibility to unilaterally change the design, security designations, manufacturing plans, and transportation plans to adjust for the redesign.  It was the agency which had the primary responsibility for protecting itself and for establishing a security plan that the contractor could follow.  If DOS wanted the fourth-floor floor panels manufactured and shipped securely, it should have identified the issue when the modifications were being discussed.  The factual recitation earlier in this opinion reflects the confusion within the agency itself concerning how to characterize the transition zone between the third and fourth floor.

76

In addition, the agency's actions in July 2004 bear out the lack of definite orders to KI in terms of secure construction of the floor of the mechanical space. On July 12, 2004, Mr. Algire e-mailed Mr. Little, Mr. Algire's Desk Officer within OBO, and Charles Kuehne, team leader for security procedures at DOS: "As there are no more secure shipments, that I am aware of, how is this stuff getting here[?] . . . Is the fourth floor south wing not CAA, just contiguous with the CAA?" JX 541 at 13. The jumbled responses from several quarters to that inquiry illustrates the lack of clarity within the agency on how to treat the materials in question. It is hardly surprising that KI assumed that none of the fourth floor mechanical space had to be treated as part of the secure construction protocol. Accordingly, we find that DOS issued a constructive change order when it halted construction and directed KI to undertake measures to ensure the security of the panels which became the ceiling of the third floor and the floor of the fourth floor.

It follows from this that the delay in closing the building to the elements must be assigned to the agency. KI was instructed on August 20, 2004, to cease installing panels pending the inspection that occurred in late September. It was not released to continue its panel installation work until September 28. The fourth-floor floor panels were fully installed by October 20.[46] We find that the delay resulted in an inability to timely weatherproof the NOB and contributed to the growth of mold and hence the need for mold remediation. While the government presented evidence that mold was a ubiquitous problem at the site and not unique to the NOB after the delay commenced, the evidence is overwhelming that the problems at the NOB were much more extensive and most likely dramatically exacerbated by KI's inability to continue work on the fourth floor just prior to the rainy period. The fact that rains did not start in earnest until November does not cut against KI's claim, because merely completing the installation of fourth floor panels did not seal the building.

Defendant did establish that there were KI-caused problems with

---

[46] Defendant contends that there was a delay in completing installation of the panels when a crane needed to hoist panels along one side could not be placed promptly because there was an insufficient foundation on which to place it. Although this is a disputed issue, we find plaintiff's evidence more credible on this question. We have the testimony of Mr. Allen, KI's on site superintendent that the area around the foundation of the south end of the NOB was fully in place when KI began installing panels on the fourth floor. The crane had to be securely placed, in other words, for any work to take place at that end of the building. We suspect that Mr. Farley's notes to the contrary probably reflect the situation at the north end of the NOB.

completely sealing the building after the fourth floor was assembled and that some modules arrived with mold already in place, but these factors would not vitiate the entire claim. KI's claim isolates costs associated with remediation only at the NOB and then reduces that amount by 25% to account for remediation that may have been otherwise necessary. The question is thus, whether 25% is a fair estimate of KI's share of the blame for mold problems. We find that it is. The bulk of the costs associated with remediation involved wholesale removal and replacement of gypsum board throughout the building. The government did not seriously question the legitimacy of the efforts that KI undertook to remedy the mold damage and we conclude that 75% of actual expenses is a fair estimate.

Accordingly, KI is entitled to recover all of its costs associated with after-the-fact security inspections and repairs and 75% of its costs associated with mold remediation. We reserve calculation of the precise amount to which KI is entitled.

IV.    Whether the termination for default was justified.

The government must prove by a preponderance of the evidence that the decision to terminate for default was justified.[47] *McDonnell Douglas Corp. v. United States*, 182 F.3d 1319, 1329 (Fed. Cir. 1999) (citing *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 765 (Fed. Cir. 1987)). It is particularly relevant here that the government is not limited to the reasons stated in the cure notice, but may rely on any rationale justifying the default termination decision based in facts that existed at the time of termination. *Empire Energy Mgmt. Sys. Inc. v. Roche*, 362 F.3d 1343, 1357 (Fed. Cir. 2004); *Joseph Morton Co. v. United States,* 757 F.2d 1273, 1277 (Fed. Cir. 1985) ("This court sustains a default termination if justified by circumstances at the time of termination, regardless of whether the Government originally removed the contractor for another reason."). Under the FAR, the government may terminate a contract for default when, after a 10-day period for the contractor to address the deficiencies stated in the cure notice, the contractor has failed to "[p]rosecute the work so as to endanger performance of [the] contract." FAR 52.249-9(a) (2014). The CO is justified in concluding that the contractor failed to prosecute the work if he or she reasonably believed that

---

[47] We do not evaluate the CO's termination for default decision with deference because "it is well-settled that the Court of Federal Claims reviews the decision to terminate a contractor for default *de novo*." *McDonnell Douglas Corp. v. United States*, 323 F.3d 1006, 1018 n.3 (Fed. Cir. 2003) (citing *Wilner v. United States*, 24 F.3d 1397, 1401 (Fed. Cir. 1994) (en banc)).

"'there was no reasonable likelihood that the contractor could perform the entire contract effort within the time remaining for contract performance.'" *McDonnell Douglas Corp. v. United States*, 323 F.3d 1006, 1016 (Fed. Cir. 2003) (quoting *Lisbon*, 828 F.2d at 765).

The completion date for the contract was June 20, 2004. The parties went well beyond that date, however, and a new substantial completion date was never formally established. In the May 21, 2005 Cure Notice, the CO writes, "The Government still anticipates substantial completion by September 1, 2005." JX 1027 at 2. The source of that substantial completion date is a mystery, but it need not be solved. Although we find that the government waived its right to insist upon the June 20, 2004 substantial completion deadline, the facts concerning KI's decision to leave the jobsite provide sufficient grounds for default termination.

In her termination notice of June 17, 2005, Ms. Lowther relied primarily on the assertion that KI had walked off the job with no intention to return in time to complete the work. We find that her interpretation of KI's conduct is correct. We now have the benefit of even more information than was available to her at the time, making it clear beyond doubt that KI elected to cut its losses by abandoning the contract. We specifically reject plaintiff's alternative explanation that it was planning to return to the site. There is no question, moreover, that even though most of the contract had been performed, substantial work remained. *See McDonnell Douglas Corp. v. United States*, 567 F.3d 1340, 1350 (Fed. Cir. 2009) (rejecting a per se rule that the government is never justified in terminating the contract for default in the absence of a deadline for substantial completion and instead insisting that the trial court conduct "an ad hoc, factual inquiry that allows careful examination and weighing of all relevant circumstances" pertaining to the termination), *vacated on other grounds*, *Gen. Dynamics Corp. v. United States*, 131 S. Ct. 1900 (2011).

Termination for default is justified when the contractor abandons the project while there is still work to be completed. *M.C. & D. Capital Corp. v. United States*, 948 F.2d 1251, 1256 (Fed. Cir. 1991) ((holding that the contractor "breached the contract by abandoning the work and leaving the job site prior to correcting deficiencies. The latter conduct itself justified the government's termination of the contract"); *PCL Constr. Servs. Inc. v. United States*, 47 Fed. Cl. 745, 808 (2000) ("[A]bandoning work on a contract without correcting deficiencies . . . justifies termination for default."); *Appeal of Big 3 Contracting Corp.*, ASBCA No. 20929, 79-1 BCA ¶ 13601, 1978 WL 2273 (Nov. 15, 1978) (citing *James E. Kennedy, Trustee v. United States*, 164 Ct.

Cl. 507, 514 (1964)) (holding that contractor "absolutely repudiated the contract" when it "left the job, removed its equipment and stated it would resume performance only upon a condition contrary to the requirements and necessities of the contract").

Accordingly, it is sufficient to sustain the termination for default to find that KI abandoned the work.  That it did so because of its financial distress is not a defense.  Nor would it be a defense if Ms. Lowther failed to consider KI's explanations in response to each cure item and did not permit KI sufficient time to cure or to meet the September 1, 2005 date for substantial completion.  The same is true of KI's argument that it could not have completed if it wanted to because the government had failed to provide permanent power to the site as of the date of termination.  We need not consider these arguments because of the overwhelming evidence that KI abandoned the project.  That fact alone trumps any possible shortcomings in contract administration. *See Appeal of Protective Coatings Co.*, ENGBCA No. 3205, 72-1 B.C.A. (CCH) ¶ 9431 (Apr. 13, 1972) (fact that government made work more difficult does not relieve contractor of obligation to continue to perform).

Although it is unnecessary to the result, we note as well that the false payment certifications would give us grounds for affirming the termination for default, even if that were not known to the agency at the time.   *See Lamb Eng'g & Const. Co. v. United States*, No. 01-225, 2002 WL 32933387 (Fed. Cl. Aug. 26, 2002); *see also Joseph Morton Co. v. United States*, 757 F.2d 1273, 1277-79 (Fed. Cir. 1985).

One final issue remains before the termination for default can be upheld.  That concerns plaintiff's assertion that agency employees acted with bad faith toward plaintiff.  We have rejected that assertion in connection with the formation of the contract.  Although many of KI's complaints about lack of cooperation, lack of civility, delay, etc. may be understandable, they do not reflect active bad faith so much as a poisoned working relationship which can be traced to KI's misunderstanding of what it had contractually obligated itself to do.  We also credit the likelihood that the way DOS managed this contract lead to unnecessary friction.  But the agency's sometimes passive-aggressive management style does not amount to bad faith sufficient to justify abandonment of the contract.

There was, however, one incident that warrants specific mention.  That concerns Ms. Lowther's interference in KI's attempt to borrow money from Tatonka Capital.  In the spring of 2005, after KI had failed to persuade DOS

to release more retainage, it approached Tatonka Capital about borrowing approximately $2 million, to be secured by monies the government was retaining.  According to Mr. Kullman, Tatonka had agreed in principle to loan KI the money, but backed out after Carol Hansen, Tatonka's Chief Executive Officer, had a conversation with Ms. Lowther.  He testified that "Lorri told her that my money was being held for retainage, that there was mold litigation going on, I was never going to get retainage, and, you know, things weren't in too good shape."  Tr. 1823 (Kullman).

Ms. Lowther's statements were not accurate.  There was no mold litigation going on and she never formally assessed liquidated damages.  We did not have the opportunity to explore Ms. Hansen's decision with her at trial.  She was not a witness.  Thus we do not know what Tatonka Capital would have done if Ms. Lowther had limited herself to the literal truth: the work had been held up for months because of mold problems; the parties disputed who was responsible for the mold; the contract allowed for liquidated damages; and, although liquidated damages had not yet been assessed, KI had been warned that they might be assessed because the contract was nearly a year beyond the original completion date.  We do know that Ms. Hansen wrote a letter to Mr. Kullman indicating that "While Ms. Lowther confirmed the retainage amount you indicated, she stated that Kullman was involved with mold litigation and that liquidated damages would be assessed.  While you made us aware of the geotech claim, these undisclosed issues prevent us from moving forward."  JX 1007 at 1.

There is no question, in other words, that Ms. Lowther's comments influenced Tatonka's decision.  What we do not know is whether Ms. Hansen would have backed off from making a loan if her knowledge was limited to what was true:  namely, the contract was way behind schedule and KI and DOS were in the middle of serious performance disputes.

Every contract carries with it the mutual exchange of promises not to treat the other party in bad faith.  Because government employees are presumed to act in good faith, however, proof of breach of the implied covenant not to act in bad faith carries a heavy burden for a contractor.  The burden can be met in circumstances, for example, in which government officials act with specific intent to injure the other party, or by abusing the government's position to target the contract benefits negotiated between the parties.  *See Centex Corp. v. United States*, 395 F.3d 1283, 1308-09 (Fed. Cir. 2005).

We can credit the possibility that Ms. Lowther was angry at plaintiff

81

and less than careful in her comments to Ms. Hansen.  KI had complained so much about her performance as contracting officer that Ms. Lowther was replaced for a time.  *See* Tr. 505-06 (Lowther).  Nor was she an impressive witness at trial.  She was frequently emotional and defensive.  We assume that, similarly, she would not have reacted well to the tension created in contemplating terminating a contract of this size for default and may well have resented KI's continued efforts to get her to release funding.  None of that allows us to presume that Ms. Lowther intended to injure KI, however. Indeed, we think it much more likely that she would have welcomed an outside lender injecting enough money into the contract to keep plaintiff on the job. We find that the most likely explanation of her comments to Ms. Hansen was carelessness.

## CONCLUSION

We conclude that KI cannot recover on its request for an equitable adjustment for the geotechnical work, that the government has proved its False Claims Act counterclaim, that the government has proved that the termination for default was justified, and that plaintiff has proved that the contract price must be adjusted to account for the constructive change order with respect to the CAA.  We reserve ruling on damages.  The court will contact the parties to arrange a status conference to address the damage calculation and fraud counterclaim.

s/Eric G. Bruggink
ERIC G. BRUGGINK
Judge